```
0001
 1              IN THE UNITED STATES DISTRICT COURT
 2               FOR THE DISTRICT OF NEW MEXICO
 3
 4   UNITED STATES OF AMERICA
 5   vs.                              No. 1:18-CR-3495-JCH
 6   DOUGLAS SMITH
 7
 8
 9              TRANSCRIPT OF PROCEEDINGS
10                      SENTENCING
11                  September 15, 2022
12
13   BEFORE:   HONORABLE JUDGE JUDITH C. HERRERA
                UNITED STATES DISTRICT JUDGE
14
15
16
17       Proceedings reported by stenotype.
18       Transcript produced by computer-aided
19   transcription.
20
21
22
23
24
25
0002
 1   A P P E A R A N C E S:
 2   FOR THE PLAINTIFF:
 3            OFFICE OF THE U.S. ATTORNEY
              P.O. Box 607
 4            Albuquerque, New Mexico  87103
              505-346-7274
 5            BY:  KYLE NAYBACK
              kyle.nayback@usdoj.gov
 6                 NOVALINE WILSON
              novaline.wilson@usdoj.gov
 7
     FOR THE DEFENDANT:
 8
              OFFICE OF THE PUBLIC DEFENDER
 9            111 Lomas Boulevard NW, Suite 501
              Albuquerque, New Mexico  87102-2373
10            505-346-2489
              BY:  ARIC GRANT ELSENHEIMER
11            aric_elsenheimer@fd.org
                   AMANDA LAVIN
12            amanda_lavin@fd.org
13
14                    I N D E X
15                                          PAGE:
```

1

```
16    Certificate of Reporter                          76
17
18
19
20
21
22
23
24
25
0003
 1           THE COURT:  Good morning to everyone.  The
 2    Case Number is 18-CR-3495.
 3           For the record can I please have counsel's
 4    appearances.
 5           MS. WILSON:  Good morning, Your Honor,
 6    Novaline Wilson on behalf of the United States.
 7           THE COURT:  Good morning, Ms. Wilson.
 8           MR. ELSENHEIMER:  Good morning, Your
 9    Honor, Aric Elsenheimer on behalf of Mr. Smith.  I
10    am joined at counsel table by Amanda Lavin with our
11    office and Dorna Sabini who is a new lawyer in our
12    office.
13           THE COURT:  Good morning to all of you,
14    and to Mr. Smith as well.  We are here today on
15    sentencing.  Let me ask the general question, is
16    everybody ready to proceed?
17           MS. WILSON:  Yes, Your Honor.
18           MR. ELSENHEIMER:  Yes, Your Honor.
19           THE COURT:  Let me ask is either side
20    intending to put on any evidence?
21           MS. WILSON:  No, Your Honor.  The
22    United States, we had a trial in this case.  I have
23    a record and we will rely on that for today's
24    sentencing.  We had intended to call no witnesses.
25           THE COURT:  How about allocution, anybody?
0004
 1           MS. WILSON:  Yes, Your Honor.  The
 2    victim's sister Melanie Montoya was going to be here
 3    this morning.  I see that she is not.  I have tried
 4    to be in contact with her this morning.  I am not
 5    sure where she is at.  I am hoping she is on her
 6    way.  It appears something may have come up but from
 7    the onset of this case she's always been involved.
 8    She always wanted to be here for sentencing, so I am
 9    hoping we see her soon.  And if she comes in, we
10    would like her to make a statement.
11           THE COURT:  All right.  Let me just ask,
12    is that the same person who wrote the statement that
13    you made available to us?  It was attached to the
14    original PSR.
15           MS. WILSON:  Yes, Your Honor, yes.
```

16          THE COURT:  I have read that statement, so
17 if she doesn't make it here today, it is not as
18 though I am not aware of what her thoughts are.
19          MS. WILSON:  Thank you.  We appreciate
20 that.
21          THE COURT:  Anybody that you intend to
22 have me hear from?
23          MR. ELSENHEIMER:  No, Your Honor, no
24 witnesses.  I do have a couple of demonstrative
25 exhibits.  I don't anticipate that will take longer
0005
 1 than 15 minutes, but no witnesses.
 2          THE COURT:  How are you intending to play
 3 that?  Do you want to play that before we get
 4 started?
 5          MR. ELSENHEIMER:  It is part of my
 6 argument for the objections so I can take it up with
 7 the objections, if that is all right.
 8          THE COURT:  I know you have filed
 9 objections.  I know this case went to trial.  I have
10 read all of your objections, you're sentencing memos
11 and so on.
12          Before I address the -- well, let me just
13 begin by taking up the objections.  Why don't we
14 start with the objections and Mr. Elsenheimer, if
15 you want to go first, that is fine.
16          MR. ELSENHEIMER:  Certainly, Your Honor.
17          Just for the sake of the record and to
18 make sure we are all on the same page, if I can just
19 review my objections.  I believe that the Probation
20 Office has agreed with a couple of those.
21          The first objection I had was to the
22 characterization of the offense of conviction.  I
23 believe that has been changed, and then the release
24 status has been changed.
25          So the first objection still under
0006
 1 consideration by the Court would be our objection to
 2 base offense level.
 3          The second objection would be to
 4 Mr. Smith's acceptance of responsibility.
 5          And then finally there are a number of
 6 objections that we had to the offense conduct
 7 description.
 8          So if the Court would like, I could begin
 9 with our objection to the base offense level, if
10 that is all right.
11          THE COURT:  Sure.
12          MR. ELSENHEIMER:  So the base offense
13 level in the PSR is currently listed as level 18.
14 That is driven by what I believe is an incorrect
15 application of the Sentencing Guidelines in light of

3

```
16   the jury's finding in this case at trial.
17             So the involuntary manslaughter guideline
18   Section 2A1.4 of the Sentencing Guidelines lists
19   base offense level of 12 if the offense involved
20   criminally negligent conduct.  And 18 if the offense
21   involved reckless conduct.
22             The PSR currently finds that the base
23   offense level is 18.  That, I believe,
24   mischaracterizes what the jury found in this case.
25             If we looked at the jury instructions in
0007
1    this case, the jury, this is Instruction Number 6 of
2    Document 201.  That is the Court's instructions to
3    the jury, that the instruction with regard to the
4    offense of involuntary manslaughter.  The second
5    element of that is that the jury had to find that
6    Jane Doe was killed while the defendant was
7    committing a lawful act in an unlawful manner or
8    without due caution and circumspection, which act
9    might produce death.
10            The key language there is the language
11   without due caution and circumspection.  That is
12   criminal negligence.  It is not recklessness.  It is
13   not anything else, it is criminal negligence or as
14   that particular instruction lists later on in the
15   explanatory section gross negligence.
16            The Government must show that his conduct
17   was grossly neglect.  That is the first paragraph of
18   Instruction 6 in Document 201 of the explanatory
19   notes of that particular instruction to the jury.
20            Gross negligence is not recklessness.  In
21   this case the base offense level is 12 because there
22   was a finding by the jury of what can only be
23   described as criminally neglect conduct.
24            Mr. Smith acting without due caution and
25   circumspection.  And I don't think there is any way
0008
1    to find that it is recklessness.  I think that if we
2    have -- if a finding, if this is reckless then there
3    is an involuntary manslaughter conviction that would
4    fall under the base offense level of 12, everything
5    would kick up to level 18 and that doesn't make
6    sense for the particular guidelines.
7             I would ask the Court to sustain our
8    objection and find that the base offense level is 12
9    based on the jury's finding that Mr. Smith acted
10   without due caution and circumspection.
11            THE COURT:  Remind me, at trial did you
12   object to the Court's Instruction Number 6?
13            MR. ELSENHEIMER:  We had proposed a
14   different instruction but I don't think I objected
15   to the Court's Instruction Number 6.  I can't
```

4

```
16   remember.
17            THE COURT:  I do remember that you had two
18   proposed instructions on involuntary manslaughter
19   that were slightly different than the Instruction
20   Number 6.
21            MR. ELSENHEIMER:  That is correct.
22            THE COURT:  But I couldn't, I didn't think
23   you objected to Instruction Number 6, okay.  Well,
24   you want to take them one at a time or are you okay
25   with going through all of yours and then we will
0009
 1   hear from the Government?
 2            MR. ELSENHEIMER:  Sure, I will be glad to
 3   do that, Your Honor.
 4            So the next objection we have is to the
 5   presentence report finding Mr. Smith did not accept
 6   responsibility.  Let me read, so this is on Page
 7   Number 2 of Document Number 222.  It is Defense
 8   Objection Number 4.  It is the PSR's or the
 9   Probation Office's summary of Mr. Smith's acceptance
10   of responsibility that we submitted in November of
11   2021.
12            Mr. Smith said in there and I am quoting
13   from that document.  "Early in the morning of May 5,
14   2018 I was in bed at my home in Espanola,
15   New Mexico.  I had been having problems with
16   break-ins and intruders on my property since the
17   year before.  Because of these break-ins, my brother
18   Dan and I put up motion sensors.  One of those
19   sensors was on the trailer behind my house that made
20   a doorbell like sound when someone walked by the
21   gate.
22            "Early in the morning, like around
23   midnight, I heard this ring, picked up my gun and
24   walked outside thinking it was probably raccoons
25   because I heard the sound earlier in the night.
0010
 1            "I opened the back door and stepped behind
 2   my house.  I looked out and saw a shadow fumbling by
 3   the door of the trailer directly behind my house.
 4   The person, when they heard me open the door, turned
 5   towards me and crouched down.  I was scared and
 6   fired my pistol to the left of the person to scare
 7   them away.  The person ran and I thought they had
 8   run around the side of my property and towards the
 9   road and left my property.
10            "To scare them away, I fired three more
11   times.  I was absolutely scared witless when I saw
12   the person behind my house.  And I fired my gun
13   because I was so scared.  I did not mean to shoot
14   someone.  I don't think I could have hit anyone when
15   I fired my gun.  The only reason I fired my gun was
```

16    to scare them away.
17         "I am truly sorry that I hit someone and I
18    know that I was not as careful as I should have
19    been."
20         That was Mr. Smith's statement as part of
21    his acceptance of responsibility.  The Probation
22    Office says this, The defendant did provide
23    Probation Office a statement of acceptance of
24    responsibility.  Although the statement was provided
25    after he was convicted at trial and following the
0011
1    disclosure of the PSR therefore it does not appear
2    that the defendant is entitled to a reduction of his
3    base offense level for acceptance of responsibility.
4         That is incorrect.  Mr. Smith since Day
5    One has accepted responsibility for this case.  And
6    I just want to summarize and I have a couple of,
7    like I mentioned, demonstrative videos or audio
8    recordings for the Court to consider.  The key note
9    there is the statement was provided after he was
10    convicted at trial and following disclosure of the
11    PSR.  It is true that that statement we submitted
12    that after, disclosed after the trial and we
13    received the PSR.
14         That statement is a summary of basically
15    everything that Mr. Smith said from the moment he
16    called 911 to the end of his testimony at trial.  I
17    just want to start with Mr. Smith's call to 911.
18    And what I have done is just taken a snippet of
19    that.
20         (Whereupon a portion of an audio recording
21    was played.)
22         MR. ELSENHEIMER:  That was Mr. Smith's 911
23    call.  Shortly after that, within five to ten
24    minutes, Espanola Police Department showed up at
25    Mr. Smith's house.
0012
1         This next clip is from Officer Rael's
2    lapel video when he first encounters Mr. Smith.
3    What I have done is I have taken the first half
4    minute or so of that.  Following that is when
5    Officer Rael goes a different place, but I've taken
6    just his first encounter with Mr. Smith and that is
7    what follows.
8         (Whereupon a portion of an audio recording
9    was played.)
10         MR. ELSENHEIMER:  Following that,
11    Your Honor, Officer Rael goes and does a protective
12    sweep of the house.  He goes through Mr. Smith's
13    house, he comes back and interviews Mr. Smith and
14    this is that interview.
15         (Whereupon a portion of an audio recording

6

```
16    was played.)
17              MR. ELSENHEIMER:  Mr. Smith's next
18    statement was later that morning around 5 o'clock,
19    so about three or four hours later with
20    Detective Abeyta at the Espanola Police Department.
21    That was a longer interview but I am going to play
22    two sections of that interview.
23              (Whereupon a portion of an audio recording
24    was played.)
25              MR. ELSENHEIMER:  This last clip is the
0013
 1    second clip from Mr. Smith's interview with
 2    Detective Abeyta.
 3              (Whereupon a portion of an audio recording
 4    was played.)
 5              MR. ELSENHEIMER:  That is the end of the
 6    clips that I have to show, Your Honor.  At the end
 7    of that last clip, Mr. Smith says, "As careful, as
 8    careful as I should have been under the
 9    circumstances."
10              Mr. Smith testified, I should also point
11    out, I don't have clips from Mr. Smith's interview
12    with the FBI.  He says substantially the same thing
13    that he said to Detective Abeyta.  He testified
14    before the jury, Your Honor heard his testimony.  I
15    direct Your Honor to Page 52 and Page 53 of the
16    trial transcripts going on to Page 54.
17              That is where Mr. Smith summarizes,
18    essentially, where he testified in the same way that
19    he had stated during his interview with Detective
20    Abeyta, his interview with the FBI, and then his
21    trial testimony.  In that testimony, let me just
22    read a very small section of that.  It is starting
23    on Page 52.  "And I stood there like I had been,
24    stood on my back porch, stood there looking and
25    watching.  And then I saw a shadow with his back, I
0014
 1    thought it was a guy.  His back was towards me and
 2    he was juggling the doorknob on the trailer.  And
 3    then he turned around and suddenly crouched down, I
 4    tried to get out the back door as quietly as
 5    possible in case it is raccoons, I would stand there
 6    and watch them.
 7              "But this guy turned around and crouched
 8    down and the way he couched down I thought I was
 9    about to be shot.  I thought he was going to start
10    blasting away at me.  Then there wasn't time.  I was
11    like a sitting duck.  Back behind me was white.  He
12    couldn't see me more than I could see him.  So I
13    cocked the pistol and I fired behind the trailer,
14    tried to get above the wire fence.  It is a hog wire
15    fence with a little square thin enough that if a
```

16   bullet hits it, it could go anywhere.
17           "I wanted it to go off behind him, behind
18   the trail in that area there where it wouldn't hit
19   him, and it wouldn't hit anybody."
20           He carries on, "That person rose and took
21   off running in a sprint as fast as they could.  At
22   that time my heart was pumping and I was shaky as
23   the dickens.  I thought that the person had run off
24   and run towards the street.  I wanted to warn them
25   again, warn this person who it might have been the
0015
 1   same guy, I have no idea.
 2           "And I fired but I was shaking just
 3   pointing towards the woodpile.  Because I was firing
 4   faster than I ever fired before, I swear when I
 5   pulled one time, I heard two shots.  I don't know if
 6   my pistol was capable of being a little machine gun.
 7   It had never done that before.  Because I heard two
 8   rounds in quick succession, I figured they had a
 9   gun.  That's why I went to reload mine because I had
10   fired.  I usually keep seven rounds in it.  It will
11   hold 14.  But if you leave them there for a long
12   period of time the clip spring just sort of gets
13   tired and it will jam so I keep it only about
14   halfway full.
15           "I had fired, I have no idea how many,
16   four, five, I thought.  I went back, I went out the
17   gate and my pickup truck was there so I used it as a
18   table."
19           Mr. Smith said in his trial testimony
20   exactly what he said in his FBI interview, his
21   interview to Officer Abeyta.  It was a shorter
22   interview to Officer Rael, but's essentially what he
23   told Officer Rael.  That is somebody who has
24   accepted responsibility.
25           The second clip of what he said to the
0016
 1   Officer Abeyta was, "I wasn't as careful, as careful
 2   as I should have been."
 3           The Probation Office recognizes that had
 4   Mr. Smith made this statement that we submitted to
 5   the Probation Office at any other point he would be
 6   entitled to acceptance of responsibility.
 7           Mr. Smith has made that statement.  What
 8   the statement we submitted was just a summary of
 9   everything.  It was a distillation of his multiple
10   times that he spoke with law enforcement.
11           I also want to point out, Your Honor,
12   Mr. Smith made two diagrams for law enforcement.  He
13   made a diagram for Detective Abeyta.  This is one of
14   the exhibits in the trial.  I can bring it up on the
15   screen if it would help Your Honor.  He made a

16  diagram for Detective Abeyta and he made a diagram
17  for the FBI.
18          That diagram, those diagrams Mr. Smith
19  made are these.  So he was directing he was showing
20  the direction in which he fired shots.  And it
21  might -- I don't know if Your Honor can see right
22  here, but where my cursor is it says, "first," that
23  was indicating his first shot toward the trailer.
24  He made the identical or substantially identical
25  diagram to the FBI.
0017
 1          The Government hired an expert to do a
 2  trajectory analysis.  That trajectory analysis
 3  confirmed what Mr. Smith said, that first shot the
 4  one that hit the side of the trailer was exactly as
 5  Mr. Smith said.  Mr. Smith's statements effectively
 6  helped law enforcement conduct their investigation
 7  of the case.  Mr. Smith's statements early on were
 8  confirmed by later trajectory analysis that the
 9  Government brought in to evaluate the scene.
10          This is all evidence of somebody who has
11  more than accepted responsibility.  Who called 911,
12  interviewed with law enforcement, immediately after
13  that interviewed with Detective Abeyta, three days
14  later interviewed with the FBI and testified at
15  trial.
16          I urge the Court to find that Mr. Smith is
17  entitled to two levels for acceptance of
18  responsibility.
19          Lastly, Your Honor, I have a number of
20  objections to the offense conduct descriptions.  I
21  am not sure how Your Honor wants to take those.  I
22  can rest on the briefing of those just because they
23  are very precise as to each of the separate
24  paragraphs of the Presentence Report.
25          THE COURT:  Let me ask you this.  I am
0018
 1  sure you have had a chance to review the addendum.
 2          MR. ELSENHEIMER:  Yes.  I have the
 3  addendum right here.
 4          THE COURT:  So in the addendum --
 5          MR. ELSENHEIMER:  As opposed to taking
 6  them line by line, let me make an overarching
 7  objection to the way that the offense conduct
 8  description is characterized in the Presentence
 9  Report.
10          The offense conduct description as the PSR
11  recognizes is drawn from the statement by the U.S.
12  Attorney's Office.  That is all substantially
13  similar to what is in the criminal complaint and the
14  allegations and the argument around the charge of
15  second-degree murder.

9

```
16              But it is not offense conduct drawn from
17    the trial.  A trial where Mr. Smith was found guilty
18    of the much lesser included offense of involuntary
19    manslaughter.  That is our substantial objection.
20    It is language that the jury specifically found was
21    not correct as a matter of law.  Mr. Smith was
22    convicted of involuntary manslaughter.
23              The language in the PSR affects conduct
24    still is riddled with language that would be more
25    appropriate to a conviction of second-degree murder.
0019
 1    That is our overarching objection to the offense
 2    conduct description.
 3              THE COURT:  Just so when I hear from the
 4    Government, I will state that I recognized that
 5    Probation prepared the offense conduct paragraphs
 6    from information provided by the Government.  And to
 7    the extent they reviewed reports by law enforcement
 8    and, of course, those were also more from the
 9    viewpoint of the Government, I would say my reading
10    of the offense conduct probably agreed a little bit
11    more with your assessment than with the Government's
12    assessment.  In other words, the offense conduct
13    looks like the Government's argument for
14    second-degree murder as opposed to what the jury
15    actually found, which was involuntary manslaughter.
16              So if the Government is providing
17    Probation with the facts, then I am not surprised
18    that that's how the paragraphs read.  So I do think
19    that, I have read your briefs, so I will, of course,
20    hear from you in a moment, but I am concerned that
21    there are, you know, the Government put the language
22    together in a way that sounds like it would support
23    second-degree murder.
24              The defense objects and states facts that
25    sound more favorable to the defense, which is
0020
 1    basically what happened at trial.  The jury did not
 2    convict the defendant of second-degree murder.
 3              So I do think that the offense language
 4    could be modified some, but, and I say that after
 5    having reviewed the Government's response in
 6    writing.  I haven't heard your comments today, but I
 7    just want you to know before you address the Court,
 8    that I do share some of the concerns, so you might
 9    be prepared to address that.
10              MR. ELSENHEIMER:  I don't believe I have
11    any other objections.
12              THE COURT:  So the reason I asked you
13    whether you had had a chance to the review addendum
14    is because the addendum has the Probation
15    Department's response to your concerns.  And I just
```

```
16   want to know whether the addendum captures all of
17   your concerns.  So that was the only reason I was
18   asking.
19          The Defense Objection Number 5 and then
20   there is the Government response, Probation, I guess
21   Probation didn't take it line by line but --
22          MR. ELSENHEIMER:  I guess, I don't
23   understand.
24          THE COURT:  So your objection has a lot of
25   specific objections to particular sentences in
0021
 1   particular paragraphs.  So I want to make sure I
 2   captured them all as I was reviewing your objections
 3   and the Government's response.
 4          The Government, I am not sure whether the
 5   Government responded to each of your specific
 6   sentences line by line like you set them out.  So I
 7   just want to make sure I didn't miss something, that
 8   is all.
 9          MR. ELSENHEIMER:  No.  I think that
10   characterizes my objections.
11          THE COURT:  Because, you have a handful
12   of, maybe more than a handful of objections to
13   specific sentences and so it is a lot more detailed
14   than we normally see, a lot more of factual
15   objections, so I want to make sure I get them all.
16          Anything else?
17          MR. ELSENHEIMER:  I believe it is all
18   characterized there.
19          Nothing else, Your Honor.
20          THE COURT:  All right.  I will hear from
21   Ms. Wilson next.
22          MS. WILSON:  Thank you, Your Honor.  I'll
23   go ahead and just start with the objections since
24   the last issue we talked about --
25          THE COURT:  Well, they are all objections.
0022
 1          MS. WILSON:  The objection specifically to
 2   the factual basis.  Thank you, Your Honor.
 3          From the United States' perspective there
 4   are only two witnesses that were there that night.
 5   And defendant, who is the surviving witness, so his
 6   version of what happened is what, I believe, much of
 7   his objections are based on.
 8          The United States submits but it still
 9   doesn't change the fact that at trial we heard that
10   he shot multiple times, four times, not once, not
11   twice, not even three times, but four times at a
12   person he knew that was a person.  He talks about a
13   shadow and eyeballs.  He knew that was a human being
14   and he still shot in that direction after the person
15   started to run.  Aimlessly shooting into the dark
```

16    night.
17              Those are still the facts, no matter if
18    defendant has objections to specific language,
19    specific characterizations.  And the United States
20    is prepared to make concessions on that.  I don't
21    believe it is material to the sentencing and to the
22    extent the Court wants to go through those, we are
23    fine with that.  But it still doesn't change the
24    fundamental facts in this case.
25              Going to the acceptance of responsibility
0023
 1    arguments, as Your Honor is aware from our briefing,
 2    there are rare circumstances, it can be provided
 3    after a defendant testifies at trial or goes to
 4    trial, but acceptance of responsibility after trial
 5    is rare.  Because at times people go to trial to
 6    argue that they aren't guilty based on the mens rea.
 7    They don't have the requisite mens rea, and that's
 8    what happened in this case.
 9              Yes, he says he killed Maria but he says
10    it was an accident.  I didn't mean to.  We proceeded
11    to trial, of course, on the theory of second-degree
12    murder, extreme recklessness and we felt that based
13    on the evidence presented, the Court could instruct
14    the jury that alone regardlessness could be lower,
15    so involuntary manslaughter also went to the Court,
16    included a lesser offense.
17              We believe that he still challenged at
18    that point at trial his requisite mens rea.  And the
19    case law is clear that that is not a basis for
20    acceptance of responsibility and we would submit
21    that this is like US v. Tom as submitted in our
22    briefing and he's not entitled to that acceptance of
23    responsibility.  Because he maintained that this was
24    an accident.  He didn't mean to do it, and that is
25    why we went to trial.
0024
 1              In response to the level of enhancements
 2    that were applied in the PSR, with regard to
 3    recklessness, the United States submits, again, that
 4    this was a step-down from second-degree murder.  We
 5    did talk to the Court during the time we were
 6    discussing the jury instructions.  And it is my
 7    recollection that I did agree that that level of
 8    recklessness was an issue for the jury and that if
 9    it were not the high extreme level of recklessness
10    warranted in our second degree, that the step-down
11    was appropriate for a lesser degree of recklessness.
12              And again, Your Honor, it just doesn't
13    change the facts in this case that the defendant
14    knew he was shooting at a human being, shot four
15    times into the dark.  In the interview that we just

16  heard, he says he couldn't see but he still
17  continues to shoot.  And he said if he would have
18  seen, he would have shot to miss.  He intended to
19  shoot to miss.
20          But, Your Honor, we saw that it was dark
21  that night.  You can see from the footage that there
22  is foliage there in that area and he was just
23  shooting.  He said he wasn't thinking, he was just
24  pulling the trigger as fast as he could.  We submit
25  that that is more than criminal negligence.
0025
 1          Some of the examples of criminal
 2  negligence that we submitted to the Court, leaving a
 3  child in a locked car, leaving a loaded firearm for
 4  a child, that is criminal negligence.
 5          The intentionally pulling a trigger more
 6  than once, four times at someone you know who is a
 7  human being in the night, we would submit that that
 8  is reckless, that the PSR level of 18 has been
 9  appropriately assessed.
10          I am happy to answer any questions you
11  might have.
12          THE COURT:  Well, let me hear any
13  additional comments and then I will have some
14  questions, probably, for you.
15          MR. ELSENHEIMER:  Very briefly,
16  Your Honor.  May I stay here?
17          THE COURT:  Yes, you may.  As long as my
18  court reporter can hear you, I am fine with that.
19          MR. ELSENHEIMER:  Your Honor, it is
20  reserved for rare cases after trial where there is
21  acceptance of responsibility, and this is one of
22  those rare cases.  And I won't say anymore, but you
23  heard the amount of times that Mr. Smith has said he
24  called 911, he met law enforcement three times, and
25  testified at trial.  He has accepted responsibility
0026
 1  and he should get the two level reduction.
 2          With regard to the base offense level,
 3  Mr. Smith, this is an accident.  It was
 4  unintentional shooting.  Mr. Smith did not think he
 5  was shooting at someone.  He did not think he was
 6  going to hit someone.  It was an accident.  That is
 7  why it is involuntary manslaughter and the finding
 8  of the jury was without due caution and
 9  circumspection and that is gross negligence.  It is
10  criminal negligence, it is not recklessness and that
11  puts this case at the base offense level of 12.
12          THE COURT:  All right.  So I will start, I
13  guess, then, with the base offense level.  You know,
14  when I look at the Court's instruction to the jury,
15  I see the language that Mr. Elsenheimer directed the

```
16    Court's attention to.
17              The second prong of the elements that Jane
18    Doe was killed while the defendant was committing a
19    lawful act in an unlawful manner or without due
20    caution and circumspection which act might produce
21    death.
22              And then I do see the Page 2 explanations
23    to the jury.  And our instructions often contain
24    language that help explain to the jury what certain
25    elements might mean.  And in this case I instructed
0027
 1    the jury that in order to, I am not going read the
 2    whole thing, but in order to prove involuntary
 3    manslaughter the Government need not prove that the
 4    defendant specifically intended to cause the death
 5    of the victim.  So we have got, we have heard about
 6    that.  But it was proved more than that the
 7    defendant was merely negligent or that he failed to
 8    use reasonable care.
 9              It goes on to say, The Government must
10    show that his conduct was grossly negligent and that
11    he had actual knowledge that his conduct was a
12    threat to the lives of others or that he had
13    knowledge of such circumstances as could reasonably
14    be said to have made foreseeable to him the peril to
15    which his acts might subject others.
16              And then this next sentence is I think
17    important.  The Government must prove gross
18    negligence amounting to wanton and reckless
19    disregard for human life.
20              The instructions go on to say that the
21    substantive distinction between second-degree murder
22    and involuntary manslaughter is the severity of the
23    reckless and wanton behavior.
24              Second-degree murder involves reckless and
25    wanton disregard for human life that is extreme in
0028
 1    nature, while involuntary manslaughter involves
 2    reckless and wanton disregard that is not extreme in
 3    nature.
 4              So I think that the offense level was
 5    properly calculated in the PSR.  I think that there
 6    is a degree of recklessness that is taken into
 7    consideration in the Court's instruction to the
 8    jury.  So I do think that the base offense level is
 9    18, not 12, and so the objection is overruled.
10              I will go next to acceptance of
11    responsibility.  You know, it is clear that the
12    defendant just immediately admitted that he shot his
13    firearm and he has not challenged the fact that
14    somebody died as a result.  So he has admitted from
15    the beginning to the facts that we heard that were,
```

16  that we both heard from Mr. Elsenheimer's reading
17  and also from what we heard and saw on the
18  recordings.
19          So that part is pretty clear, he has
20  admitted from the beginning.  The question is did he
21  accept responsibility for the offense.
22          Now he was charged one count second-degree
23  murder.  The jury found him not guilty of that.  So
24  it is hard to hold it against the defendant, so to
25  speak, that he chose to go to trial when he went to
0029
 1  trial and he won on the only count that the
 2  Government brought against him.
 3          So whether or not he accepted
 4  responsibility for second-degree murder is not of
 5  any value for us here.  He was convicted of
 6  voluntary manslaughter.  And I don't know what he
 7  may have done pretrial to demonstrate his acceptance
 8  of responsibility for that offense.
 9          Now, I know the defense submitted an
10  involuntary manslaughter jury instruction.  The
11  Government didn't, but I don't know if submitting
12  that instruction constitutes acceptance of
13  responsibility for the offense, especially when, at
14  trial the defendant argued against a finding of
15  guilt for involuntary manslaughter.
16          So this is a very unusual case.  I mean,
17  the defendant was charged with one thing,
18  second-degree murder, he won on that so why would he
19  accept responsibility for that pretrial.  He is the
20  one who submitted an instruction for involuntary
21  manslaughter.  Granted, I gave a different
22  instruction not the one the defendant proposed.
23          So did the defendant accept responsibility
24  for involuntary manslaughter before trial?  I have
25  no way to gauge that.  So unless anybody has any
0030
 1  other information for the Court, I am inclined to
 2  overrule the objection for additional reduction for
 3  acceptance of responsibility because I have nothing
 4  that tells me he accepted responsibility for the
 5  offense.
 6          I agree he admitted to firing, and I agree
 7  he told us why.  He had an intruder on his property
 8  at 1:00 in the morning and, yes, it was dark, but I
 9  didn't hear him accept responsibility for the
10  offense.  So for that reason, the Court will
11  overrule the objection.
12          I don't have much to say, I will hear from
13  you in a moment.  I don't have much to say on the
14  offense conduct objections.  I think it probably
15  needs to be reworked a little bit, but I would be,

15

16    yeah, I don't think that it is useful to sit here
17    and go line by line.  I think what I would suggest
18    is that before we finalize any judgment in this case
19    I will ask you-all to try to get together on a more,
20    I would say, actual recitation of the offense
21    conduct.  And again, you know, I read the offense
22    conduct that was provided by the Government to
23    Probation and it, I mean, it does look like
24    second-degree murder, not involuntary manslaughter.
25    So I would prefer that it be a little bit more in
0031
 1    line with how things actually came out.
 2              I think the other thing I wanted to say
 3    about the recklessness in terms of the offense level
 4    is I probably would see your side, the defense side
 5    of it more if the defendant hadn't fired his weapon
 6    basically at the same height as a human being.  I
 7    mean, if he had shot above up in the air or maybe
 8    not straight up in the air, but I mean over the
 9    victim's head, he didn't know if it was a man or a
10    woman.  I heard him say he would have felt better if
11    it was a big man but, you know, he wouldn't have
12    missed the big man either if he, if this individual
13    had been a big man.
14              So what I am saying is if he truly was
15    trying to miss a person, he didn't shoot at the
16    level that would miss a person.  I understand it was
17    dark, it was 1:00 in the morning.  I understand he
18    couldn't see very well, he saw shadows.  I
19    understand that he was scared.  I understand how
20    people react in the middle of the night when there
21    is an intruder on the property is a fearful time.
22    But I think that the defendant's line of fire
23    supports a finding of the jury's finding of
24    involuntary manslaughter and recklessness that may
25    not be extreme but reckless and wanton disregard
0032
 1    nevertheless.
 2              So that is another thing I wanted to
 3    mention in terms of my ruling on your base offense
 4    level objection.  So I think you had something you
 5    wanted to say, Mr. Elsenheimer.  It looked like you
 6    were trying to get the Court's attention.
 7              MR. ELSENHEIMER:  You had asked us about
 8    what, if there is any evidence of what Mr. Smith did
 9    before trial in terms of accepting responsibility
10    for involuntary manslaughter.  I just, what I, to
11    answer that, what I want to just point out, again
12    when Mr. Smith was interviewing with Detective
13    Abeyta he said, "I wasn't as careful, as careful as
14    I should have be under the circumstances."
15              I don't know what other, what else one has

16   to do to accept responsibility.  I just, factually
17   he effectively admitted everything that the jury
18   found.  I don't see how there can ever be acceptance
19   of responsibility in a case in a circumstance where
20   someone goes to trial if it is not here.  He has
21   said everything that essentially the jury was later
22   inclined in finding him guilty of involuntary
23   manslaughter.  I think that is the basis for
24   acceptance given his statements and specifically the
25   statements about just under the circumstances he
0033
 1   knows he could have been more careful.
 2          THE COURT:  Well, it is a bit of an
 3   unusual case in the sense that he gave his
 4   statements to law enforcement, none of which
 5   included any kind of a denial about shooting.  But
 6   he goes to trial and prevails on the one count that
 7   was brought by the Government against him.
 8          So as I said before, it is not necessarily
 9   in keeping with the authority the Government
10   provided in the brief.  I mean, yeah, the Tom case,
11   I think the defendant went to trial but was
12   convicted of the charge that was brought against him
13   even though he challenged the mens rea.  This is
14   different.  He challenged and the jury agreed with
15   the defendant that he was not guilty on the count of
16   second-degree murder.  But I still am of the mind
17   that while the defendant admitted to all the facts,
18   I just don't see where he admitted or accepted
19   responsibility for involuntary manslaughter.  So
20   that is, I think the guideline requires the
21   defendant to accept responsibility for the offense
22   in order to get the reduction and points, so I am
23   overruling the objection on base offense level.  I
24   am overruling the objection on acceptance of
25   responsibility, and I want to work with counsel
0034
 1   separately on the offense conduct and we will do
 2   that before the judgment is finalized.
 3          Now the Government also had an objection,
 4   so let's take that one up.
 5          MS. WILSON:  Thank you, Your Honor.  The
 6   United States is asking for the obstruction
 7   enhancement to be applied in this case.  The
 8   defendant made statements under oath and he
 9   testified about two uncorroborated narratives with
10   the willful intention of providing false testimony.
11   That is the Government's assertion.
12          He, as we heard in the recording,
13   initially states that he shot to miss even though
14   later he says it was too dark, I couldn't see, but I
15   shot to miss was his intention originally.  Later on

16    that evolved into shooting at a woodpile.  None of
17    those statements had come to any law enforcement
18    officers before he testified.
19              The United States would submit that he
20    submitted this fact, this untrue statement which is
21    material because it cuts against his statement about
22    where, why he was doing what he was doing, where he
23    was doing and goes directly to his mens rea.
24              The United States submits that this is a
25    manufactured set of events and again cannot be
0035
 1    attributed to any confusion that he may have had,
 2    mistake or faulty memory.  The second statement that
 3    the United States also has concern about is the
 4    statement that his firearm was, he experienced his
 5    firearm was firing two rounds with one trigger pull,
 6    nothing supports this statement.  We believe the
 7    statement is material because he uses the statement
 8    to justify his actions and why he continued to fire
 9    as much as he did.  And that contributes to his
10    recklessness with the firearm.
11              Again, there is nothing to show that these
12    statements were made out of confusion, mistake, or
13    faulty memory.  None of these, neither of these two
14    statements were made to any law enforcement and the
15    United States submits that under 3C1.1 that the
16    enhancement for obstruction should apply.
17              I am happy to answer any questions you
18    might have.
19              THE COURT:  Okay.  Thank you, Ms. Wilson.
20    Your response?
21              MR. ELSENHEIMER:  Your Honor, I will stand
22    on what we said.  This is not appropriate for an
23    obstruction enhancement.  Mr. Smith was recollecting
24    that he heard his gun fire faster than it had ever
25    fired before because in moments of extreme panic and
0036
 1    fire and adrenaline we perceive things differently,
 2    and that is just what he was expressing.  It is not
 3    even remotely close to perjury.  And with regard to
 4    the woodpile, part of the clip in talking to
 5    Detective Abeyta you see that Detective Abeyta says
 6    he reaches to the side, he said, so over to the
 7    wood, over to the wood and Mr. Smith says yes.  They
 8    are talking about the woodpile.  It is right there
 9    on Mr. Smith's property.  Obstruction is nowhere
10    near this case.
11              THE COURT:  All right.  Anything further?
12              MS. WILSON:  Just in response to that.
13    The defendant never made any statement specifically
14    about a woodpile.  I think how Detective Abeyta
15    decided to characterize the trees in that area could

18

16  have been arguably woods.  That wasn't explored.  I
17  don't know if that is the case but I think
18  characterizing it in that way, it doesn't take away
19  from the fact that there is nothing to show that
20  that statement was made on any prior occasion.
21          THE COURT:  Thank you.  Well, I am going
22  to overrule that objection.  I don't feel that the
23  record gives the Court any basis to find that the
24  defendant perjured himself.
25          The firing of two rounds with one pull of
0037
 1  the trigger, so to speak, I think that the defendant
 2  has been, he has talked about that and even today he
 3  said that he must have shot five rounds because
 4  there were only two rounds left in the weapon when
 5  he thought he had fired four rounds.
 6          He was cross-examined about that at trial
 7  and the concern apparently was that he may be trying
 8  to set up a self-defense claim.  But he was
 9  cross-examined on that at trial, you are not
10  claiming self-defense, he said no.  And that was
11  questioning by the Government.  I just don't see
12  that I could find that there was perjury on the
13  firearm.  I mean, he is telling us what he thought,
14  what he was thinking at the time.  I can't conclude
15  from what I heard that it was manufactured.  And the
16  same with the woodpile.  Saying that he shot at the
17  woodpile is not a whole lot different than telling
18  us that he thought he was shooting to miss the
19  victim.  I don't see enough to find that the
20  defendant committed perjury on telling us that he
21  shot toward a woodpile.  He was asked about towards
22  the woods and does that mean woods or does it mean
23  woodpile.  I just don't have enough to say that
24  there was perjury, so I am going to overrule the
25  objection.
0038
 1          So I think I have given you what we need
 2  to proceed with the hearing.  Now, the offense
 3  conduct, I think we all know what the offense
 4  conduct was, so I feel like we can proceed with this
 5  hearing even though we don't necessarily have
 6  agreement on what the specific language in the PSR
 7  will be regarding the offense conduct.
 8          Is that okay with everybody?
 9          MR. ELSENHEIMER:  That is fine with us,
10  Your Honor.
11          MS. WILSON:  Yes, Your Honor.  For the
12  record, the United States doesn't mind conceding to
13  the specific concerns that defendant had within the
14  offense conduct and when we rework it we will keep
15  that in mind.

```
16              THE COURT:  All right.  Sounds good.  Let
17  me ask Probation, is that workable for you?  You can
18  get this, get these changes made before we finalize
19  the judgment?
20              THE PROBATION OFFICER:  Yes, Your Honor,
21  that would be no problem.
22              THE COURT:  I assumed as much, but I
23  thought I should doublecheck.
24              THE PROBATION OFFICER:  Thank you.
25              THE COURT:  All right.  Thank you.  So
0039
 1  having then ruled on the objections, the Court will
 2  adopt the factual findings that are contained in the
 3  Presentence Report so that no evidentiary hearing
 4  will be necessary today.
 5              And so what I will do is hear from
 6  everybody about what you-all believe the appropriate
 7  sentence should be.  I will, of course, give
 8  Mr. Smith an opportunity to address the Court as
 9  well.  The Government may or may not have someone
10  who wants to address the Court.
11              MS. WILSON:  We do, Your Honor, yes.
12              THE COURT:  Since you do, let me hear from
13  that individual first.
14              Give us your full name and spell your last
15  name for the record.
16              THE WITNESS:  My name is Melanie Jo
17  Montoya, M-O-N-T-O-Y-A.
18              THE COURT:  Thank you.
19              MS. MONTOYA:  These statements were
20  unbearable to write.  How can I put into words the
21  loss of our unending regrets for me and my family.
22  My baby sister's name is Maria Elena Gallegos.  She
23  was born on November 3, 1981.  She was my only
24  biological sister and the last person left in my
25  family.  Now it is just me with my children, my
0040
 1  nephews, nieces, great nephews and great nieces.
 2              She was taken from us on May 5, 2018.  My
 3  sister Maria is two years younger than me and I was
 4  always her protecter.  I would never let anyone pick
 5  on her when we were growing up.  As we grew up we
 6  lived next door to one another and helped each other
 7  with our kids and celebrated everything together.
 8              She was my baby-sitter while I was at work
 9  and I was hers.  Maria was compassionate, giving and
10  loving.  Her and my son Nicholas shared a special
11  bond and they both lost their lives due to
12  unnecessary gun violence.  I want everyone to know
13  what an amazing sister, friend, mother and auntie
14  she is and always will be.  She was funny, caring
15  and was so proud of her kids, no matter what choices
```

20

```
16      she made in her short life.
17              Me and her children, Eric Santana,
18      Samantha Santiago, Don Quixote, and little Xavier
19      and her grandchildren, Jacob, Julian, Stephanie and
20      her nieces Victoria and Danielle love her and miss
21      her every day.  I wish she could be here to see her
22      grandson Julian grow up, as I am raising him now.  I
23      know if she was still here she would want that
24      responsibility, but I am doing this for her.
25              The chance of me telling all of this to my
0041
 1      sister was taken from me.  I will never get to see
 2      her smile at me, hear her voice or see her get the
 3      opportunity to change her life for the better.  We
 4      were robbed of this and so was she.
 5              She was my and the kids only person.  We
 6      don't have our mom, our dad.  We don't have our
 7      grandparents.  We don't have our aunts and uncles,
 8      or cousins on my mom's side anymore it is just me
 9      and all the kids now.  I wish every day she was
10      here.  Me and the kids need her and are lost without
11      her.
12              I feel that anyone who chooses to take
13      someone's life with a weapon should be 100 percent
14      held responsible to the fullest extent of the law.
15      There is no excuse to aimlessly firing a weapon in
16      the middle of a town and get away with it.  It could
17      have been anyone's sister, anyone's mom or child,
18      but sadly it was mine.
19              I know in this life your punishment will
20      be confinement and that brings my family some
21      comfort knowing that you will not get the
22      opportunity to life, harm or be negligent with
23      another human life.  You will have to answer for
24      your sins in another life and live with yourself as
25      well.
0042
 1              My words and intention aren't going to be
 2      paid to you anymore.  My sister will live along with
 3      her kids and her grandkids forever.  I will make
 4      sure they know what an amazing person she was and
 5      how loved she was and always wanted us to be happy.
 6      I am never going to let her be forgotten.  She was
 7      my baby sister, and I would know she would do the
 8      same for me.
 9              Thank you.
10              THE COURT:  Thank you, Ms. Montoya.
11              Anyone else, Ms. Wilson?
12              MS. WILSON:  No, Your Honor.  Thank you.
13              I'm sorry, apologies, Your Honor, there is
14      one more.
15              THE COURT:  So before you begin, give us
```

16    your name and spell your last name, please.
17            MS. HERRERA:  Santana Herrera,
18    H-E-R-R-E-R-A.
19            I want to start out by saying how much we
20    miss my mom, me and all my siblings.  She might have
21    not lived the best life, but one thing my mom always
22    was, was good to us.  She always made sure that we
23    were loved and we were cared for.  She never put us
24    in harm's way and my mom has never been an evil
25    person.
0043
 1            So the fact that something so bad happened
 2    to her is so hard for us.  Because I don't have a
 3    dad and as my aunt said, I don't have grandparents.
 4    My aunt is all we have.  I have a lot of siblings
 5    and now we have nobody.  All my siblings have gotten
 6    separated.  I have siblings that I don't get to see
 7    no more.  I have siblings that we just don't talk
 8    and our lives are just bad without my mom.
 9            And I am a mom myself.  So to go on
10    without her and to try to learn to be the best mom I
11    could be is so hard.  And I just want to say that I
12    hope my mom gets the justice she deserves because
13    she was such a beautiful woman and she didn't
14    deserve the pain she felt.  She didn't deserve to be
15    left on a cold street dark in the night alone
16    hoping -- I don't know what her last thoughts were.
17    If she was hoping that her kids are going to be okay
18    because that is the only thing my mom ever cared
19    about was making sure we were okay.
20            So it breaks my heart to know that she was
21    left alone on a cold floor just hurting by herself
22    with no compassion, no comfort, with nothing.  And
23    his life might be able to go on, but my mom will
24    never get to see another day.  We will never get to
25    see another day with my mom.  Our children will
0044
 1    never get to know their grandmother.  And I just
 2    hope that she gets the justice she deserves,
 3    Your Honor.
 4            Thank you.
 5            THE COURT:  I believe that concludes the
 6    comments from the victims; is that right?
 7            MS. WILSON:  Yes, Your Honor.
 8            THE COURT:  All right.  So now I will take
 9    your arguments on the appropriate sentence and then
10    I will also hear from Mr. Smith.
11            MR. ELSENHEIMER:  Thank you, Your Honor.
12    May we stand at the lecturn?
13            THE COURT:  Yes.
14            MR. ELSENHEIMER:  Your Honor, on May 5
15    Mr. Smith was laying in bed in his house in

16    Espanola.  He was not -- that night he was not out
17    looking for trouble.  He did not go out as a
18    vigilante to seek trouble.  He was not seeking to
19    confront anybody.  He was in his bed and he saw an
20    intruder in his backyard.
21            And, Your Honor knows what happened in
22    this case, I don't need to rehash it or go through
23    it again.  He was somebody who was terrified when he
24    confronted an intruder and he did not act with the
25    care he should have exercised but he acted because
0045
1    he was under the -- he was under the influence of
2    fear.  That is one of the things that he said to the
3    FBI.  They said, were you under the influence of
4    anything and he said he was under the influence of
5    fear and that is absolutely true.  He was scared
6    when he was back there and because of that fear he
7    acted in the way that he did.
8            He did not go out seeking trouble.  He was
9    in bed that night in his home and we know that
10    Mr. Smith did not go out seeking trouble, not just
11    because we know the facts of the case but because we
12    can look at his background.  We can look at the
13    history that he has.
14            1975 was the only entry in Mr. Smith's
15    criminal history.  I actually said in my sentencing
16    memorandum that he has over 30 years of good
17    conduct.  I don't know why I said 30 years, it is
18    over 50 years of good conduct.
19            1975.  Mr. Smith has a considerable amount
20    of time of good conduct.  He has no, not even a
21    speeding ticket in those intervening 45 years.  We
22    know he didn't go out in search of trouble because
23    his history and his past and his characteristics
24    tell us that.  It tells us that this was a tragic
25    mistake but it was a mistake and it was an accident
0046
1    and that is at the root of what this is.
2            We are here because that night there was
3    an intruder on Mr. Smith's property.  That is the
4    fact.  And I don't in any way want to denigrate
5    anybody in this case, but that is what lies at the
6    root.  And Mr. Smith's fear and his reaction to
7    that, the only sentence in light of Mr. Smith's
8    history, in light of his characteristics, what
9    happened in this case, the only sentence that is
10    appropriate under the guidelines is a sentence of
11    probation.
12            And I want to talk about that a little
13    bit, but first, I want to discuss just why we know
14    that a sentence of probation is appropriate in this
15    case.  First of all, Mr. Smith has been on

23

16    supervised release since May of 2018, so over
17    four years now.  He has, not one, as far as I am
18    aware, not one incident in that entire period of
19    four years.  He has been fully compliant with his
20    conditions of supervision.  He has a lifetime of
21    model behavior, not a traffic offense, not a
22    criminal offense, nothing, a model citizen for the
23    entirety of his life.
24            He is a genuinely decent neighbor, not
25    just a decent neighbor but when somebody in his
0047
 1    community needed help, Orcelia Trujillo, who is now
 2    his neighbor, when she lost her home and her sons
 3    didn't have a home, Mr. Smith opened part of his
 4    apartment to them and gave them a place to live.
 5    They paid him, but they are not wealthy by any
 6    means.  They are not affluent people.  They have
 7    problems with money and very often they are not able
 8    to make their full payment or any payment and
 9    Mr. Smith continues to let them stay there because
10    he has a genuinely good heart.  He is a genuinely
11    good neighbor.
12            This is a genuine aberration, it fits the
13    guideline definition of aberrant behavior.  It calls
14    under 3553 for a sentence of probation.  If we look
15    at the totality of the circumstances, everything
16    that the -- that that statute that Congress intends
17    a punishment to do, that Congress intends a sentence
18    to do in this case calls for a sentence of
19    probation.
20            Mr. Smith is 72 years old.  This is not a
21    man who can even make it in the Bureau of Prisons or
22    who should be in the Bureau of Prisons.  A sentence
23    of probation is punishment.
24            In this sentencing memo I discuss that
25    Congress recognizes that probation or supervision
0048
 1    serve as a form of punishment.  It is certainly not
 2    as punitive as confinement but it serves as a form
 3    of punishment because it places significant
 4    conditions and restrictions on a person.  It places
 5    restrictions on a man who is 72 years old,
 6    restrictions on his liberty, where he can go, what
 7    he can do.  That is a punishment that serves the
 8    purposes of sentence under 3553.
 9            We know that Mr. Smith will not have any
10    problems while on probation given the behavior that
11    he has had the last four years and given the past 45
12    years of his life.  Mr. Smith is a law-abiding
13    person.  He at 1:00 in the morning in his backyard
14    confronted an intruder.  He did not go out searching
15    for that person and he made a mistake.  It was an

24

16   accident and he regrets that.  He recognized, as I
17   said earlier, he recognized when he was speaking
18   with Detective Abeyta, "I wasn't as careful, as
19   careful as I could have been under the
20   circumstances."
21          He is -- that summarizes the case right
22   there.  He knows that he could have been more
23   careful, but his lack of care was not borne out of
24   any type of ill-will or intention or anything like
25   that it was borne out of the fear that he felt when
0049
 1   he was confronted by somebody in his backyard.  And
 2   I just -- thinking about that, because I think about
 3   my own backyard or I think about anybody who goes
 4   into their backyard in the middle of the night and
 5   confronts an intruder and that feeling of fear, that
 6   feeling of fear, that punch you get in your heart it
 7   is something that it is difficult to rationalize
 8   over it and to think calmly through.  That is what
 9   happened in this case.  It was borne out of that
10   punch to his heart of fear and Mr. Smith reacted to
11   that.
12          The punishment for that is something that
13   is, that places restrictions on Mr. Smith but
14   doesn't place him in confinement, that doesn't place
15   him in a position where he is in the Bureau of
16   Prisons or waiting to get to the Bureau of Prisons
17   in an environment that he has never, ever before in
18   his life has experienced.
19          The most he has ever spent in jail is the
20   five days that he spent when he was arrested in
21   Espanola and then released from this court, I think
22   on May 9th or 10th.  It is the only period of time
23   he has ever spent in jail.  I think he has five days
24   in, so the 10th.  He was in custody from the 5th
25   until the 10th.  That is the only period of time he
0050
 1   has ever spent in jail in his entire life.  Jail is
 2   something that is not just, would not just be
 3   difficult for him, it is an entirely foreign and
 4   alien environment.
 5          The Court can see him right here.  There
 6   is no way that he can survive the difficulties of
 7   jail, of prison.  And placement on probation serves
 8   the purposes of punishment, it serves the purposes
 9   of deterrence and it places, it's punitive in the
10   sense that it significantly restricts liberty,
11   Mr. Smith what he can do, where he can go, the types
12   of -- for that matter, the type of people that he
13   can see.
14          I would ask the Court to impose a sentence
15   of probation in this case.  With probation the Court

16  would have the option down the road, I don't think
17  this is in any way conceivable, but would have the
18  option of resentencing if Mr. Smith ever came back
19  before the Court.  But a period of probation is
20  appropriate under the Sentencing Guidelines.  Given
21  that the guidelines are 27 to 33 months, it is not a
22  significant variance from the guidelines, but it is
23  appropriate if we take into account Mr. Smith's
24  history and characteristics, his long, long lifetime
25  of law-abiding behavior, the type of person he is
0051
 1  and the type of family member he is.
 2              I also want to point out, Your Honor, that
 3  Mr. and Mrs. Wheat are here in the courtroom on the
 4  right side.  You may have remembered them from the
 5  trial.  Mr. Smith is a good neighbor for his
 6  neighbor Orcelia Trujillo.  He helps her out.  He
 7  helps out her son.  I think there is a letter from
 8  her son, Patrick Martinez, as well.
 9              A sentence of probation accomplishes the
10  purposes of sentencing and it is sufficient but not
11  greater than necessary.  It is that parsimony clause
12  that is critical in this case.  It is sufficient.
13  It imposes punishment but it is not greater than
14  necessary.
15              A sentence to the Bureau of Prisons would
16  be greater than necessary to accomplish the purposes
17  of sentencing given all of the circumstances in
18  Mr. Smith's life, given all of his background and
19  given what happened that led to this case, given the
20  fact that he was laying in bed and would still be
21  laying in bed if there wasn't an intruder on his
22  property.  Would have been laying in bed that whole
23  night if there wasn't an intruder on this property.
24  That is what precipitated this case.  It wasn't what
25  Mr. Smith did.  It wasn't something, him going out
0052
 1  seeking trouble.  He was home laying in bed and
 2  given that, a sentence of probation is appropriate
 3  here.
 4              THE COURT:  All right.  Thank you,
 5  Mr. Elsenheimer.
 6              Mr. Smith, you do have the right to
 7  address the Court before sentence is imposed.  So if
 8  you choose to do so, you may proceed.
 9              THE DEFENDANT:  I would like to read this.
10              THE COURT:  All right.
11              THE DEFENDANT:  Judge Herrera, thank you
12  for taking the time to listen to this letter.  I
13  never thought I would be in this situation.  Aside
14  from one drunk driving charge in my much younger
15  years, I have never had any run-ins with the law.

26

16          When I was younger growing up in Espanola
17  it was a beautiful city, a small community with a
18  history and an interconnectedness with Native
19  American culture.
20          Espanola was once a safe place to live.
21  As the years went by, my parents passed on and
22  Espanola changed to what it is today, the heroin
23  capital of the United States.  I used to enjoy
24  running a motel, I would meet travelers from all
25  over the world.  But as the years went by it became
0053
 1  more and more of a hassle.  I was dealing with
 2  violence and drug use and it became far too much.
 3          Closing down the Western Winds Motel was
 4  my only option.  I decided to rent only to my friend
 5  Orcelia Trujillo and her family because they are
 6  honest God fearing people.  This didn't end the
 7  criminal element.  For years I dealt with break-ins
 8  and trespassers.
 9          A local news would describe violent crime
10  all around my home.  The fear that I felt was
11  enduring and imminent.  We made changes, added
12  motion sensors, notified law enforcement, but
13  nothing got better.  Things continued to get worse.
14          Today I stand before you for killing Maria
15  Gallegos.  I never expected to hurt anyone when I
16  shot that night.  I believed that I was shooting
17  into a woodpile, that the person that was breaking
18  into my mother's trailer had fled.  To this day, I
19  don't know how many people were there that night.  I
20  only knew the fear that I experienced.
21          My motion sensors had been going off all
22  night and I saw someone eyeballing me like they were
23  about to attack me.
24          I didn't know what was going to happen.
25  There was no time to call the police.  Shooting into
0054
 1  the woodpile seemed like a safe option to tell these
 2  people that breaking into my property wasn't safe.
 3          Somehow my shot ended up in the worse
 4  place at the worse time.  I didn't know that
 5  Ms. Gallegos was there.  I never intended to hit
 6  her.  I know that Ms. Gallegos has a family and
 7  people who love her.  To them, I apologize.  I know
 8  that every human life has the right to live.
 9          Because of my actions Maria Gallegos will
10  never be able to see her children again.  It was not
11  my place to take her life.  Although it was an
12  accident, it was because the extreme fear that
13  caused me to shoot into the dark towards the
14  woodpile.  I did not think I was aiming at the
15  height of the human being.  I didn't want to shoot

16   straight up or down, I wanted the bullets to lodge
17   into the woodpile.
18          I am 72 years old and cannot survive in
19   jail.  For the past four years I have complied with
20   all of my conditions and have never broken a rule.
21   The sorrow and regret for my actions never cease and
22   I will never own firearms again.  This will never
23   happen again.
24          Apologies will never bring back Maria to
25   her family.  I know that my actions have caused
0055
 1   undue time with the Court, law enforcement and
 2   mostly important to Maria's family.  Please have
 3   mercy on me.  I respect your decision and ask that
 4   you take into consideration all of the things you
 5   heard during trial and know about this case.
 6          Thank you.
 7          THE COURT:  Thank you, Mr. Smith,
 8   Mr. Elsenheimer.
 9          Ms. Wilson.
10          MS. WILSON:  The defendant was aware of
11   the risk he created with his conduct and he knows
12   bullets are dangerous.  That night knowing that
13   somebody was eyeballing him, he still chose to shoot
14   into the night at a height of a human being.  All of
15   that foliage, without adequate lighting, near a busy
16   highway, near businesses, and keep in mind he is
17   shooting on a property that is marked as a motel.
18          The defense talked about an intruder
19   coming into your backyard.  But this is a motel.
20   The sign is still up as a motel.  There are no signs
21   up that say, "no trespassing."
22          People come back and forth, there is
23   pedestrian traffic.  And defendant shoots four
24   times.  He intentionally pulls that trigger four
25   times and he says he assumes the person had fled
0056
 1   when he started shooting or that he was shooting at
 2   the woodpile, but he didn't do anything to make sure
 3   that person fled.  He didn't yell out a warning.  He
 4   didn't use a flashlight to see where he was
 5   shooting.  He didn't shoot in the air and he did not
 6   shoot in the ground.  His conduct was not a mistake
 7   or an accident.  This was not just a failure to be
 8   conscientious.
 9          The defendant was incredibly reckless and
10   he disregarded the value of human life.  The
11   defendant does not have the right to protect his
12   property with deadly force.  He also testified he
13   was not acting in self-defense.
14          What is concerning to the United States is
15   that just a month prior to Maria being shot and

28

16  killed, the defendant told law enforcement he had
17  shot at another trespasser on his property.  He told
18  law enforcement pow, pow, pow, again just like I did
19  with this girl.  He shot multiple times at another
20  man as he fled his property.  This isn't aberrant
21  behavior from the motel cop.
22          The defendant testified he patrolled his
23  property and even ran after another trespasser.  He
24  is not a peaceful man.  He shoots at trespassers as
25  they run away.  He is not afraid.  He had gone out
0057
 1  multiple times that night.  His gun was on the
 2  counter ready to go.  He is indignant and he clearly
 3  disregards human life live through his outrageously
 4  reckless conduct.
 5          And just for the record, Your Honor, he
 6  did test positive for marijuana on May 9, 2019 as
 7  noted in the PSR Paragraph 4.  So just to clarify he
 8  has not been perfect on pretrial services.  He
 9  admitted to the use, no further action was done, but
10  that is still an act of noncompliance.
11          Maria's death was truly senseless.  And
12  from the Government's perspective, this type of
13  arbitrary and senseless gun violence endangers the
14  whole community.  He didn't know who he shot that
15  night, he was just shooting.
16          You heard from Maria's family.  Her life
17  was important.  She was precious to her family and
18  their loss is significant and they will feel the
19  harm for the rest of their lives.
20          And for those reasons the United States is
21  asking for a sentence of 60 months, funeral
22  expenses, and as noted in the Presentence Report, I
23  believe the amount is $1,800.  We would also ask for
24  a term of supervised release at the conclusion of
25  defendant's sentence.
0058
 1          The United States has outlined in its
 2  sentencing memorandum that the Court may consider
 3  both a variance and a departure given the use of a
 4  dangerous firearm in this case, and we believe that
 5  those reasons for allowing an upward variance or
 6  departure are warranted in this case.
 7          Thank you.
 8          THE COURT:  Mr. Elsenheimer, anything
 9  further?
10          MR. ELSENHEIMER:  Yes, may I briefly
11  respond?
12          THE COURT:  Yes.
13          MR. ELSENHEIMER:  I know we talked about
14  this a lot at the trial and I am just going to go
15  over it again.  But Mr. Smith's -- the Western Winds

16    Motel is not an operating motel.  It was pitch black
17    behind his house.  That was the backyard, it was not
18    a hotel.  There is a difference and that difference
19    is clear and palpable to anybody who walked by it,
20    drove by it or probably live in Espanola or anywhere
21    that drives by that area.
22              Second, Mr. Smith has four years of fully
23    compliant behavior on supervision.  He tested
24    positive for marijuana when he was released from
25    custody on May 9.  That was the day he was released
0059
 1    from custody.  So that was not, whatever use there
 2    was, was not a violation of his conditions or could
 3    even be construed as a violation of his conditions
 4    when he was tested when he was released.
 5              That is all I wanted to clarify.
 6              THE COURT:  Thank you.  I have just a
 7    brief question for Probation.  If you could come to
 8    the bench for just a moment.
 9              (Whereupon a Bench discussion was held off
10    the record.)
11              THE COURT:  All right.  I will ask
12    Mr. Smith and Mr. Elsenheimer to come to the podium,
13    please.
14              THE COURT:  Let me begin by saying this
15    has been a truly tragic case.  Tragic from, clearly
16    from the side of the victim, the victim's family.  I
17    mean, somebody died, and there is no, you know,
18    there is no way to mitigate the injury.  There is no
19    way to mitigate the pain that the family is going
20    through and so that is the first and foremost
21    observation that I have for you about how tragic
22    this situation is.  So that is the first thing I
23    want to say.
24              The second thing that I want to say is
25    that I have, you know, I presided over the trial.
0060
 1    Every hearing that has taken place in this case has
 2    been, anything involving the evidence in this case
 3    has been information that I have paid close
 4    attention to.
 5              So I understand that the defendant was
 6    scared and, again, 1:00 in the morning, dark, an
 7    intruder on his property.  And I understand that the
 8    defendant was scared, so I get all of that.
 9              You know, the Government has argued that
10    this was a motel almost as if to say that the
11    defendant should expect that there would be people
12    on the property.  It didn't sound that way to me
13    after hearing the testimony.  What I do recall was
14    testimony that the motel was not open.  The office
15    was not open.  The lights were not on and I

16  certainly didn't hear any evidence that the motel
17  attracted a lot of traffic from visiting travelers
18  looking for a place to stay.  I just didn't hear
19  anything in the course of the trial that this
20  property was understood to be any kind of a public
21  space.
22          And I do recall from the testimony that
23  this incident happened, the trailer was located
24  behind the defendant's residence, not in the front.
25  So I don't look at it as a place where there was a
0061
 1  lot of foot traffic and the defendant should have
 2  expected that there could be people walking around.
 3  It sounded like the area where this happened would
 4  not have been an area where he would have expected
 5  people to be walking around.
 6          I heard the testimony from the defendant
 7  that he had experienced other intruders over the
 8  course of time.  I know the Government has suggested
 9  that that is his reaction, his response to other
10  intruders should be taken into consideration as
11  evidence of the defendant's, I guess, history and
12  characteristics for some form of gun use, some form
13  of violent conduct.
14          It is hard for the Court to take it that
15  way because, first of all, the defendant was never
16  charged with any kind of unlawful conduct before
17  this.  And to the extent that he did shoot his
18  weapon at another intruder a month earlier, while I
19  understand the Government's point, I don't know that
20  that was ever determined to be an unlawful shooting
21  and nobody was injured.  So I just don't have enough
22  information to conclude that the defendant has been
23  conducting himself in a, you know, wildly careless
24  way.  I mean, it is his property.  He doesn't want
25  intruders on his property.  I am sure there are a
0062
 1  lot of ways to handle it, but until this instance
 2  there had been no other injury or anybody else who
 3  was harmed by the defendant.
 4          Middle of the night, you hear an intruder,
 5  I have no question that the defendant felt fear and
 6  I think that that would be a common experience for
 7  most people who hear an intruder on their property
 8  at 1:00 in the morning to perhaps feel some fear.
 9  Then the question is what do you do about that fear?
10          In this case, of course, the defendant
11  went out, saw a person, wanted to scare the person
12  off and shot his weapon.  And the defendant said
13  that he thought that perhaps he might be shot.
14          Now this is not a case where the defendant
15  claims self-defense.  I don't see anything in the

16    case that would support that theory.  So, again, the
17    jury, I think spoke to us about what the proper
18    response to the defendant's conduct was, and that
19    was a conviction for involuntary manslaughter.
20              I already said earlier that I thought that
21    the defendant's conduct supported a degree of
22    recklessness that is sufficient to support this
23    conviction.  But I will say, again, that the
24    defendant could have, and I am sure the defendant
25    agrees in hindsight could have done things
0063
 1    differently.  But at that point when he made the
 2    decision to shoot his gun, it was shot not at a high
 3    level to avoid hitting somebody but it was shot at
 4    exactly the level to hit someone and someone who was
 5    not real, real tall.  So that I think that there was
 6    a degree of recklessness that, again, supports the
 7    conviction in this case.
 8              I have no doubt that Mr. Smith is
 9    remorseful for what happened.  He has said that,
10    time and time again.  And I have no doubt that the
11    victim in this case, you know, I have heard that she
12    had a tough time.  I don't know why she was there
13    that night, I will never know, but I don't say for a
14    moment that she deserved what came to her.  I don't
15    think anybody says that and I don't want anybody to
16    feel that the Court feels like she deserved what
17    happened to her.
18              I have looked at all the arguments here,
19    you know, the Government suggests that I should
20    increase the, go above the guideline range because
21    of outrageously reckless conduct.  And the briefing
22    mentioned more than once a degree of recklessness
23    that supports increasing the sentencing range here.
24              I will deny the Government's request.  I
25    think that the jury instructions were pretty clear
0064
 1    that the jury should find involuntary manslaughter
 2    if they see that it involves reckless and wanton
 3    disregard that is not extreme in danger.
 4              So to the extent that the Government
 5    argues that the facts in this case support an
 6    outrageously reckless act, I would have to say that
 7    the jury found otherwise.  If the Government is
 8    trying to say that the defendant's history and
 9    characteristics because he has reacted to intruders
10    on his property in the past and therefore his
11    reaction to intruders in the past would support
12    other outrageously reckless conduct, again, I would
13    have to disagree with the Government on that.
14              I didn't, for reasons I have already
15    stated, it didn't appear that his prior conduct was

16    unlawful, at least was not brought to the Court's
17    attention that it was.  So, I decline to vary upward
18    or grant any kind of a upward departure.
19             The defendant has asked for a sentence of
20    probation arguing that, well, many things, that this
21    was not an intentional act, this was an accident,
22    the defendant is law-abiding, he has no prior
23    convictions and he has performed well while on
24    pretrial conditions of release.
25             There are certain things that I agree with
0065
 1    and certain things that I disagree with.  I agree
 2    that the defendant has done well on pretrial
 3    conditions of release.  I agree that the defendant
 4    is remorseful and that this was an accident.  But I
 5    do not think that probation is the appropriate
 6    disposition in this case.  I do feel that the level
 7    of recklessness, while not outrageously reckless,
 8    was nevertheless reckless and I do believe that a
 9    custodial sentence is appropriate in this case.
10             I know the guideline range is 27 to 33
11    months.  The Government has asked for 60 months.  I
12    intend to impose a sentence at the low end of the
13    guidelines, 27 months, and I intend to make a
14    recommendation to the Bureau of Prisons that the
15    sentence be served at a facility that takes into
16    consideration the age of the defendant and any
17    medical conditions.
18             So my, I intend to recommend that to the
19    extent the defendant qualifies for a medical
20    facility, I will make that recommendation or if
21    there is a facility that is on the lower end of the
22    security level, I will recommend that.  Because, I
23    do believe that the facts in this case support a
24    custodial sentence, but I also recognize that the
25    defendant is older and may have medical issues that
0066
 1    are different from someone of a younger age.
 2             So having said that, I will also say I
 3    have not heard anything about self-surrender, but I
 4    don't think the defendant is a danger or flight
 5    risk, so I do intend to allow self-surrender.  So I
 6    haven't heard anybody on that.
 7             MR. ELSENHEIMER:  We would be asking for
 8    self-surrender, Your Honor.
 9             MS. WILSON:  No objection, Your Honor.
10             THE COURT:  All right.  So unless anybody
11    has anything else they want to say, I will proceed
12    to pronounce sentence.
13             MR. ELSENHEIMER:  May I just say in terms
14    of the Sentencing Guidelines and I want to just
15    object to the guidelines.  Your Honor, I, if

33

16    Your Honor were to think a custodial sentence is
17    appropriate, this is at least a case to consider a
18    variance from the Sentencing Guidelines given
19    everything that I discussed, but most particularly
20    Mr. Smith's age and his 72 years of virtually
21    unblemished conduct.
22              There are variances routinely in Federal
23    Court and this is a case that cries out for a
24    variance from the Sentencing Guideline range.  Even
25    if the Court were to consider a custodial sentence
0067
 1    as being appropriate, I think this is one where
 2    Mr. Smith's zero criminal history, zero incidents
 3    except for something in 1975 and the factors in the
 4    case that precipitated what happened even though,
 5    even if Mr. Smith acted as Your Honor said,
 6    recklessly, this is something that is, that under
 7    the guidelines or under the statute is more than
 8    appropriate for a variance from the guidelines.
 9              So I am asking the Court to reconsider a
10    variance from the guidelines even if Your Honor
11    thinks that a custodial sentence is appropriate.  27
12    months is a long time for somebody who is 72.
13              THE COURT:  You know, I would have maybe,
14    expected isn't the right word.  I would have looked
15    at, I will say that, I would have looked at any
16    argument you might have made but didn't to the
17    extent that you would have wanted a variance because
18    of his age.  Age is something that is, it is not
19    unusual for Courts to look at that, but, you know, I
20    know how old he is, but there was no argument really
21    that was made.
22              MR. ELSENHEIMER:  I thought I mentioned
23    that in my sentencing memorandum, Your Honor.
24              THE COURT:  Mentioning, you did mention
25    his age, but, you know, I would have, I mean, I know
0068
 1    how old he is.
 2              MR. ELSENHEIMER:  I apologize, that is my
 3    fault.  I thought that I mentioned his age as being
 4    somebody who is 72, just not of the age to -- I am
 5    sorry, I thought I made the argument.
 6              THE COURT:  Well, you did, but it was
 7    almost, you know, it seemed like it was almost in
 8    passing.  You are emphasizing it more today than I
 9    thought you did in the sentencing memorandum.  But
10    in any event, I will just leave it at that.
11              Is there anything else you want me to
12    consider?
13              MR. ELSENHEIMER:  Then in light of that, I
14    would ask you to reconsider your sentence in light
15    of Mr. Smith's age, his advanced age.  I'm sorry,

34

16  that is on me that I didn't lay out in more detail.
17  I thought that my mentioning it in passing given the
18  fact that he was 72 and mentioning that it was a
19  basis for a variance was sufficient, but let me go
20  into that.
21          THE COURT:  You are talking to somebody
22  who is not much younger than 72 so I would need a
23  little bit more specifics.
24          MR. ELSENHEIMER:  I'm sorry about that,
25  Your Honor.  Mr. Smith, if we look at him, Mr. Smith
0069
 1  is frail.  Some people at 72, like anybody of any
 2  age, there is a variety.  Mr. Smith is the type of
 3  person who is old.  His 72 is an advanced age and
 4  for somebody who is of his age to go into the Bureau
 5  of Prisons is remarkably difficult.
 6          It is again, and I go back to what I was
 7  saying earlier, he has never served a custodial
 8  sentence before.  The most he has ever served is
 9  four, five days that he was in custody.  To impose
10  27 months is remarkably more time than he has ever
11  served and that in and of itself serves as a basis
12  for a variance.
13          Mr. Smith's age is such that placing him
14  in the Bureau of Prisons is going to age him so much
15  faster and be so much more punitive for somebody of
16  his age than it is for somebody who is 35 or 40 or
17  even 50.  That historically justifies a variance and
18  I would ask Your Honor to consider that.
19          MS. WILSON:  Your Honor, in response, it
20  seems to me that in announcing your intention in the
21  sentence, you have considered his age.  He is going
22  to a BOP facility and you are making a
23  recommendation that his medical needs be assessed
24  and taken care of.
25          Defense had the opportunity to fully
0070
 1  examine this further through briefing, but I haven't
 2  heard anything specific about this defendant that
 3  warrants that type of a variance.
 4          Your Honor, again, I would ask that you
 5  impose a sentence as announced.
 6          THE COURT:  Yeah, you know, I, at this
 7  stage of the game, I have nothing really to
 8  distinguish this defendant for reasons beyond just
 9  the fact that he is 72.  I mean, the physical
10  condition description in the PSR doesn't give me any
11  kind of medical issue.  I just, you know, I don't
12  have anything to go on.  So he is 72, I know he is
13  72.
14          But my, as I said, I would, I know the
15  Bureau of Prisons is able to house people who are

16    older and so my recommendation to them would be, you
17    know, I am not expecting the defendant to be in a
18    situation where he is treated like someone who is,
19    you know, 25.  So I, believe me, it doesn't, this
20    case doesn't bring any joy to anybody for any
21    reason.
22              Certainly brings me no satisfaction at all
23    to have to deal with the situation where somebody
24    shot and killed somebody.  There is just, this is
25    just, as I said at the very beginning, tragic all
0071
 1    the way around.  So, you know, I am prepared to
 2    proceed.  I do want you to feel like I have
 3    considered every argument.  You know, you haven't
 4    asked me for the opportunity to submit anything
 5    else, so I am ready to go here.
 6              MR. ELSENHEIMER:  May I have a moment,
 7    Your Honor?
 8              THE COURT:  Yes.
 9              Mr. Elsenheimer?
10              MR. ELSENHEIMER:  Well, Your Honor, in
11    terms of the age, I just think it is a factor under
12    3553 in and of itself.  And I guess I would ask
13    Your Honor for additional time so that we could
14    submit additional materials with regard to
15    Mr. Smith, to what he does and the difficulties that
16    he would face were he to go to the Bureau of
17    Prisons, and to, I guess, further elaborate 3553
18    factors for the Court to consider.
19              This just is, to me, a sentence that under
20    3553 demands consideration of factors, 3553 factors
21    age, his history and characteristics as a variance
22    from the guideline sentence to examine that with
23    more detail.
24              THE COURT:  So, you know, I -- here is why
25    I will give you additional time.
0072
 1              When we got together here today you were
 2    asking for certain reductions, you were asking for
 3    certain enhancements.  I think now that these have
 4    been cleared away now that we know basically the, I
 5    guess, sort of the four corners of the, what we are
 6    looking at, I am willing to give you an opportunity
 7    to address certain issues, 3553 issues now with the
 8    added information of the Court's rulings on the
 9    variances.
10              And Ms. Wilson?
11              MS. WILSON:  And for the record we would
12    object, Your Honor.  This sentencing has been held
13    in abeyance for some time.  The victims need some
14    semblance of justice.  Counsel had more than enough
15    time and opportunity to collect this information,

```
16    put these factors together.  It seems to me that he
17    is taking yet another bite at the apple because he
18    is not happy with the custodial sentence.
19              And from our perspective this sentence
20    should go through.  It should be a short time frame
21    on this additional evidence that you are wanting to
22    consider.  Just for the interest of justice on
23    behalf of the victims, the United States is
24    compelled to put that in the record.
25              THE COURT:  I understand that and I would
0073
 1    do the same thing if I were in your place.  I am not
 2    saying I am going to change my mind but I, what I am
 3    saying is there were a lot of unknowns when we
 4    started this hearing.  I have made rulings today
 5    that kind of shift the framework just a little bit,
 6    so I am willing to let you address other issues now
 7    that you have the clarity of what it is we are
 8    dealing with.
 9              You know what I am inclined to do, I have
10    already said low end of the guideline range, and --
11    but I am willing to hear you.  I frankly feel like
12    the defendant's age and conditions can be
13    accommodated by the Bureau of Prisons.  That is what
14    I believe, so I am not -- don't mistake what I am
15    saying by any kind of a commitment on my part to
16    look at things differently.  I just think it is
17    fair, it is fair to let the defendant have a little
18    bit more of an argument with the clarity of the
19    Court's rulings so --
20              MR. ELSENHEIMER:  Thank you.
21              THE COURT:  Having said that, I will give
22    you 14 days to submit something.  Is that
23    sufficient?
24              MR. ELSENHEIMER:  Your Honor, I have a
25    trial that starts on Monday it might go for a week
0074
 1    and a half.  You know how these could go a week,
 2    week and a half.  Could I have 21 days, yeah,
 3    21 days.
 4              THE COURT:  21 days.
 5              MR. ELSENHEIMER:  Actually, Your Honor, I
 6    think one of the things we are going -- that
 7    Your Honor would like to know is what can the Bureau
 8    of Prisons do.  Part of that may be a consultation
 9    with an expert of the, former Bureau of Prisons.
10    That might take longer than 21 days.  Could I alert
11    the Court in 21 days as to when I think I could have
12    a report from an expert?
13              THE COURT:  I am agreeable to that but,
14    you know, you have other people in your office and I
15    am not going to drag it on for a month or
```

```
16   two months.  I mean, I do want to get this resolved.
17             MR. ELSENHEIMER:  Certainly.
18             MS. WILSON:  We would object to that just
19   for the record, again, Your Honor, for the same
20   issues.  I think 14 days is more than sufficient.
21   You're right, Your Honor, he has got counsel,
22   cocounsel and other resources available to assist
23   him in this endeavor.  So, for the record.
24             Thank you.
25             THE COURT:  All right.  We will see in
0075
 1   21 days how it is looking, but I am not expecting
 2   you to tell me in 21 days you haven't been able to
 3   reach anybody or, you know, I want to get this thing
 4   going.
 5             MR. ELSENHEIMER:  Certainly, absolutely.
 6   Thank you, Your Honor.
 7             THE COURT:  I will set something in the
 8   next month or so and try to get this wrapped up.
 9             MR. ELSENHEIMER:  Thank you.
10             THE COURT:  Thank you.  We will be in
11   recess.
12             (Proceedings concluded at 11:27 a.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25
0076
 1                    REPORTER'S CERTIFICATE
 2
 3        I certify that the foregoing is a correct
 4   transcript from the record of proceedings in the
 5   above-entitled matter.  I further certify that the
 6   transcript fees and format comply with those
 7   prescribed by the Court and the Judicial Conference
 8   of the United States.
 9
10   Date:  September 15, 2022
11
12
13                      _____
14                      PAUL BACA, RPR, CCR
                        Certified Court Reporter #112
```

38

15                    License Expires:  12-31-2022
16
17
18
19
20
21
22
23
24
25