1              IN THE UNITED STATES DISTRICT COURT

2                FOR THE DISTRICT OF NEW MEXICO

3

4    UNITED STATES OF AMERICA

5    vs.                          No. 1:CV-18-03495-JCH

6    DOUGLAS D. SMITH

7

8

9                 TRANSCRIPT OF PROCEEDINGS

10                   TRIAL ON THE MERITS

11                     June 15, 2021

12                      Volume 2

13                   Pages 185 - 399

14

15   BEFORE:   HONORABLE JUDGE JUDITH HERRERA
                UNITED STATES DISTRICT JUDGE
16

17

18

19       Proceedings reported by stenotype.

20       Transcript produced by computer-aided

21   transcription.

22

23

24

25

```
1   A P P E A R A N C E S:

2   FOR THE PLAINTIFF:

3           OFFICE OF THE U.S. ATTORNEY
            P.O. Box 607
4           Albuquerque, New Mexico  87103
            505-346-7274
5           BY:  NOVALENE D. WILSON
            novalene.wilson@usdoj.gov
6               KYLE T. NAYBACK
            kyle.nayback@usdoj.gov
7
    FOR THE DEFENDANT:
8
            OFFICE OF THE FEDERAL PUBLIC DEFENDER
9           111 Lomas, Northwest, Suite 501
            Albuquerque, New Mexico  87102
10          505-346-2489
            BY:  ARIC ELSENHEIMER
11          aric_elsenheimer@fd.org
                AMANDA LAVIN
12          amand_lavin@fd.org

13

14                    I N D E X

15                                          PAGE:
```

```
16  Opening Statement on Behalf of the        281
        Government
17
    Opening Statement on Behalf of the        287
18      Defendant

19  WITNESS:

20  MATTHEW CAIN, MD

21      Direct Examination by Ms. Wilson      295
        Cross-Examination by Mr. Elsenheimer  304
22
    DANIEL SMITH
23
        Direct Examination by Mr. Nayback     309
24

25
```

```
1                      I N D E X (Continued)

2    WITNESS:                                         PAGE:

3    GERALDINE GUTIERREZ

4         Direct Examination by Ms. Wilson         312

5    LYNNE GUDES

6         Direct Examination by Mr. Nayback        317
          Cross-Examination by Ms. Lavin           331
7         Redirect Examination by Mr. Nayback      351

8    TAMMY PETER

9         Direct Examination by Mr. Nayback        357
          Cross-Examination by Ms. Lavin           373
10
     NATHAN SCHWABEDISSEN
11
          Direct Examination by Mr. Nayback        377
12        Cross-Examination by Ms. Wilson          387

13

14   Certificate of Reporter                       399

15

16

17

18

19

20

21

22

23

24

25
```

1              (Whereupon the following proceedings were

2    held in Open Court.)

3              (Whereupon the jury panel enters the

4    courtroom.)

5              THE COURT:  Please be seated.

6              Good morning to everyone.  All right.  We

7    are on the record in the case of United States of

8    America versus Douglas D. Smith.  The case number is

9    18-CR-18-4395.

10             And for the record could I please have

11   counsel's appearances.

12             MS. WILSON:  Good morning, Your Honor.

13   Novalene Wilson on behalf of the United States with

14   cocounsel Kyle Nayback.  And also at the table is

15   FBI Special Agent Travis Taylor.

16             MR. ELSENHEIMER:  Good morning, Your

17   Honor.  Aric Elsenheimer on behalf of Mr. Smith.  I

18   am joined by Amanda Lavin and Daniel Berg.

19             THE COURT:  Good morning.  Thank you.

20             Good morning, ladies and gentlemen of our

21   jury panel.  I would like to welcome you to our

22   courthouse today for jury selection in this criminal

23   case.  I will tell you a little bit more about the

24   case in just a moment, but I do want to thank you

25   for coming.  It is an important part of our jury

1    trial process to have people like you who are

2    willing to come in and participate in this process.

3            As you all know, the Constitution does

4    guarantee the right to a jury trial in matters such

5    as this criminal matter, and our justice system does

6    depend on the willingness of our citizens to

7    participate, serve as jurors, and so all of us

8    appreciate that.

9            I realize that many of you will not have

10   an opportunity to serve in some of our branches of

11   Government, such as a Governor or on a City Council

12   or even on the bench as a Judge.  But if you are

13   selected as a judge in this case, as a juror in this

14   case, you will be serving as a judge of the facts.

15   So this will be an opportunity for you to serve our

16   judicial system.  So my hope is that if you are

17   selected you will find it to be an interesting

18   experience, an educational experience, and also a

19   very important experience.

20           So you, the jury, would be the judges of

21   the facts.  I serve as the judge on the law and the

22   Rules of Evidence.  I have heard other Judges

23   compare our role as a Judge in a trial to that of a

24   traffic officer who is directing traffic and trying

25   to keep traffic moving smoothly.  That is what I try

1    to do as a Trial Judge, keep the case moving along,

2    moving along smoothly and make sure that the rules

3    of the road, so to speak, our Rules of Evidence, are

4    all followed.

5              So I am going to begin by introducing my

6    court staff to you and I will want to know if

7    anybody knows anyone on our court staff.  So I will

8    begin by again introducing myself, Judith Herrera.

9    I have been here on the Court for 17 years and

10   before that I practiced law in Santa Fe.

11             My court reporter is in front of me here

12   to my right.  His name is Paul Baca.  He has been a

13   court reporter for many, many years and has been a

14   court reporter in Federal Court for much longer than

15   I have been here.  So he knows what he is doing and

16   he is Mr. Personality.  So if you are selected for

17   the jury, you will be well entertained, I will tell

18   you that, very well entertained.  And he does his

19   job very well, too.

20             In front of me to your right, my left, is

21   my law clerk.  Her name is Virginia Loman, and she's

22   been with me for a number of years now as well.  She

23   is a lawyer.  She is a brilliant lawyer, graduated

24   at the top of her law school class.  And I know she

25   is probably blushing right now, but she is very

1    good.

2            To my far left is my courtroom deputy.

3    Her name is Yvonne Romero.  She is, her job is to

4    keep the criminal cases moving.  So she is the one

5    who makes, sets my schedule and makes sure I don't

6    forget to address cases.  And so I have a wonderful

7    team here.

8            Yvonne will be the one that the jury will

9    interact with most often.  She is the one who will

10   make sure everybody knows where they need to be and

11   she is the one who will make sure everybody is

12   comfortable.  She is the one who makes sure the

13   drinks in the jury room refrigerator are cold.  I

14   don't know if it is a jury room situation with this

15   whole COVID protocol.  In any event, she will make

16   sure you are well taken care of.

17           So having introduced our staff, do any of

18   you, members of the panel, know any of our court

19   staff?  And I don't see any hands.

20           MR. NAYBACK:  There is a hand.

21           THE COURT:  Sorry.  So let me tell you how

22   I will do this.  Anytime I ask a question and

23   somebody has an answer, I will ask you to stand,

24   give us your name and I will see if I can hear you

25   without you having to go to the microphone.

1            But if I have trouble hearing you or if

2    Mr. Baca has trouble hearing you, then I will ask

3    that you either try to speak louder or go to the

4    microphone.  I think it goes a little quicker if we

5    don't have to go to the microphone, but we will just

6    see how it goes.

7            All right.  Let me call on the panel

8    member who raised his hand.  Is that Mr. Chavez?

9            POTENTIAL JUROR:  Yes.  Paul is my cousin.

10           THE COURT:  All right.  I hope he has been

11   good to you and you won't be mad about being on a

12   jury if you are selected here.

13           All right.  Anybody else know anyone else

14   on our court staff?

15           All right.  Thank you.  So as we go

16   through this process, I will be asking you a few, I

17   will ask you more questions.  I want to make it

18   clear that I don't want to pry.  My purpose is not

19   to pry.  The attorneys will have an opportunity to

20   ask you questions.  Their purpose is not to pry but

21   the whole purpose of this jury selection process,

22   the purpose is to match jurors to the case that we

23   are hearing.

24           As I said before, I will tell you a little

25   bit more in just a moment, but I just want to

```
1   emphasize that we all go through life, we all have

2   different experiences.  We all develop different

3   things that we like or dislike, things that we are

4   comfortable with or not comfortable with.  And along

5   the way we all develop preferences, we develop

6   biases, whatever the case may be, it is all part of

7   just the development of our personalities and our

8   life experiences.

9           So some cases may be more difficult for a

10  person to serve on than another case might be.  For

11  example, there are some people who in their personal

12  lives or family experience or in the experience of

13  close friends may have been the victim of, say, a

14  sexual assault.  So if the trial involved an issue

15  of sexual assault it may be very uncomfortable for

16  that person to serve as a juror and be able to put

17  aside whatever the personal experience and the

18  personal feelings may have been and decide a case

19  fairly.

20          So this does not involve sexual assault,

21  though, I will tell you that.  But if there are

22  issues that are involved in this case that would be

23  difficult for someone to sit through and serve as a

24  juror, then we need to know these things.  So I will

25  ask some questions about your personal experiences
```

 1    as they may relate to some of the issues that are

 2    involved in this trial, so I do need everybody to

 3    feel free to speak about these things.

 4            If I ask a question that would require you

 5    to give an answer that makes you uncomfortable to

 6    share in front of the whole group, what I can do is

 7    have you hold on to whatever your answer will be and

 8    at the conclusion of all of the questioning, the

 9    conclusion of my questioning, the lawyers'

10    questions, what I typically do is excuse the panel

11    and then bring in the person who has something that

12    they want to say in a smaller setting.

13            It won't be completely private.  It won't

14    be just me, it will be everybody at these tables, my

15    court staff, and Paul will be making the record of

16    whatever is said.

17            So understand that it would not be secret,

18    a secret disclosure, it would be public, it just

19    would be in a smaller setting.

20            But if anybody needs to do that, just let

21    me know.

22            My expectation is that someone might need

23    a break and that is usually what happens, so let me

24    just ask you if somebody decides that they need to

25    go to the bathroom or something, raise your hand and

1    let me know but don't leave the room until I say you

2    can leave the room.  And it is not that I will keep

3    you trapped in here for too long it is just that it

4    is very important that all of you hear everything

5    that goes on here during this jury selection

6    process.  So if somebody wanted to just slip out for

7    a couple of minutes, that person would miss things

8    that were said here in the courtroom, so I can't let

9    you do that.  But believe me, if you need a break I

10   will give you a break.  I will just ask you to raise

11   your hand and we will do that.

12           So I told you this is a criminal case and

13   so I am going to read the Indictment.  The

14   Indictment says that on or about May 5, 2018 in

15   Indian Country in Rio Arriba County in the District

16   of New Mexico, the defendant, Douglas D. Smith, a

17   non-Indian unlawfully killed Jane Doe, an Indian

18   with malice aforethought, in violation of Federal

19   statutes.

20           So that is the Indictment.  That is what

21   this trial will be about.  I want to make sure that

22   everybody understands and agrees that the Indictment

23   does not mean the defendant is guilty.  It is the

24   charge, the Government has charged the defendant

25   with that crime.  But do all of you understand that

```
 1   that does not mean the defendant is guilty?  Does
 2   anybody disagree?
 3              All right.  Thank you.
 4              The next thing I want to tell you is this
 5   case is expected to last four or five days, so I
 6   would just say Thursday or Friday is what I am
 7   thinking.  We did start our jury selection
 8   yesterday, so I am thinking that this case will end
 9   Thursday or Friday.
10              So my question to you, does that timetable
11   cause any conflicts in your schedule or is there any
12   problem with anybody's schedules?
13              All right.  I see a few hands.  Let me
14   start on this side of the courtroom, which is your
15   right.  I saw a hand go up.  Can you raise your
16   hands again.
17              Okay.  So I see, I believe it is
18   Mr. Villa.  Could you stand?  I know you are wearing
19   a mask, so I probably need you to go to the
20   microphone.
21              POTENTIAL JUROR:  My name is Robert Villa.
22   I am self-employed.  I pushed things that I normally
23   would be doing this early in the week to later in
24   the week.  I teach a class on Thursday afternoon.
25              THE COURT:  And when you say you teach a
```

1  class, is that at a particular institution?

2         POTENTIAL JUROR:  At Los Alamos National

3  Laboratory.

4         THE COURT:  Now, Mr. Villa, if you were

5  selected in this case is there any way that your

6  schedule could be changed or someone could cover for

7  you?

8         POTENTIAL JUROR:  No one could cover for

9  me.

10         THE COURT:  Could your schedule be

11  changed?

12         POTENTIAL JUROR:  Perhaps.

13         THE COURT:  All right.  So I will write

14  perhaps on my list.  Now, let me address one other

15  thing.  I see that you are wearing a mask and I saw

16  that you are wearing latex gloves or something like

17  that.

18         POTENTIAL JUROR:  I am not vaccinated.

19         THE COURT:  You are not vaccinated, okay.

20  Well, that is what I was going to say.  If you are

21  not vaccinated, then it is your choice.  If you are

22  vaccinated, you are free to remove your mask, but

23  obviously your choice is to keep the mask on.

24         Let me ask you one other question as long

25  as we are on this subject.  You are not vaccinated.

1    How do you feel about being in a room full of people

2    who are not wearing masks because I don't require

3    masks if people are vaccinated.

4              POTENTIAL JUROR:  I am okay with it.  For

5    me it is just extra precaution because I am not out,

6    you know, in a building, a lot people.  I haven't

7    done a lot of that this year or last year.  It is

8    just extra precaution.

9              THE COURT:  All right.  And then how do

10   you feel about us not wearing masks?  Is that going

11   to affect your view of participating in this

12   process?

13             POTENTIAL JUROR:  Not at all.

14             THE COURT:  Okay.  Thank you, Mr. Villa.

15             I saw another hand in that side of the

16   courtroom, is that Ms. Canon?

17             POTENTIAL JUROR:  Yes.

18             THE COURT:  Can you stand?

19             POTENTIAL JUROR:  I think you can hear me.

20   I have been excused for next week.  This week is

21   fine.  I just needed you to know that if the trial

22   goes next week, I have scheduled, you know, visits

23   that are in other parts of the State.  They are

24   compliance reviews at hospitals, so that is all I

25   wanted to state.

1           THE COURT:  Thanks for letting us know
2     that.  I feel very confident that this case will not
3     spill over into next week.
4           POTENTIAL JUROR:  Okay.  Thank you.
5           THE COURT:  Thank you, Ms. Canon.
6           Is there anyone else on that side of the
7     courtroom who has a scheduling issue?
8           Okay.  Let's move over across the aisle.
9     I do see one hand.  Is that Mr. Conway?
10          POTENTIAL JUROR:  Yes, ma'am.  Michael
11    Conway.  I drive for Northern New Mexico Gas
12    Company.  We have got seven drivers, three of them
13    are out right now.  We deliver to Eagle Nest,
14    Questa, anywhere north of Angel Fire.  If I am gone
15    for too long we will have people run out of gas.  It
16    is residential delivery of propane.
17          THE COURT:  And when you say too long,
18    would this week be available for you to serve as a
19    juror?
20          POTENTIAL JUROR:  Not, no, it would be
21    bad.  It would be put back on my route.
22          In other words, four of us are trying to
23    deliver gas to seven different routes and we are
24    behind as it is, pretty much.
25          THE COURT:  All right.  Thank you,

1  Mr. Conway.

2          Is there anyone else in that back section

3  in the back row?  I guess you are the

4  second-to-the-last row.  Ms. Vidal.

5          POTENTIAL JUROR:  Yes.  My son and I were

6  going on vacation.  We are leaving, we are going to

7  be out of town from June 21st to mid-July.  I have a

8  number of work responsibilities that I need to

9  conclude before I travel so, and I also have a small

10  child at home.

11          THE COURT:  I know you said you are

12  leaving on June 21st and have things to do before

13  that, but is there any way that this trial, you

14  could serve in this trial and have someone else help

15  you with either your childcare or making whatever

16  accommodations need to be made for your travel?

17          POTENTIAL JUROR:  I suppose I can kind of

18  move things around, if necessary.  My husband also

19  works full-time and my child is home because of the

20  pandemic so she is not on summer camp.  But if

21  necessary I can be here, but it is a challenge for

22  my family.

23          THE COURT:  Okay.  Well, thank you for

24  letting me know.  Thank you, Ms. Vidal.

25          Is there anybody else in that section of

1   the courtroom that has a scheduling issue?

2               Okay, I don't see any other hands.

3               Is there anybody in the jury box that has

4   any scheduling issues?  Ms. Nixon.

5               POTENTIAL JUROR:  Yes, that's right.  Not

6   until next Tuesday.

7               THE COURT:  All right.  So next Tuesday I

8   feel certain we will not interfere with whatever

9   your schedule is.

10              POTENTIAL JUROR:  My name is Ms. Enriquez.

11              THE COURT:  Ms. Enriquez.

12              POTENTIAL JUROR:  I actually do not have

13  enough PTO hours to cover this week.  I actually do

14  have a child in daycare that has to be picked up

15  before 5:00.  I don't really have anybody else to

16  pick up my son.

17              THE COURT:  That was going to be my next

18  question.

19              I don't know how the PTO works in your

20  employment situation, so you would have to, you

21  would have to take time, take some sort of time off

22  of work?

23              POTENTIAL JUROR:  I would, yeah, but I do

24  not have enough hours to cover the week.  I am not

25  sure if it would run into next week as well.

```
1              THE COURT:  All right.  Thank you,
2    Ms. Enriquez.
3              Did I get everybody?
4              I will tell you my little secret is that I
5    wear my reading glasses and as I have aged I need
6    distance glasses.  And so I try not to shuffle too
7    much.  I actually have progressive lenses, but they
8    don't work for me, they are worthless for me to
9    read.  So bear with me if I don't see a hand.  I
10   have good people here that will let me know that I
11   missed somebody, but that is my secret.
12             Let me ask you if you have heard anything
13   about the case and then I will introduce everyone at
14   the tables to you.
15             I told you this incident occurred on
16   May 5, 2018, and it occurred in the City of Espanola
17   at the Western Winds Motel on Riverside Drive.
18             The defendant, I told you is Douglas
19   Smith, and Mr. Smith is seated at counsel table.
20   Could you just stand for a moment.  Thank you,
21   Mr. Smith.
22             And so I am wondering if any, if this
23   rings a bell for any of you.  So I want to know if
24   any of you heard about the case and that is all, I
25   guess, I can say at the moment.  But let me call on
```

1    the person who raised his or her hand.  I can't see

2    well enough, so Ms. Dishta.

3              POTENTIAL JUROR:  I am from Rio Arriba and

4    the Espanola area, and also the person in question

5    was my best friend's sister.

6              THE COURT:  All right.  Thank you,

7    Ms. Dishta.

8              Is there anyone else who knows anything

9    about this case?  I don't see any other hands.

10             I had the defendant stand.  Does anybody

11    know the defendant Mr. Smith?  I don't see any

12    hands.

13             Now the Government is represented by, the

14    prosecutors work at the United States Attorney's

15    Office.  There are two Assistant United States

16    Attorneys here and the acting United States

17    Attorney, the individual who is in charge over

18    there, his name is Fred Federici.  He is not here in

19    the courtroom, but does anybody know Fred Federici?

20             The Assistant U.S. Attorneys who are here

21    prosecuting this case are Ms. Novalene Wilson and

22    Mr. Kyle Nayback.

23             Does anybody know Ms. Wilson or

24    Mr. Nayback?

25             They introduced Special Agent Taylor to us

1    a moment ago.  Does anyone know FBI Agent Travis

2    Taylor?

3              Mr. Smith is represented by the lawyers

4    seated at that table.  First is Aric Elsenheimer.

5    Does anybody know Aric Elsenheimer?

6              I see no hands.

7              Also representing Mr. Smith is Amanda

8    Lavin.  Does anyone know Amanda Lavin?

9              And the third individual is Dan Berg, also

10   on the defense team.  Does anybody know Dan Berg?

11             And I see no hands, thank you.

12             MR. ELSENHEIMER:  Your Honor, may we

13   approach very briefly?

14             THE COURT:  Yes.

15             (Whereupon a Bench discussion was held

16   outside the hearing of the jury.)

17             MR. ELSENHEIMER:  I am concerned that

18   Ms. Dishta identified that she knew the best friend

19   of the victim, and that was announced to the jury.

20   I am concerned about that.  I think it taints the

21   jury against us, potentially.

22             THE COURT:  Tell me how.

23             MR. ELSENHEIMER:  I just think that

24   introducing that to the jury panel, I just wanted to

25   point that out.  I think it is a problem for this

1    particular panel.  I think just identifying that she

2    is familiar with a family member of the alleged

3    victim.

4            THE COURT:  Tell me how that taints your,

5    taints the whole panel.

6            MR. ELSENHEIMER:  Introducing that into

7    the panel, it brings that into the -- it colors any

8    discussion that we have from this point on about the

9    facts of the case.

10           THE COURT:  Any comment?

11           MR. NAYBACK:  The jury already knows that

12   this is a homicide case.  This is not a relative of

13   the decedent.  It sounds like she might know or is

14   friends with a family member.  I don't think, she

15   might have said sister, but I don't see how that

16   would --

17           THE COURT:  Her best friend's sister.

18           MR. NAYBACK:  She knows someone who knows.

19   I don't see how this would taint this panel in any

20   way.  The only other thought would be we know that

21   she probably is not going to make it on the jury.

22   We could probably excuse her early so she doesn't

23   come in.

24           In *United States versus Kevin Vigil*

25   Mr. Elsenheimer was counsel in front of Judge

1    Vasquez, someone stood up and said that she was

2    related.  It turns out she was metaphorically

3    related because she was Native American, and there

4    were gasps in the courtroom.  I don't think just the

5    fact that there is somebody here that might know a

6    family member of the victim taints the jury panel at

7    all.

8            MR. ELSENHEIMER:  I want to bring it to

9    the Court's attention I think it does.  I understand

10   the Court's direction and how you are going to rule

11   if we could avoid other discussion to that effect.

12           THE COURT:  I don't think there is any

13   taint at this point, but I sure wouldn't call on

14   her.  She is not going to make it on the jury.

15           MS. LAVIN:  If she raises her hand and

16   wants to comment?

17           THE COURT:  I will definitely excuse her

18   early, I don't know how early.

19           MR. NAYBACK:  I don't think we should

20   excuse her now, maybe at the first break if Yvonne

21   could let her go.  It is just a suggestion.  This is

22   very difficult for her and there are probably a lot

23   of people that might be curious about what she has

24   to say.

25           THE COURT:  I could see it could lead to a

1    problem, but I don't think we are there yet.  I
2    guess this is a good opportunity to just let
3    everybody know that I don't think she is going to
4    make it on to this jury.  I expect that nobody
5    should call on her and I will, if she raises her
6    hand, I will have to try to come up with a way to
7    not call on her.
8              MS. LAVIN:  I think we don't know what
9    kind of discussion she has had with other jurors
10   outside.  She knows she was the best friend of the
11   victim's sister.  We just don't know.  I will make
12   that point.  I think the sooner we can let her go,
13   the better.
14             THE COURT:  I agree, I just always worry
15   about letting people go.
16             MS. WILSON:  Letting her go at this time
17   excusing her right away I think would have an
18   appearance just as well.
19             THE COURT:  Why don't I just take a break
20   right now and during the break we will let her know
21   that she is excused.
22             MR. ELSENHEIMER:  Even if we go a little
23   more questioning and really take a break, that
24   really doesn't look like it is that close in time.
25             THE COURT:  One of the issues that you

1  raised, I don't know that she knew which case she

2  was.

3          MR. ELSENHEIMER:  She works for dispatch

4  in Espanola, so it is likely that she did.

5          MR. NAYBACK:  She wouldn't have known that

6  she was called for U.S. versus Smith this morning.

7          MR. ELSENHEIMER:  Sure, that is true.

8          THE COURT:  I don't know that she would

9  have said anything to the panel members before, but

10 I don't want her to say anything after.

11          So when I excuse her, I am going to have

12 to make sure somebody is --

13          MS. WILSON:  Just for the record, the

14 victim's name was never mentioned.

15          THE COURT:  Correct.  I won't take a break

16 just yet, we will ask a few more questions.

17          (Whereupon the following proceedings were

18 held in Open Court.)

19          THE COURT:  All right.  Now every now and

20 then in any kind of legal proceeding there are

21 issues that come up that we need to address, and I

22 do my best to try to anticipate things and have

23 these kinds of discussions before the jury comes in

24 or in this case the jury panel comes into the

25 courtroom, but sometimes there are just things that

1  come up, so I hope you bear with us.  It is

2  important that we make sure that everything is done

3  correctly, so thank you for your patience.

4          Have any of you or any member of your

5  family or anyone close to you ever been employed by

6  a law enforcement agency?  And when I say law

7  enforcement agency, I mean, of course, the obvious

8  things like police departments, sheriff's

9  departments, but I also mean things like FBI, DEA,

10  anything that involves the investigation of crimes

11  or traffic offenses, anything.

12          I see one hand, two hands in the jury box.

13          POTENTIAL JUROR:  My name is Hind Joseph.

14          Did you say employed or work with?

15          THE COURT:  Any of the above.

16          POTENTIAL JUROR:  I am a City of

17  Albuquerque Tort Adjustor, so I work with APD,

18  investigate claims on a daily basis.

19          THE COURT:  Okay.  Can everybody hear

20  Ms. Joseph?  It sounds like everybody, it seems like

21  everybody can hear you.

22          You are close enough to me that I can hear

23  you, but I want to make sure everybody can hear you.

24          So you are a tort investigator?

25          POTENTIAL JUROR:  Tort adjustor, yes, for

1  risk management.

2          THE COURT:  Okay.  And in that job you

3  work with APD?

4          POTENTIAL JUROR:  APD on a daily basis,

5  yes, ma'am.

6          THE COURT:  All right.  Is there anything

7  about your knowledge of APD officers or friendship

8  with them or anything about what you know they do

9  that might make you favor police testimony or the

10 prosecution side of the case over the defense?

11         POTENTIAL JUROR:  Well, if they are under

12 oath, I would definitely believe their testimony.

13         THE COURT:  So you would believe if they

14 are under oath.

15         POTENTIAL JUROR:  Yes.

16         THE COURT:  Really what I want to know is

17 whether you think you could be fair to both sides of

18 the case.

19         POTENTIAL JUROR:  Absolutely.

20         THE COURT:  And so if a law enforcement

21 officer is testifying on one side of the case, do

22 you automatically give that testimony more weight

23 than you would a defense witness, for example?

24         POTENTIAL JUROR:  If he is under oath,

25 yes, I would.

```
 1                THE COURT:  Okay.  Thank you, Ms. Joseph.
 2                All right.  Then I did see Ms. Nixon's
 3       hand.
 4                POTENTIAL JUROR:  My brother-in-law worked
 5       for the Farmington Police Department for a few
 6       months in 2007.
 7                THE COURT:  All right.  And is there
 8       anything about his employment there that would cause
 9       you to look more favorably on law enforcement or the
10       prosecution side over the defense?
11                POTENTIAL JUROR:  No.
12                THE COURT:  Okay.  Thank you, Ms. Nixon.
13                And one more in the jury box.
14                POTENTIAL JUROR:  Your Honor, I have two
15       friends that are officers with APD Southeast, Lee
16       Mudworth and Dane Sims, and my son-in-law is Border
17       Patrol.
18                THE COURT:  I'm sorry, I can't hear you.
19                POTENTIAL JUROR:  My son-in-law is Border
20       Patrol.
21                THE COURT:  Your name is Ms. Crandall,
22       right?
23                POTENTIAL JUROR:  Yes.
24                THE COURT:  I think I am going to need you
25       to speak into the microphone.  She will hand you the
```

1   microphone.  I just have another question or two for

2   you.

3           So with your friends and your son-in-law

4   working in law enforcement do you think that would

5   cause you to give the law enforcement side of the

6   case more weight or could you be fair to both sides?

7           POTENTIAL JUROR:  I think I could be fair,

8   yes.

9           THE COURT:  All right.  Thank you,

10  Ms. Crandall.

11          Now moving to the person in the middle,

12  Ms. Howells.

13          POTENTIAL JUROR:  Yes, ma'am.

14          My stepfather was employed by Farmington

15  Police Department, but has retired about six years

16  ago, and an uncle San Juan County Sheriff's Office,

17  Roy Truby (phonetic), a deputy and he also retired

18  over ten years ago.

19          THE COURT:  Okay.  So because of your

20  relationship with these retired law enforcement

21  officers do you feel that that would cause you to

22  weigh the prosecution side more favorably than the

23  defense?

24          POTENTIAL JUROR:  No, ma'am.

25          THE COURT:  You could listen fairly to the

```
 1   defense side of the case?
 2              POTENTIAL JUROR:  Yes, ma'am.
 3              THE COURT:  And make a decision fairly and
 4   impartially based on the evidence?
 5              POTENTIAL JUROR:  Yes, ma'am.
 6              THE COURT:  Okay.  Thank you.
 7              I did see another hand on that side of the
 8   courtroom, I believe, maybe not.
 9              So going across the aisle.  And so,
10   Ms. Dishta, you have friends or relatives who worked
11   in law enforcement?
12              POTENTIAL JUROR:  I myself work in law
13   enforcement.
14              THE COURT:  Okay.  Tell me where you work.
15              POTENTIAL JUROR:  I work for the
16   Santa Clara Tribal Police.
17              THE COURT:  Okay.  Thank you, Ms. Dishta.
18              All right.  I see no other hands.
19              Have any of you or anybody in your family
20   or anybody close to you ever worked for an attorney
21   or in a legal office?  And when I say legal office,
22   it would be, for example, the legal department of a
23   business or an agency.
24              I see no hands.
25              Let me ask you do any of you have any kind
```

1    of a medical issue that might prevent you from

2    serving as a member of the jury, for example, do any

3    of you have any hearing problems or do you have any

4    vision problems that would prevent you from hearing

5    or seeing all the evidence, all the testimony.

6            Do you have any physical ailments

7    sometimes people have back problems makes it hard

8    for them to sit for a long time.  So anything that

9    you can think of that might prevent you from being

10   able to serve as a juror in this case.

11           And Ms. Crandall?

12           POTENTIAL JUROR:  Yes, I am hard of

13   hearing.  I have hearing aids but I still have a

14   hard time hearing.  The back is to me or soft

15   voices, I can't hear you.

16           THE COURT:  Let me ask you, have you had

17   difficulty hearing anything that has gone on in the

18   courtroom this morning?

19           POTENTIAL JUROR:  No, I heard you great.

20           THE COURT:  Anybody else?

21           Is there anybody who has any kind of a

22   personal issue that might be distracting for you

23   during this trial if you were selected as a juror?

24   And I know sometimes people have someone at home who

25   is ill or things like that, that might prevent you

1  from focusing on the issues involved in this

2  proceeding.

3          I don't see any hands.

4          All right.  I have a matter that I need to

5  address and I am going to have to take a short

6  break.  So what I, so I will ask you I will pay

7  attention to where you are sitting so that if you

8  decide you want to get out of the courtroom for a

9  couple of minutes, stretch your legs or whatever,

10  you can return to your seat.

11          Yvonne will make sure that everybody is

12  back in their seats before we reconvene.

13          I am thinking it won't be more than about

14  ten minutes, okay.  So, thank you.  We'll be in

15  recess for about ten minutes.

16          (Whereupon the jury panel exits the

17  courtroom.)

18          (A recess was taken.)

19          THE COURT:  All right.  We are back on the

20  record.

21          Let me ask, I am going to ask a number of

22  questions now that go to a slightly more substantive

23  issues.  So the background or context, I guess, for

24  my questions is that there may be evidence that is

25  presented to you that the defendant was awakened at

1:00 in the morning and believed there was a
trespasser on his property where he lived at the
Western Winds Motel in Espanola.  And there may be
testimony that he fired his gun to scare the
trespasser away.

So with that background, that leads me to
my questions.  And let me ask for a show of hands,
do any of you own any guns?

All right.  So I do see, let's see, three,
four, eight, nine, ten, ten of you, okay.  All
right.  So is there anything, now you have not heard
any evidence in this case.  Let me tell you
everything I say, everything the lawyers say in this
process is not evidence.

So we are asking you questions to kind of
gauge your feelings about certain issues, but this
is not evidence.  And if you are selected to be a
juror and you hear the witnesses testify from the
witness stand, that is the testimony.

If we, if there are exhibits that are
introduced, that is the evidence that you rely on,
not what we say here in jury selection.

So is there anything about the fact that a
firearm was involved in this case that would make
any of you feel like you could not serve as a juror

1    in this case fairly?

2              Have any of you or anybody close to you

3    ever been involved in a criminal matter, either as a

4    defendant, as a witness in a case or as a victim of

5    any kind of a crime?

6              When I say any kind of a crime, it could

7    be a property crime like a burglary, it could be a

8    financial crime, anything.  And I do see a hand.

9              Ms. Howells.

10             POTENTIAL JUROR:  What do you mean by

11   crime?  Would like child abuse and neglect be

12   considered that?

13             THE COURT:  Anything.

14             POTENTIAL JUROR:  So my son, a few years

15   ago our babysitter was caught using meth, like when

16   he was being watched by her.  We had to go through a

17   DA process and it was settled outside of court, but

18   we were involved in that.

19             THE COURT:  So I see that you did get a

20   little emotional talking about that.  This case does

21   not involve anything like that, but do you think

22   that there is anything about your situation that

23   might cause you to be uncomfortable if you were

24   sitting as a juror in this case and deciding a

25   criminal matter?

```
 1              POTENTIAL JUROR:  No, ma'am, no.
 2              THE COURT:  Okay.  Thank you.  Anybody
 3     else?  Again, been involved in a criminal matter
 4     either as a defendant or as a witness or as a
 5     victim.
 6              I see no other hands.
 7              Have any of you or any family member or
 8     anybody close to you ever fired a weapon to scare
 9     off an intruder or scare off an animal or anything
10     like that?
11              I see no hands.
12              Have any of you or, again, anybody close
13     to you or family member had a situation that relates
14     to an intruder or a trespasser on your property?
15              THE COURT:  Let me call on, is that
16     Ms. Chavez?
17              POTENTIAL JUROR:  Yes, ma'am.  My uncle,
18     he caught someone intruding with a gun and pistol
19     whipped him.
20              THE COURT:  I am trying to hear you but I
21     am having trouble, so thank you for going to the
22     microphone.
23              POTENTIAL JUROR:  I am Melanie.  My uncle
24     was pistol whipped as some intruder knocked on the
25     door, wanted a glass of water and then they hit him
```

1    over the head with a pistol.

2              THE COURT:  And was the intruder charged

3    with any crime?

4              POTENTIAL JUROR:  I don't know.  I didn't

5    go that far.  I don't think they found him.  It was

6    two individuals and I don't think they ever found

7    them.

8              THE COURT:  All right.  So did your uncle

9    require any kind of medical treatment?

10             POTENTIAL JUROR:  Yes, ma'am.

11             THE COURT:  Okay.  Was there anything, was

12   there a reason for this?  Was anything stolen

13   from --

14             POTENTIAL JUROR:  They were trying to

15   steal, they were trying to steal from him.  He was

16   just watering his garden.  He was trying to be nice.

17   They wanted water, so he went in to get some water

18   and that is when they went ahead and did what they

19   did.

20             THE COURT:  So understanding that you have

21   this family situation, do you think that there is

22   anything about your uncle's situation that you might

23   carry with you and would influence you if you were

24   listening to the evidence in this case?

25             POTENTIAL JUROR:  No, ma'am.  I think it

1    is heartbreaking, you know, something like that

2    happens, it is just heartbreaking.  But I don't

3    think it would influence me in any way.

4              THE COURT:  Do you think it would cause

5    you to look more favorably at the defense side of

6    this case?

7              POTENTIAL JUROR:  No, I don't believe so.

8              THE COURT:  Is there anyone else who has,

9    either yourselves or family members or close friends

10   who had an experience with an intruder or

11   trespassers on their property?

12             Okay.  I don't see any other hands.

13             Let me talk for a moment with you about

14   the Government's burden of proof.  Does everybody

15   understand that it is the Government that bears the

16   burden of proof in a criminal trial?  So it is up to

17   the Government to prove that the defendant is guilty

18   beyond a reasonable doubt.  Does everybody agree

19   with that.  Does anybody disagree with that?

20             Is there anybody here that would require

21   the defendant to prove his innocence?

22             And nobody is raising their hand.

23             So essentially if the Government does not,

24   if you believe after you hear all the evidence in

25   the case that the Government has not proven its case

1    beyond a reasonable doubt, do any of you think that

2    even if the Government didn't prove the case beyond

3    a reasonable doubt that you would be unable to find

4    the defendant not guilty?

5            So even if you were convinced that the

6    Government had not proven its case, would anybody

7    have trouble finding the defendant not guilty?

8            Okay.  I see no hands.

9            Now, let me just talk a moment about the

10    concept of reasonable doubt.  I know we all watch TV

11    shows, I am sure we watch court shows, crime shows

12    where they sometimes talk about guilt beyond a

13    shadow of a doubt or beyond all doubt.  Concepts

14    like that.

15            Does everybody understand that that is for

16    TV, it is not real life?  So that in this courtroom

17    the Government's burden is to prove beyond a

18    reasonable doubt.  It doesn't mean beyond all doubt,

19    it just means beyond a reasonable doubt, which means

20    a doubt that is based on reason and common sense.

21            Would anybody hold the Government to the

22    standard of beyond all doubt or beyond a shadow of a

23    doubt, anybody?

24            And I see no hands.

25            Another issue in criminal cases is the

 1    defendant's Fifth Amendment right not to testify.
 2    So basically what that means is that an individual
 3    is not required to prove his innocence, is not
 4    required to testify.  And if an individual chooses
 5    to exercise their right and not testify, that person
 6    should not be thought to be guilty.
 7              So can everybody, is there anybody who has
 8    any problem with the idea that a defendant has the
 9    right not to testify?
10              Does anybody disagree with that concept?
11              I see no hands.
12              So is there anybody here that would hold
13    it against the defendant if he did not testify?
14              Now I told you already that this case
15    involves a charge of second-degree murder, so some
16    of the evidence in this case may be graphic.  Do any
17    of you feel that you could not sit as a juror in
18    this case and view graphic visual evidence and
19    listen to graphic testimony?
20              Does anybody feel they would have a
21    problem with that?
22              Okay.  I see no hands.
23              Now, again you haven't heard any evidence
24    yet at all, but based on what you have heard so far
25    from me, do any of you feel like you would have

1    feelings or biases against the Government's side of

2    the case based solely on what you have heard so far?

3    Anybody feel like you would be biased against the

4    Government on this case, or have any negative

5    feelings about the Government based on what you have

6    heard so far?

7                And I see no hands.

8                I am going to ask the flip side of that

9    question.  Do any of you have any kind of negative

10   feelings or biases towards the defendant based on

11   what I have said, the questions I have asked you so

12   far here today?

13               I see no hands.

14               So what that tells me is all of you feel

15   that you can listen to the evidence and decide

16   fairly, based on the facts that you hear in this

17   courtroom and not be influenced by any kind of bias.

18               Anybody disagree with that?

19               Now, at the end of the case one of my jobs

20   is to instruct you on what the law is that you

21   should apply as you decide the facts of this case.

22               Now, I know that sometimes people feel

23   like maybe they wish a law didn't exist or maybe a

24   law should be changed.  I know for many years in my

25   early days as a Judge there were a lot of people who

1  took issue with some of the drug laws, for example,

2  and now, again, you don't know all of the

3  intricacies of this case yet, but based on what you

4  have heard, is there any reason you can think of

5  that you would not be able to follow the Court's

6  instructions on the law.

7          Do you feel you would be able to follow

8  the law and apply the law as the Court instructs you

9  at the end of the trial?

10         Everybody seems to be in agreement with

11  that concept.  So does everybody understand the

12  English language?  Is everyone understanding what

13  has gone on in the courtroom so far?  Okay.

14         Now, I know I have asked you a number of

15  questions today but let me ask you this:  Is there

16  anything that comes to your minds that suggests to

17  you, anything that I have not asked you about that

18  might make you feel that you could not sit fairly as

19  a juror in this case?  Anybody have any feeling

20  like, I don't know that this is the case for me,

21  anything like that?  No.

22         All right.  I think I am about done here,

23  let me just review my notes quickly.

24         So what I am going to do is give the

25  attorneys an opportunity to ask you some questions.

1    Normally they don't take as long as I just did, so I
2    am expecting, I can't see the clock over there.  I
3    expect that we will -- the attorney portion of the
4    questioning, I am thinking we will be done with
5    their questions before 11.  But what I am going to
6    do is I am going to ask the attorneys to come to the
7    corner here so we can just coordinate for a moment
8    before I turn it over to you.
9                 (Whereupon a Bench discussion was held
10   outside the hearing of the jury.)
11                 MS. WILSON:  I think we still need to go
12   over the witnesses.  I will probably do much like
13   last time.
14                 MR. ELSENHEIMER:  The same, maybe just a
15   couple of questions about gun ownership.
16                 THE COURT:  All right.  Good enough.
17                 Does anybody disagree with my time
18   estimate that we will be done with the questioning
19   about 11?
20                 (Whereupon the following proceedings were
21   held in Open Court.)
22                 THE COURT:  So I am about to turn it over
23   to the attorneys, but I do need to find out if any
24   of you on the jury panel know any of the witnesses
25   who may testify in this case.  What I would like to

1    do is run through the list of witnesses.  I will

2    start with the Government's witnesses.

3            Ms. Wilson, can you go through the list

4    but go slowly so the panel members have an

5    opportunity to raise their hand and let us know if

6    they know anybody.

7            MS. WILSON:  Yes, Your Honor.  Thank you.

8            Espanola Police Department Detective Byron

9    Abeyta; OMI Field Deputy Investigator Lynne Gudes,

10   G-U-D-E-S; Dr. Matthew Cain; FBI Photographer Tammy

11   Peter; FBI Special Agent Bryan Acee; FBI Physical

12   Scientist and Forensic Examiner Theodore Chavez; FBI

13   Photographer Nathan Schwabedissen; Geraldine

14   Gutierrez; Derrick De La Cruz; and Daniel Smith.

15           THE COURT:  So I never saw any hands go

16   up, so I take that to mean nobody on the panel knew

17   any of the Government's witnesses.

18           Mr. Elsenheimer, can you please let us

19   know if you have any additional witness that have

20   not already been mentioned.

21           MR. ELSENHEIMER:  Certainly, Your Honor.

22           Good morning everyone.  Does anyone know

23   Ercilia Trujillo; Judy Wheat; Billie Wheat; and

24   Espanola Police Officer Albert Rael?

25           THE COURT:  Again, I didn't see any hands

```
 1    go up as Mr. Elsenheimer was reading the list of
 2    witnesses, so I take that to mean that the panel
 3    doesn't know any of them.
 4              So I will now turn it over to the
 5    attorneys.  We will begin with the Government's side
 6    of the case.
 7              Ms. Wilson.
 8              MS. WILSON:  Thank you, Your Honor.  Good
 9    morning again.  My name is Novalene Wilson and again
10    with my colleague, Mr. Kyle Nayback.  We are
11    responsible for introducing the evidence that
12    supports the charges against the defendant, Douglas
13    Smith.
14              We talked a little bit about what the case
15    is.  I just want to follow-up on a few things.
16    Those of you who own guns and have shot guns, I
17    wanted to know, do you know the basic gun safety
18    rules?  I see a few nods, you do?  Anybody want to
19    let us know a couple of those rules?
20              POTENTIAL JUROR:  Make sure your safety is
21    on.
22              MS. WILSON:  Okay.  And you're Juror
23    Number 61.
24              POTENTIAL JUROR:  Yes.
25              THE COURT:  Make sure your safety is on.
```

1  That is important.  Any other rules folks may know

2  of when you think of gun safety?

3              POTENTIAL JUROR:  Muzzle control.

4              MS. WILSON:  Muzzle control.  Has anyone

5  heard of the rule, Never point your gun at something

6  you are not prepared to destroy.  I see a few more

7  nods.

8              Juror 51, have you heard of that before?

9              POTENTIAL JUROR:  Yes, I have.

10              MS. WILSON:  And what does that mean to

11  you?

12              POTENTIAL JUROR:  So it means that you

13  shouldn't point a gun.  I have also heard the rule,

14  Always assume the gun is loaded.

15              So even if you know for a fact it is

16  unloaded, you don't want to point that gun at

17  anybody.

18              MS. WILSON:  Why do you think that is

19  important?

20              POTENTIAL JUROR:  Just so that you are in

21  control of the weapon that you are holding.

22              MS. WILSON:  And another rule, let's see,

23  have you guys heard about, Always be sure of your

24  target and what is behind it.  Have you guys heard

25  that one as well?

```
 1            I think I see you Juror Number 53 nodding,
 2  Mr. Berger.  You have heard that rule before?
 3            POTENTIAL JUROR:  Yes.
 4            MS. WILSON:  What do you know about that
 5  rule?
 6            POTENTIAL JUROR:  It is one of the rules.
 7            MS. WILSON:  Why do you think it is
 8  important?
 9            POTENTIAL JUROR:  You need to know what
10  your target is, where your target is, what is behind
11  it.  So if you don't miss your target, you don't
12  hurt or harm somebody else or something else.
13            MS. WILSON:  And that would be important
14  shooting at night, per se?
15            POTENTIAL JUROR:  That would be important
16  shooting at night.
17            MS. WILSON:  Thank you.
18            I wanted to talk just a little bit about
19  the distinction between an intruder and a
20  trespasser.  What does that mean to you-all if
21  somebody is trespassing versus somebody intruding?
22            Ms. Howells, Number 59.
23            POTENTIAL JUROR:  I feel like an intruder
24  would pose more threat.  You would feel more
25  threatened, so your instinct to protect your family
```

1   would come more naturally versus somebody who is

2   trespassing.

3           MS. WILSON:  When you are thinking of

4   somebody trespassing --

5           POTENTIAL JUROR:  Maybe coming through

6   your yard, walking on your property, maybe digging

7   through your trash, I don't know.

8           MS. WILSON:  And intruder what do you

9   think of?

10          POTENTIAL JUROR:  Coming through your

11  window or front door.

12          MS. WILSON:  Thank you.

13          I appreciate your time.

14          Thank you so much.

15          THE COURT:  Thank you, Ms. Wilson.

16          I will now turn to Mr. Elsenheimer.

17          MR. ELSENHEIMER:  Thank you, Your Honor.

18          Good morning everyone.  My name is Aric

19  Elsenheimer, and I represent Douglas Smith.  I am

20  joined by my colleague Amanda Lavin and my colleague

21  Daniel Berg.

22          First of all, I want to thank you for

23  being here and participating in the jury selection

24  process.  In my view, this is one of the most

25  important things that we as citizens can do in a

1    democracy.  I want to thank you for participating in

2    this.  I know it is time out of your day and it is

3    time away from your jobs and your families and all

4    of that, so I really appreciate that.

5           The voir dire process, the word, I think

6    the word voir dire, what they mean and whether it is

7    Latin or French, voir dire means to tell the truth.

8    And that is really what we are talking about here in

9    the voir dire process.  We are asking you to tell

10   the truth about your background and your experience

11   and things that have happened to you in your life

12   that shapes the way you think about the world and

13   that shapes the way you think about events that you

14   see or, in this case, for example, evidence that you

15   are going to hear.

16          You know, we have been talking about are

17   you biased against the prosecution or might you be

18   biased against the defense.  I want to talk about

19   that word bias.  We are not asking, you know, we

20   hear the word bias and there is something that

21   sounds maybe icky or bad about that.  I don't mean

22   that in any way that it is a bad thing.  All of us,

23   because of our experiences, because of where we have

24   been in our life and the things we have done, have

25   particular views on the world.  And in that way we

1    might view things in a certain way and that is what

2    we are talking about.  It is not bias, it is really

3    what shapes our perspective on events.

4            So, you know, let me ask again, is

5    anybody, based on what you have heard today, based

6    on what the Judge has said about what this case,

7    what the evidence is you might hear in this case, is

8    anybody concerned you might have a particular

9    perspective against the defense or against the

10   prosecution?  Does anybody, after you have thought

11   about this or heard us talk about this, does anybody

12   have any thoughts that kind of rise up in your

13   minds, anybody?

14           In a couple of minutes I want to talk

15   about the burden of proof and the burden on the

16   prosecution and the requirement that they prove

17   their case beyond a reasonable doubt.  But before I

18   get to that I think that a number of you raised your

19   hands that you are gun owners.  I am going to test

20   my memory here and look around and see if I can

21   remember who raised their hand awhile ago when the

22   Judge asked that.

23           Ms. Nixon, I think you raised your hand.

24   Did you raise your hand?

25           POTENTIAL JUROR:  Yes.

```
 1              MR. ELSENHEIMER:  Why is it you own guns?
 2              POTENTIAL JUROR:  I married a man who has
 3    guns and now they are shared.
 4              MR. ELSENHEIMER:  Why is it that your
 5    husband owns guns?
 6              POTENTIAL JUROR:  He used to hunt with his
 7    dad.
 8              MR. ELSENHEIMER:  Okay.  Thank you.
 9              Anyone else who I can't remember.
10    Mr. Rushton, did you say you own guns?
11              POTENTIAL JUROR:  I do not but I have used
12    them.
13              MR. ELSENHEIMER:  Okay.  Why do you think
14    somebody might own a gun?
15              POTENTIAL JUROR:  For shooting.  My
16    father-in-law, he does skeet shooting and other gun
17    target practices and other things.
18              MR. ELSENHEIMER:  Kind of shooting sports?
19              POTENTIAL JUROR:  Yes, thank you.
20              MR. ELSENHEIMER:  Thank you, Mr. Rushton.
21              Who on this side raised their hands about
22    gun ownership?  Can I ask, is it Mr. Villa, why do
23    you own guns?
24              MR. ELSENHEIMER:  Home protection.
25    Personal home protection.
```

```
 1              THE COURT:  I think he said --
 2              MR. ELSENHEIMER:  I'm sorry, would you
 3     mind stating that again, Mr. Villa.
 4              POTENTIAL JUROR:  Home and personal
 5     protection.
 6              THE COURT:  Thank you.
 7              MR. ELSENHEIMER:  On the flip side of
 8     that, you know, a lot of people have very strong
 9     feelings about guns one way or the other.  No
10     criticism either side but, you know, we hear in the
11     news, we hear in the newspaper and on TV that a lot
12     of people have very strong emotions about gun
13     ownership, so I have asked people to raise hands who
14     own guns.
15              What about the flip side of that?  Does
16     anybody have a really strong feeling that people
17     should not have guns, that guns are maybe a problem?
18     Does anybody have feelings like that?
19              Let me ask you, let me go back, and the
20     Judge talked about this, and I want to talk a little
21     bit more.  In our society someone who is charged
22     with a crime is presumed innocent.  They are
23     innocent unless and only unless the Government can
24     prove their case beyond a reasonable doubt.  The
25     Government has charged that Mr. Smith -- charged
```

1    Mr. Smith with second-degree murder.  Mr. Smith is

2    innocent as he sits there.  He is innocent and he

3    remains innocent unless the Government proves their

4    case beyond a reasonable doubt.

5             Does anybody have a problem with that?

6    Does anybody have a concern that they might not be

7    able to honor that principle?

8             Will you all commit to honoring that

9    principle that this man is innocent and he remains

10   innocent and if you have a question about what

11   happened or a question about the evidence that the

12   Government has put on, what will you do if you have

13   a question and you don't think that they have proven

14   their case beyond a reasonable doubt?  What do you

15   do?  What is your verdict?  What would your verdict

16   been in that situation?

17            POTENTIAL JUROR:  He would be innocent.

18            MR. ELSENHEIMER:  And you would find him

19   not guilty?

20            POTENTIAL JUROR:  That's correct.

21            MR. ELSENHEIMER:  Thank you, Mr. Rushton.

22   Anyone else?

23            Ms. Nixon, in that situation what would

24   your verdict be?

25            POTENTIAL JUROR:  If the Government has

1    not proven their case, then I would find him not

2    guilty.

3              MR. ELSENHEIMER:  What if you had a

4    question, you had a question about what happened and

5    the evidence just, it was like a puzzle and there

6    were a couple of pieces missing from the puzzle, you

7    know, to have full proof beyond a reasonable doubt

8    you needed those extra pieces.  Would you want to

9    hear from Mr. Smith or would you want the defense to

10   put on something?

11             POTENTIAL JUROR:  Are we allowed to ask

12   questions?

13             MR. ELSENHEIMER:  The juror would be

14   allowed to ask questions.  After all of those

15   questions, after the evidence has come in, I am

16   asking you at that --

17             THE COURT:  I am not sure the jury gets to

18   ask questions.

19             MR. ELSENHEIMER:  After all of the

20   evidence is in, you are back in the jury room

21   deliberating and there are a couple of pieces of

22   that puzzle missing, would you want the defense to

23   do anything to put in that evidence to say oh, why

24   didn't the defense provide this evidence or provide

25   this testimony?  Would you require that?

```
 1              POTENTIAL JUROR:  No.
 2              MR. ELSENHEIMER:  You would put it
 3  entirely on the Government.
 4              POTENTIAL JUROR:  Yes.
 5              MR. ELSENHEIMER:  Thank you, Ms. Nixon.
 6              I know we touched on this, I want to go
 7  over it one more time.  We are at the tail end of
 8  the pandemic, knock on wood.  But I know that some
 9  people, a lot of us, those of us who are up here are
10  vaccinated, we don't wear masks.  Is anybody
11  concerned about that?  Does anybody have a concern
12  that might shape how you view the lawyers, the court
13  staff or anything like that in this case for not
14  wearing a mask?
15              THE COURT:  Or the Judge?
16              MR. ELSENHEIMER:  Or the Judge.
17              May I have a moment, Your Honor?
18              THE COURT:  You may.
19              MR. ELSENHEIMER:  Ms. Vidal, I think you
20  mentioned that you are traveling.  Is it the 24th
21  you are leaving town?
22              POTENTIAL JUROR:  The 21st.
23              MR. ELSENHEIMER:  The 21st.  So in
24  preparation for that you have to get ready to
25  travel.  That sometimes takes time.  I think you
```

1    mentioned you are also working?

2            POTENTIAL JUROR:  I do.

3            MR. ELSENHEIMER:  There is also childcare.

4            POTENTIAL JUROR:  Yes.

5            MR. ELSENHEIMER:  So my question for you

6    is this:  So if this trial goes to the end of this

7    week, is there any concern that you might be

8    distracted or not be focused on the evidence that

9    you hear in this case because you are going to be

10   making preparation or concerned about travel plans?

11           POTENTIAL JUROR:  I think there will be a

12   little bit of anxiety, but I still think I would be

13   able to focus.

14           MR. ELSENHEIMER:  Thank you very much,

15   ladies and gentlemen.  Thank you.

16           THE COURT:  All right.  That concludes the

17   questioning process, so let me explain to you what

18   we are going to do.  You're the third group that we

19   have met with.  We met with two groups yesterday, so

20   I will need to get together with the lawyers and we

21   are going to go through all three groups.  And I am

22   expecting that we will not keep you waiting too

23   long, but the way the process works is you will

24   wait, second floor.

25           Yvonne will let you know where to go and

1    when the attorneys and I finish our work, I will
2    bring in each group as they appeared with us
3    yesterday.  So I will bring the first group in and
4    then the second group and then you are the third
5    group, so it would take maybe a little bit of time
6    but I think I can be done with the lawyers, I don't
7    know, in about 20 minutes or so.  So after that, we
8    will bring in the first group and then the second
9    group and the third, then you, the third group.
10            That is my long-winded way of saying that
11   I think we will be done with you by noon, but I do
12   not expect you to come back this afternoon unless
13   you are selected for the jury.
14            So if you are selected for the jury, then
15   my plan is that we would start with our opening
16   statements and then go on to the presentation of
17   evidence this afternoon.
18            So we will hit the gas, pedal to the
19   metal, I guess, is the saying.  We will get going on
20   the case.  So I will excuse you-all at this time so
21   please rise, everyone, while our jury panel leaves
22   the courtroom.
23            (Whereupon the jury panel exited the
24   courtroom.)
25            (Open court, outside the presence of the

1  jury.)

2          THE COURT:  So I will give you-all some

3  time to go over your notes and we will get together

4  here in the courtroom in 15 minutes or so.

5          MR. ELSENHEIMER:  Is the Court willing to

6  let us know how we are going to do, so we are

7  looking over our notes for cause but how you are

8  going to handle peremptories today?

9          THE COURT:  When you are ready we will

10  take up first the challenges for cause on the third

11  group and then we will go through the peremptories

12  for all three groups.

13          MR. ELSENHEIMER:  Okay.  Could I suggest

14  just five minutes on cause challenges because I

15  don't think there were that many.

16          THE COURT:  Sure.  Are you ready to go now

17  on challenges for cause?

18          (Discussion off the record.)

19          THE COURT:  Are you ready to go on cause?

20          MR. NAYBACK:  We are, Your Honor.

21          THE COURT:  All right.  Mr. Nayback?

22          MR. NAYBACK:  Number 50, Robert J. Villa.

23  This is the gentleman who first spoke to the Court

24  about a number of issues, but said --

25          THE COURT:  Well, hold on.  I prefer to

1    find out whether or not there is any dispute.

2                MR. NAYBACK:  I'm sorry.

3                THE COURT:  Mr. Elsenheimer?

4                MR. ELSENHEIMER:  We disagree.

5                THE COURT:  Okay.  Go ahead, Mr. Nayback.

6                MR. NAYBACK:  So he told the Court that he

7    teaches a class at the Los Alamos National Labs.  I

8    know that he is a financial analyst of sorts, that

9    he cannot reschedule on Thursday.

10               That, in addition to he seemed to be fine

11   with his masking and glove practice, but the class

12   that cannot be rescheduled I think would take him --

13   he didn't budge on that and I think for that reason

14   we seem to have enough jurors that he should be

15   excused for cause.

16               THE COURT:  Mr. Elsenheimer?

17               MR. ELSENHEIMER:  Mr. Villa said that

18   there is no coverage but perhaps he could change his

19   schedule.  He didn't seem like that was a problem.

20               THE COURT:  I agree.  It didn't seem like

21   that.  I think he said perhaps is the only question

22   in my mind but he didn't say it was impossible,

23   unlike, say, other people who did.  So I will deny

24   the challenge for cause.  I would have excused him

25   based on some of the information in his

```
 1   questionnaire about the autoimmune, but he didn't
 2   seem to have an issue today so --
 3            MR. NAYBACK:  I don't know if anyone else
 4   noticed, I just noticed him sleeping a fair amount
 5   in the front row.  I don't know if the autoimmune
 6   has anything to do with it but his eyes were shut a
 7   fair amount of time.
 8            THE COURT:  I didn't see.  I couldn't see
 9   that.
10            MS. LAVIN:  We didn't see that, either.
11            THE COURT:  Next?
12            MR. NAYBACK:  Mitzi Yvonne Enriquez said
13   she has child --
14            THE COURT:  Hold on.
15            MR. ELSENHEIMER:  No opposition.
16            THE COURT:  Okay.  We will excuse
17   Number 54, Ms. Enriquez.
18            MR. NAYBACK:  Number 65, Michael Douglas
19   Conway.
20            MR. ELSENHEIMER:  No opposition.
21            THE COURT:  We will excuse Mr. Conway.
22   Those people in Northern New Mexico need their
23   propane.
24            Next.
25            MR. NAYBACK:  That is the end of the
```

1    panel.

2            MR. ELSENHEIMER:  Your Honor, we would

3    move for Number 45, Hind Joseph.

4            THE COURT:  Is there objection?

5            MR. NAYBACK:  Yes.

6            THE COURT:  Okay.  Go ahead,

7    Mr. Elsenheimer.

8            MR. ELSENHEIMER:  She said she would

9    definitely give law enforcement more weight than lay

10   witnesses.  I think that is a basis for cause.

11           MR. NAYBACK:  I changed my mind.  No

12   objection.

13           THE COURT:  Ms. Joseph is excused.

14   Anybody else?

15           MR. ELSENHEIMER:  No, Your Honor, I don't

16   believe so.

17           MR. NAYBACK:  No, Your Honor.

18           THE COURT:  All right.  So I will let you

19   go to work to come up with your peremptories.  We

20   will get together in, what do you need, ten minutes,

21   15 minutes?

22           MR. ELSENHEIMER:  Can we have 15?

23           (A recess was taken.)

24           THE COURT:  So what I will do is I am

25   starting with, obviously, Group Number 1 and my plan

1    and I take no offense if anybody corrects me because

2    my plan is to take turns.  I will start with the

3    peremptories with the Government and then you go

4    second, but then I switch it, I alternate.  So then

5    the next one you will go first and they will go

6    second.  And sometimes I confuse myself, so I expect

7    that you will let me know if it is not your turn to

8    go first.

9              MR. ELSENHEIMER:  Before we get going,

10   Yvonne mentioned that Juror Number 35, I believe it

11   is Veronica Black had mentioned to somebody in the

12   jury staff that she has something on Thursday

13   afternoon into Friday which could pose a problem.

14             THE COURT:  She did say that to court

15   staff.  She did not say that to us in the courtroom

16   yesterday.  So I don't know, what do you think?

17             MR. ELSENHEIMER:  We could bring her in

18   for questioning just to clarify or find out more

19   about that to see if it is a problem.  If it is

20   something that she has a conflict on then that could

21   really pose a problem.  Maybe it came up since she

22   was in here yesterday.  She is 35, so it would have

23   been in the afternoon.

24             THE COURT:  I guess we could bring her in

25   or we could put her on the jury and if you don't --

1          MR. NAYBACK:  We are going to have

2     alternates.

3          THE COURT:  That is where I was about to

4     go.  We are going to have two alternates, so if we

5     lose her, then we lose her.

6          MR. ELSENHEIMER:  That's true.

7          MR. NAYBACK:  We fully intend to be done

8     with our case on schedule, if we are starting at

9     1:30 today.  We are resting tomorrow.  Ten

10    witnesses, three or four will be done today.  We'll

11    rest tomorrow.

12         The defense case, I can't comment on it,

13    but the witnesses they listed are three or four.  I

14    can't see it going into Friday or beyond Friday.  So

15    if she is on the jury, then she has to go, then we

16    have two alternates and maybe we should pick 14.

17         THE COURT:  Well, I think we said 14, but

18    something said, well, maybe 13, depending on how

19    many numbers we have.

20         MR. ELSENHEIMER:  I don't see how it hurts

21    for us to have two minutes of a very brief voir dire

22    with her about what her plans are.

23         THE COURT:  Well, is she anywhere nearby?

24         THE DEPUTY CLERK:  She is in Pecos.

25         (Whereupon Jury Panel Number 35 enters the

courtroom.)

THE COURT:  All right.  Ms. Black is with us, Jury Panel Number 35.

Ms. Black, one of my court staff said that you brought, you mentioned to her that you have some kind of a conflict later in the week?

POTENTIAL JUROR:  Yes, on Friday.  I thought it was next Friday that I had off, but when I called my work and let them know that I might be here for the rest of the week, they reminded me I requested for this Friday off.

THE COURT:  Okay.  So if this case ends on Thursday, you're fine?

POTENTIAL JUROR:  I am fine if it ends on Thursday.

THE COURT:  Okay.  If it goes into Friday would you be able to make any kind of changes to your plans?

POTENTIAL JUROR:  No.  It's a family gathering.  We have not seen my mom in awhile.  Me and my kids are leaving Thursday.

THE COURT:  Do you have plane reservations or are you driving?

POTENTIAL JUROR:  We are driving six hours.

```
1              THE COURT:  It is something you couldn't
2    postpone a day if we were still here on Friday?
3              POTENTIAL JUROR:  I really don't want to
4    because we haven't seen her since the beginning of
5    last year, I believe, so --
6              THE COURT:  All right.  Let me ask the
7    attorneys if they have any questions for Ms. Black.
8              Ms. Wilson?
9              MS. WILSON:  Yes.  If you are leaving to
10   see her on Friday, is it the weekend you are going
11   to be with her, that whole weekend?
12             POTENTIAL JUROR:  Yes.  Leaving Thursday.
13             MS. WILSON:  Leaving Thursday and the
14   whole weekend Friday, Saturday, Sunday with her?
15             POTENTIAL JUROR:  Yes.
16             MS. WILSON:  Okay.  It would just cut into
17   that time.
18             POTENTIAL JUROR:  It is just not hers,
19   other family as well.
20             THE COURT:  I'm sorry.
21             POTENTIAL JUROR:  It is other family as
22   well.
23             MS. WILSON:  All right.  I understand that
24   it would cut into the time that weekend with the
25   family.
```

1            That is it.

2            THE COURT:  Mr. Elsenheimer, do you have

3     any questions for Ms. Black?

4            MR. ELSENHEIMER:  Ms. Black, what time are

5     you leaving on Thursday?

6            POTENTIAL JUROR:  After I get off of work,

7     so about 5:00.

8            MR. ELSENHEIMER:  So you are spending the

9     weekend?

10           POTENTIAL JUROR:  Yes.

11           MR. ELSENHEIMER:  It is a family

12    gathering?

13           POTENTIAL JUROR:  Yes.

14           THE COURT:  All right.  Thank you.  I will

15    excuse you from the room at this time.

16           (Whereupon Jury Panel Number 35 exits the

17    courtroom.)

18           THE COURT:  All right.  Any comment?

19           MR. ELSENHEIMER:  I move again to excuse

20    her for cause.  It seems like we have plenty of

21    folks on the panel.  It seems like if we do go into

22    Friday with deliberations that would complicate her

23    plans.

24           THE COURT:  Your response?

25           MS. WILSON:  We will leave it up to

 1   Your Honor.  It sounds like it would cut into her

 2   weekend time, which I think, you know, she didn't

 3   want to do but it wasn't anything that involved

 4   plane tickets, nothing firm.  We still think we are

 5   going to be able to conclude our case early.  So

 6   with anticipation of that, we are sort of -- we will

 7   leave it to Your Honor but we think that we would

 8   object to that cause.

 9            THE COURT:  Anything else?

10            MR. ELSENHEIMER:  No, Your Honor.

11            THE COURT:  I am going to deny the

12   challenge for cause.  I expect we will be done by

13   Thursday.  If by some chance we are not, we do have

14   two alternates.  So the only issue would be at which

15   point would she be excused because if the jury

16   starts deliberating on Thursday and then she leaves,

17   I would not want to have to bring an alternate in

18   and then start the deliberations all over again.  So

19   does that affect anybody's thinking?

20            MR. ELSENHEIMER:  I mean, that is the

21   reason we are moving for cause.  I understand the

22   Government might finish but the risk, I think, is

23   deliberations.  If she is not an alternate and that

24   then spills over into Friday and she is going to be

25   perhaps rushed or not wanting to participate, that

1    could be the problem.  It doesn't seem like --

2            THE COURT:  I am less concerned really

3    about her travel as I am about my jury's

4    deliberations.  So now I am more inclined to excuse

5    her for cause because I don't want deliberations to

6    start and then we end up in a problem because she

7    has to leave or she doesn't leave and she is rushed,

8    you know, she pushes one way or another because she

9    wants to get on the road, so I am going to excuse

10   her for cause.

11           Let's start with Juror Number 1.  We will

12   begin with Mr. Nayback.  Juror Number 1 is Jerrina

13   Sanchez.  Mr. Nayback?

14           MR. NAYBACK:  Accept.

15           MR. ELSENHEIMER:  Accept.

16           THE COURT:  Our next juror that we will

17   consider is Adam Baker, Number 3.

18           MR. ELSENHEIMER:  Accept.

19           MR. NAYBACK:  Reject.

20           THE COURT:  Mr. Baker is excused.

21           Next is Juror Number 5, Stevenson.

22           Mr. Nayback?

23           MR. NAYBACK:  Accept.

24           THE COURT:  Mr. Elsenheimer?

25           MR. ELSENHEIMER:  Accept.

```
 1              THE COURT:  We have two jurors.

 2              Next is Juror Number 6, Alicia Broadhurst.

 3              Mr. Elsenheimer?

 4              MR. ELSENHEIMER:  Reject.

 5              MR. NAYBACK:  Accept.

 6              THE COURT:  She is already rejected.

 7              MR. NAYBACK:  Sorry.

 8              THE COURT:  Next is Number 7, Ms. Roberts.

 9              Mr. Nayback?

10              MR. NAYBACK:  Accept.

11              THE COURT:  Mr. Elsenheimer?

12              MR. ELSENHEIMER:  Reject.

13              THE COURT:  Next is Mr. Renner.

14              Mr. Elsenheimer?

15              MR. ELSENHEIMER:  Reject.

16              THE COURT:  Next is Number 16, Jared

17     McBrayer.

18              Mr. Nayback?

19              MR. NAYBACK:  Accept.

20              MR. ELSENHEIMER:  Accept.

21              THE COURT:  Next is Juror Number 24.

22              Mr. Elsenheimer?

23              MR. ELSENHEIMER:  Reject.

24              THE COURT:  So that is your fourth.

25              Next is Number 25, Steven Rodrigue.  I am
```

1    not sure how he pronounces it.

2              Mr. Nayback?

3              MR. NAYBACK:  Reject.

4              THE COURT:  That is your second challenge.

5              Number 26, Barbara Christensen.

6              Mr. Elsenheimer?

7              MR. ELSENHEIMER:  Reject.

8              THE COURT:  That is your fifth strike.

9              Next is Number 27, Allen Blue-Sky.

10             Mr. Nayback?

11             MR. NAYBACK:  Accept.

12             THE COURT:  Mr. Elsenheimer?

13             MR. ELSENHEIMER:  Reject.

14             MR. NAYBACK:  Your Honor, could I lodge a

15   Batson challenge?  I believe Mr. Blue-Sky was a

16   tribal member.  I brought this up in the past and I

17   don't know of a nonracial issue.  I would like to

18   hear the nonracial issue that the defense is using.

19             MR. ELSENHEIMER:  Your Honor, Mr. Blue-Sky

20   is working in Santa Fe.  He works for Target.  He is

21   trying to work a lot to move to Albuquerque.  He did

22   say that he would, that he thought that would be a

23   problem.  But I just got the impression from his

24   first explanation that work and trying to earn as

25   much money is important to him, that if

253

```
1   deliberations carried into the weekend or the next
2   week, that would pose a problem.
3            THE COURT:  Any comment?
4            MR. NAYBACK:  I have in quotes that it
5   would just bother him a little bit.  He seemed, he
6   was very vocal.  He seemed willing to sit on the
7   jury and this was next month.  It didn't seem to
8   have anything to relate to June.
9            THE COURT:  He did say it was the end of
10  next month.
11           MR. NAYBACK:  He also said it wouldn't cut
12  into his deliberations.
13           THE COURT:  But he did say he was trying
14  to make as much money as he could and he was working
15  extra hours, so that is a nonracial reason, so I
16  will overrule the Batson objection.
17           I believe that was your sixth strike; is
18  that right?
19           MR. ELSENHEIMER:  That is right,
20  Your Honor.
21           THE COURT:  Next is Juror Number 28,
22  Andres Rivera.
23           Mr. Elsenheimer?
24           MR. ELSENHEIMER:  We will accept
25  Mr. Rivera.
```

```
 1              THE COURT:  Mr. Nayback?

 2              MR. NAYBACK:  Reject.

 3              THE COURT:  So that is the Government's

 4   third strike.

 5              Next Number 23, Taylor Lynn Herson.

 6              Mr. Nayback?

 7              MR. NAYBACK:  Accept.

 8              MR. ELSENHEIMER:  Accept.

 9              THE COURT:  So that was our fourth juror.

10              Next is Number 30, Katherine Romero.

11              Mr. Elsenheimer?

12              MR. ELSENHEIMER:  Accept.

13              THE COURT:  Mr. Nayback.

14              MR. NAYBACK:  Accept.

15              THE COURT:  Five jurors, okay.

16              Next is Number 31, David Anthony Mardo.

17              Mr. Nayback?

18              MR. NAYBACK:  Accept.

19              MR. ELSENHEIMER:  Accept.

20              THE COURT:  Next is Number 33, Jordan

21   Alexander.

22              Mr. Elsenheimer?

23              MR. ELSENHEIMER:  Reject.

24              THE COURT:  That is your seventh

25   challenge.
```

1          Next is Number 34, Joanne LaFrak.

2          Mr. Nayback?

3          MR. NAYBACK:  Accept.

4          THE COURT:  Mr. Elsenheimer?

5          MR. ELSENHEIMER:  Accept.

6          THE COURT:  Next is Juror Number 38, David

7  Devlin.

8          Mr. Elsenheimer?

9          MR. ELSENHEIMER:  Reject.

10          THE COURT:  That is your eighth strike.

11          Next is Number 3, Iliana Velasquez.

12          Mr. Nayback?

13          MR. NAYBACK:  Accept.

14          MR. ELSENHEIMER:  Reject.

15          THE COURT:  She is your ninth strike.

16          Next is Adrian Montes.

17          Mr. Elsenheimer?

18          MR. ELSENHEIMER:  He was for cause.

19          THE COURT:  I'm sorry.  So 41, Lisa Ann

20  Finch.

21          MR. ELSENHEIMER:  Accept.

22          THE COURT:  Mr. Nayback?

23          MR. NAYBACK:  Reject.

24          THE COURT:  All right.  That is your

25  fourth strike.

```
 1              Next is Juror Number 42, Kara Komula.

 2              Mr. Nayback.

 3              MR. NAYBACK:  Accept.

 4              MR. ELSENHEIMER:  Reject.

 5              THE COURT:  That is your tenth peremptory.

 6              Then moving to Number 44, Jesse Kistler.

 7              Mr. Nayback?

 8              MR. NAYBACK:  Accept.

 9              THE COURT:  We have eight jurors.  Next is

10   Number 46, Denny Begay.

11              Mr. Nayback?

12              MR. NAYBACK:  Accept.

13              THE COURT:  Next is Number 47, Jennifer

14   Nixon.

15              Mr. Nayback?

16              MR. NAYBACK:  Accept.

17              THE COURT:  Next is Number 48, Jeanette

18   Crandall.

19              Mr. Nayback?

20              MR. NAYBACK:  Accept.

21              THE COURT:  Next is Number 49, Gina

22   Foster.

23              Mr. Nayback?

24              MR. NAYBACK:  Accept.

25              THE COURT:  So we have 12.  We will select
```

1  two alternates, and I will give, I usually give each

2  side an additional peremptory for alternate

3  selection.

4          Robert Villa.  I will start with the

5  defense.

6          MR. ELSENHEIMER:  Accept.

7          THE COURT:  Mr. Nayback?

8          MR. NAYBACK:  Reject.

9          THE COURT:  Okay.  Next is Daniel Rushton.

10         MR. ELSENHEIMER:  Accept.

11         THE COURT:  Mr. Nayback?

12         MR. NAYBACK:  Do I still have a choice?

13         THE COURT:  Well, I don't have you as

14  using all of your six peremptories.

15         MR. NAYBACK:  We accept 51.

16         THE COURT:  So 51 you accept and

17  Mr. Elsenheimer you accepted also, right?

18         MR. ELSENHEIMER:  Yes, ma'am.

19         THE COURT:  Next is Number 52, Eli Xavier

20  Yazzie.

21         Mr. Nayback?

22         MR. NAYBACK:  Accept.

23         THE COURT:  Mr. Elsenheimer?

24         MR. ELSENHEIMER:  Accept.

25         THE COURT:  All right.  So Mr. Yazzie is

1    our second alternate.  So I think we are in

2    business.  So I am showing, not in alphabetical

3    order but in numerical order our jury includes

4    Number 1, Ms. Sanchez; Number 5, Mr. Stevenson;

5    Number 16, Mr. McBrayer; Number 29, Taylor Herson;

6    Number 30, Romero; Number 31, Mardo; Number 34,

7    LeFrak; Number 44, Kistler; Number 46, Begay;

8    Number 47, Nixon; Number 48, Crandall; and

9    Number 49, Foster.  And our two alternates are

10   Rushton first and Yazzie is the second.

11              Do I have it right?

12              MR. NAYBACK:  That comports.

13              THE COURT:  All right.  So we will have

14   the panels come in one at a time.  I will let the

15   jurors who are selected know that they have been

16   selected and then I will excuse the remaining four

17   people, I guess it is on Panel 1, and likewise with

18   Panel 2.  Of course, with Panel 3, everybody will

19   come in and I will simply announce which members of

20   Panel 3 have been selected and then everybody else

21   goes.

22              My plan is to have everybody come back at

23   1:30 and I will give the jury the preliminary

24   instructions after lunch and then we are off to the

25   races, as they say.  Good enough?

```
 1            MR. NAYBACK:  Yes, thank you.

 2            MR. ELSENHEIMER:  Yes.

 3            (Whereupon the following proceedings were

 4       held in Open Court.)

 5            (Whereupon Prospective Jurors, Jury Panel

 6       Number 1 enter the courtroom.)

 7            THE COURT:  Please be seated.  We have

 8       with us in the courtroom the several members of the

 9       just panel who have not yet been excused.  So what I

10       am going to do is I am going to announce the names

11       or, so, Yvonne, she is usually the one who announces

12       the names of the jurors.  What we are going to do is

13       she will give you instructions, if you are on the

14       jury, she will give you instructions when we're

15       done.

16            Before we do that, I want to make sure I

17       thank everybody.  Those of you who are not selected,

18       I want to thank you for your attendance, for your

19       patience and for your participation in this process

20       because it's been a major pain in the neck to have

21       to do things this way, split it up and make people

22       wait.  It's been a problem for everyone.  It has

23       been a problem for us, too.  I want you to know that

24       I appreciate your patience and your participation in

25       this process.
```

1          So with that, Yvonne, if you could

2    announce the members of the jury, please.

3          THE DEPUTY CLERK:  Juror Number 1 is

4    Jerrina Sanchez.  Juror Number 2 is Cody Stevenson.

5    Juror Number 3 is Jared McBrayer.

6          THE COURT:  So for those of you who are

7    not selected, maybe we will catch you another time.

8    But thank you for your patience and your attendance

9    today.  It was very important, so thank you.  You

10   are excused.

11          (Whereupon the Prospective Jurors exited

12   the courtroom.)

13          THE COURT:  We may have time before lunch

14   to maybe give the jury the preliminary instructions.

15   So if it is, if we have some time, I will do that,

16   it won't take very long.

17          Given the fact that it is not 12:00 yet, I

18   may have time before we break for lunch to give the

19   jury the preliminary instructions which I don't

20   think will take very long, but we might as well do

21   what we can.

22          When I do instruct give the jury the

23   preliminary instructions I usually say that the

24   defendant's attorney may make an opening statement.

25   So I am assuming that you are not going to reserve

 1    your statement for later.

 2            MR. ELSENHEIMER:  We are going to do

 3    openings after lunch, right?

 4            THE COURT:  Openings after lunch.  If I

 5    instruct the jury, I want to know.

 6            MR. ELSENHEIMER:  We are not reserving.

 7            (Whereupon Prospective Jurors, Jury Panel

 8    Number 2 enter the courtroom.)

 9            THE DEPUTY CLERK:  Please be seated.

10            THE COURT:  Welcome back everyone.  Thank

11    you for your patience.  Several of you will be

12    selected for this jury, most of you will not.  So

13    what we will do is I will, in a moment, have Yvonne

14    announce the names of the jurors who have been

15    selected, the rest of you then will be excused.

16            But I want to thank all of you for your

17    service and your patience.  I know it probably

18    wasn't the most thrilling thing to wait for us all

19    morning, but I truly appreciate it.  It was

20    important, and so I want you to know that you have

21    made a contribution here whether you are selected

22    for this jury or not.

23            So for those of you who are not selected,

24    I certainly hope we will have a chance to work again

25    in some trial in the future.

1          So with that, Yvonne can you announce our

2    jury, please.

3          THE DEPUTY CLERK:  Juror Number 4 is going

4    to be Taylor Herson; Number 5, Katherine Romero;

5    Number 6, David Mardo; Number 7, Joanne LeFrak; and

6    Juror Number 8 is Jesse Kistler.

7          THE COURT:  So for the rest of you who

8    were not selected for this jury, once again, thank

9    you.  Thank you for your participation and you're

10   excused at this time.

11          (Whereupon Prospective Jurors exited the

12   courtroom.)

13          (Whereupon Prospective Jurors, Jury Panel

14   Number 3 entered the courtroom.)

15          THE DEPUTY CLERK:  Please rise.

16          THE COURT:  All right.  Everybody can take

17   their seats.  Welcome back, ladies and gentlemen of

18   the jury panel.  We have completed the work in

19   selecting our jury.  And several from this group

20   will be selected and most of you will not be

21   selected for this jury.

22          So to those of you who are not selected,

23   you will be excused, but I don't want you to go

24   before I have a chance to tell you that I greatly

25   appreciate your participation in this process.  Our

1    system really does depend on people like you who are

2    willing to come and participate in this.

3              Now, I know you don't always have a

4    choice, but your participation and your attendance

5    is really important and appreciated.  So thank you

6    for your patience.

7              And at this time Yvonne will announce the

8    individuals who have been selected.

9              THE DEPUTY CLERK:  Juror Number 9 is Denny

10   Begay; Number 10, Jennifer Nixon; Number 11,

11   Jeanette Crandall; Number 12 is Gina Foster;

12   Number 13, Daniel Rushton; and Number 14 is Eli

13   Yazzie.

14             THE COURT:  So once again to those of you

15   who were not selected, I thank you for your

16   participation, and I will excuse you at this time.

17             Thank you.

18             (Whereupon Prospective Jurors exited the

19   courtroom.)

20             THE COURT:  So ladies and gentlemen of the

21   jury, now that you have been selected, I will ask

22   you all to stand and Yvonne will administer the

23   oath.

24             Everyone else can have a seat.

25             (Whereupon the jury was sworn.)

1          THE COURT:  So ladies and gentlemen of the

2    jury, let me just tell you what we are going to do.

3    We will break for lunch in just a couple of moments,

4    but I want to give you some preliminary

5    instructions.  And I also want to let you know that

6    we will begin with the opening statements at 1:30.

7          Because everything is a little bit

8    different with the COVID protocols that we are

9    doing, Yvonne will let you know where you will

10   congregate before you come into the courtroom at

11   1:30.  But at this time I am going to give you some

12   preliminary instructions.

13         So members of the jury, at the end of the

14   trial I will give you detailed guidance on the law

15   and how you will go about reaching your decision,

16   but now I simply want to generally explain how the

17   trial will proceed.

18         This criminal case has been brought by the

19   United States Government.  I will sometimes refer to

20   the United States as the Government or the

21   prosecution.  The United States is represented by

22   Novalene Wilson and Kyle Nayback who are both

23   Assistant United States Attorneys.

24         The defendant, Douglas Smith, is

25   represented by his lawyers Aric Elsenheimer, Amanda

1    Lavin, and Dan Berg.

2              The Indictment charges the defendant with

3    second-degree murder.  The Indictment is simply the

4    description of the charges made by the Government

5    against the defendant.  It is not evidence of guilt

6    or of anything else.

7              The defendant pleaded not guilty and is

8    presumed innocent.  He may not be found guilty by

9    you unless all 12 of you unanimously find that the

10   Government has proved his guilt beyond a reasonable

11   doubt, that the Government has proved his guilt

12   beyond a reasonable doubt.

13             The first step in the trial will be the

14   opening statements.  The Government in its opening

15   statement will tell you about the evidence which it

16   intends to put before you.  Just as the Indictment

17   is not evidence, neither is the opening statement.

18   Its purpose is only to help you understand what the

19   evidence will be.  It is a roadmap to show you what

20   is ahead.

21             After the Government's opening statement,

22   the defendant's attorney may make an opening

23   statement, and then the evidence will be presented

24   from which you will have to determine the facts.

25             The evidence will consist of the testimony

1    of the witnesses, documents and other things

2    received into the record as exhibits and any facts

3    about which the lawyers agree or to which they

4    stipulate.

5         The Government will offer its evidence and

6    after the Government's evidence, the defendant's

7    lawyer may present evidence, but is not required to

8    do so.

9         I remind you that the defendant is

10   presumed innocent and it is the Government that must

11   prove the defendant's guilt beyond a reasonable

12   doubt.

13        If the defendant submits evidence, the

14   Government may then introduce rebuttal evidence.

15        At times during the trial a lawyer may

16   make an objection to a question asked by another

17   lawyer or to an answer by a witness.  This simply

18   means that the lawyer is requesting that I make a

19   decision on a particular rule of law.  Do not draw

20   any conclusion from such objections or from my

21   rulings on the objections.

22        If I sustain an objection to a question,

23   the witness may not answer it.  Do not attempt to

24   guess what the answer might have been if I had

25   allowed the answer.

1          If I overrule the objection, treat the
2     answer as any other.
3          If I tell you not to consider a particular
4     statement, you may not refer to that statement in
5     your later deliberations.
6          Similarly if I tell you to consider a
7     particular piece of evidence for a specific purpose,
8     you may consider it only for that purpose.
9          During the course of the trial I may have
10    to interrupt the proceedings to confer with the
11    attorneys about the rules of law that should apply.
12    Sometimes we will talk briefly at the bench but some
13    of these conferences may take more time, so I will
14    excuse you from the courtroom.  I will try to avoid
15    such interruptions whenever possible, but please be
16    patient even if the trial seems to be moving slowly,
17    because these conferences often actually save time
18    in the end.
19          You are to consider all of the evidence
20    received in this trial.  It will be up to you to
21    decide what evidence is to be believed and how much
22    of any witness' testimony to accept or reject.
23          After you have heard all the evidence on
24    both sides, the Government and the defense will each
25    be given time for their final arguments.  And, of

1  course, one of the final parts of the trial is when

2  I instruct you on the rules of law which you are to

3  use in reaching your verdict.

4          Now, during the course of the trial I may

5  ask a question of a witness.  If I do, that does not

6  indicate that I have any opinion about the facts in

7  the case but only trying to bring out facts that you

8  may consider.

9          If you would like to take notes during the

10  trial, you may.  On the other hand, you are not

11  required to take notes.  If you do decide to take

12  notes, be careful not to get so involved in note

13  taking that you become distracted.  And remember

14  that your notes will not necessarily reflect exactly

15  what was said.  So your notes should be used only as

16  a memory aide.  Therefore you should not give your

17  notes precedence over your independent recollection

18  of the evidence.

19          You should also not be unduly influenced

20  by the notes of other jurors.  If you do take notes,

21  leave them in the jury room at night and do not

22  discuss the contents of your notes until you begin

23  deliberations.

24          During the course of the trial you should

25  not talk with any witness or with the defendant or

1    with any of the lawyers at all.  In addition, during

2    the course of the trial you should not talk about

3    the trial with anyone else.  Do not discuss the case

4    with anyone or provide any information about the

5    trial to anyone outside of the courtroom until the

6    verdict is received.

7              Do not use the Internet or any other form

8    of electronic communication to provide any

9    information.  Simply put, do not communicate with

10   anyone about the trial until your verdict is

11   received.

12             Also, you should not discuss this case

13   among yourselves until I have instructed you on the

14   law and you have gone into the jury room to make

15   your decision at the end of the trial.  It is

16   important that you wait until all the evidence is

17   received and you have heard my instructions on the

18   controlling rules of law before you deliberate among

19   yourselves.

20             Let me add that during the course of the

21   trial you will receive all the evidence you properly

22   may consider to decide the case.  Because of this,

23   you should not attempt to gather any information or

24   do any research on your own.

25             Do not attempt to visit any places

```
 1   mentioned in the case either actually or on the
 2   Internet, and do not in any other way try to learn
 3   about the case outside of the courtroom.
 4           Now the court reporter is making
 5   stenographic notes of everything that is said but
 6   this is basically to assist in any appeals.
 7           A typewritten copy of the testimony will
 8   not be available for your use during deliberations.
 9   On the other hand, any exhibits that are introduced
10   will be available to you during your deliberations.
11           So now that the trial has begun, you must
12   not hear or read about it in the media.  The reason
13   for this is that your decision in this case must be
14   based solely on the evidence presented in the trial.
15           So with that, ladies and gentlemen of the
16   jury, I am going to excuse you for lunch.  We will
17   begin again in the courtroom at 1:30.
18           Yvonne will assist you and let you know
19   what time she would like you to be back in your
20   meeting place.  Where are you congregating?
21           THE DEPUTY CLERK:  In the jury assembly
22   room.
23           THE COURT:  Have a nice lunch, drink your
24   coffee and caffeine and we will get going on this
25   case.
```

1          So thank you all.  We'll be in recess

2    until 1:30.

3          (Whereupon the jury exited the courtroom.)

4          (Open court, outside the presence of the

5    jury.)

6          THE COURT:  So I have reviewed the

7    objection, which is Document Number 195 and I have

8    reviewed the Government's response, which is 196.

9          MR. ELSENHEIMER:  It might be 194 and 195.

10         THE COURT:  194 and 195?  I think your

11   objection is 195.

12         MR. ELSENHEIMER:  That's right.  I

13   apologize, Your Honor.

14         THE COURT:  The Government's response is

15   196.

16         I understand Mr. Elsenheimer's objection

17   is that certain language has been redacted.

18   Pages 15, Line 20 through Page 16, Line 8.

19         Right?

20         MR. ELSENHEIMER:  That is right,

21   Your Honor.

22         THE COURT:  Okay.  So, Mr. Nayback, any

23   comment?

24         MR. NAYBACK:  Just, Your Honor, we worked

25   hard on this.  We think we are in compliance with

1     the Court's order.  We think this is basically a

2     motion for reconsideration.  This is something that

3     the Court has already determined to be a

4     self-serving statement that is not admissible as an

5     excited utterance.

6          We don't think that we have said anything

7     else that should cause the Court -- we have not

8     included anything else in our audio and in our

9     redacted statement that should cause the Court to

10    change its mind on its original ruling.

11         THE COURT:  Anything else?

12         MR. ELSENHEIMER:  The specific problem,

13    Your Honor, is the Government's original, what they

14    originally proposed to introduce into evidence

15    included that particular statement.  I think that

16    was a ruling with regard to the Rule of Completeness

17    with regard to that statement.

18         Now, when we lodged those objections we

19    had that discussion.  My understanding is that this

20    was a complete, so that statement coupled with

21    Mr. Smith's other statements seemed to give a

22    complete picture of what he said.

23         The Government's editing of that to redact

24    that statement poses a problem under the Rule of

25    Completeness because based on their representation,

1   and I think what triggered this is the Government's

2   representation in one of their pleadings that they

3   seek to characterize Mr. Smith's statement as

4   telling law enforcement that he shot four times and

5   draws a diagram showing he was tracking Jane Doe's

6   path of travel.  That never happened.

7           Mr. Smith's statement in its entirety, the

8   complete statement, including Page 15, Line 20

9   through 16, Line 8 makes clear that Mr. Smith was

10  not tracking or in any way shooting with the

11  intention of hitting anybody or even thinking

12  anybody was in front of him.

13          So leaving that out under the Rule of

14  Completeness allows a mischaracterization of

15  Mr. Smith's statement.  That raises a significant

16  due process problem because essentially the

17  Government is bringing in Mr. Smith's statement to

18  make it appear as though he said one thing, but by

19  selectively editing that, they are allowing a

20  mischaracterization of that statement which could

21  potentially, and the significant risk is it leaves

22  the jury with a misinformed based on a

23  mischaracterization of the entirety of what

24  Mr. Smith said.

25          That particular, I think that the entire

1    statement should be introduced out of fundamental

2    fairness and under the Rule of Completeness because

3    it is Mr. Smith's entire statement and you can't

4    selectively edit and cut and paste.

5             Specifically with regard to the due

6    process problem, I think at the very least we need

7    to introduce Mr. Smith's statement on Page 15,

8    Line 20 through 16, Line 8 to show that the

9    individual had run and he thought she was already

10   gone before he started firing.

11            THE COURT:  Anything else?

12            MR. NAYBACK:  Your Honor, the Court heard

13   this and we went through this.  It seems like it was

14   at least three months ago.  This is a last minute

15   objection that the Court, I believe, has already

16   ruled on.

17            There is nothing, there is nothing that

18   Mr. Elsenheimer can point to that runs afoul of the

19   Court's initial very lengthy and well thought out

20   opinion as to what can come in and what can't.  I

21   don't see a violation of the Court's initial order

22   and that is how we make these things.  You know, we

23   ask the Court to make a determination as to what is

24   self-serving, what is not.

25            You required us to include some stuff that

1    we included, if we were going to choose another

2    part.  So I just don't see the purpose of the

3    change.  And Mr. Elsenheimer has the ability to

4    cross-examine witnesses.  It is not like he can't

5    cross-examine the agent about this diagram that

6    shows the defendant tracking Jane Doe's path of

7    travel counterclockwise from noon to 9:00, 9 p.m.

8            So I, and, again, we could probably make

9    it happen, but I am concerned with the eve of trial

10   we are about to start testimony that we can get this

11   done in time.

12           MR. ELSENHEIMER:  One last thing.  The

13   Government filed Exhibit 35, I want to say last

14   week, the beginning of last week.  The original

15   redactions and portions of Mr. Smith's statement

16   included that statement.  And the redaction, as far

17   as I am aware, was not made until, or at least not

18   made clear to us until last week.

19           Seeing that and the Government's

20   representation that they are seeking to say

21   Mr. Smith said something that he most clearly did

22   not say raises that and prompted my filing of that

23   because it is a particular problem, not only with

24   regard to Exhibit 35 and coupled with the

25   Government's representation or mischaracterization

1    of what they are seeking to say Mr. Smith said.

2            THE COURT:  All right.  I know I did make

3    rulings before that some of the transcript was

4    hearsay, not an excited utterance, self-serving, but

5    there were a number of passages that I allowed

6    because of the Rule of Completeness or the confusion

7    if information is not included.

8            I tend to view this excerpt as context

9    that would help make sense of information that

10   follows.  So I am going to sustain the objection and

11   require that the Exhibit include what we see at

12   Pages 15 and 16, Page 15, Line 20 through Page 16,

13   Line 8.

14           And I know that technology is such that I

15   am confident you will be able to make the changes

16   you need to make, Mr. Nayback.  Even in the dark

17   ages when I practiced law, we would make changes on

18   the fly, so I know you can do it.

19           All right.  Thank you.

20           MS. WILSON:  Just to clarify Your Honor, I

21   think the Court's order, Document Number 158 Page 8,

22   in addition to that 15, 21, through 6, 18, the Court

23   said the Government was inclined to introduce 15,

24   20, 21 through 6, 9, 25.

25           So it includes more language and I think

1    those two sort of went hand-in-hand and parcel.  So

2    since we excluded that latter part, we were not

3    intending to introduce.  If we have to now include

4    the section that he is objecting to, we would ask

5    that we be able to include that additional line.

6            THE COURT:  What is the addition again?

7            MS. WILSON:  It is on Page 8.  Page 16,

8    Lines 9 through 25.  And I believe that is

9    consistent with the Court's order Document 148,

10   Page 8, top of the table.

11           THE COURT:  Any comment, Mr. Elsenheimer?

12           MR. ELSENHEIMER:  I am not sure what the

13   Government's seeking.

14           THE COURT:  They want to add what follows

15   the language you want.  So you want through Line 8

16   of Page 16 they say the rest of the page should also

17   come in.

18           MR. ELSENHEIMER:  I don't have the

19   unredacted transcript, I don't think.

20           THE COURT:  I have a marked up one.  I

21   drew lines on what, who is asking for what.

22           MS. WILSON:  Again, Your Honor, that is

23   what the Court ordered.

24           MR. ELSENHEIMER:  If that is what the

25   Court ordered originally, that is fine with us.

```
 1              THE COURT:  So for the record tell me what
 2    your position is, Mr. Elsenheimer.
 3              MR. ELSENHEIMER:  My understanding is the
 4    Government is saying if you are introducing 15, 20,
 5    you are saying that goes over and down to 16, 8.
 6              MS. WILSON:  The rest of that page would
 7    come in, Your Honor, 16, 9 through 25 and then the
 8    top of 17, which was taken out just for context.
 9              THE COURT:  Mr. Elsenheimer?
10              MR. ELSENHEIMER:  The only objection to
11    that is that we should have Mr. Smith's answer to
12    Abeyta's question, which is down to Line 4, right?
13              THE COURT:  Ms. Wilson, I see Page 16,
14    Line 25, the very last line, is a question.
15              MS. WILSON:  Yes.
16              THE COURT:  So you want the answer?
17              MR. ELSENHEIMER:  Yes.
18              MS. WILSON:  So all of Page 17 would not
19    be redacted.
20              MR. ELSENHEIMER:  I think the Government
21    is saying that it would come over to Line 2 on
22    Page 18.  We agree with that.
23              THE COURT:  So it would include Line 2?
24              MR. ELSENHEIMER:  It currently does,
25    anyway, and that is no problem with us.
```

1          MS. WILSON:  I think that is fine.  I

2     think that we worked out that he is okay with a

3     little more than I am, but we will make it work.

4          THE COURT:  The objection is sustained is

5     on the record.  Where you go from there is not

6     necessarily clear if it is more than Page 17.

7          MS. WILSON:  I can live with it.  I will

8     go ahead and let you know what we have agreed to,

9     and I think you're consistent with this.

10          Starting from Line 20 where the objection

11     was sustained, including all of Page 16 and the top

12     of Page 17 that was redacted.

13          THE COURT:  Two lines of 17 were already

14     included.  They had not been redacted, I believe.

15     They are redacted, nevermind, got it.

16          See you at 1:30.

17          (Discussion off the record.)

18          THE COURT:  We are on the record.

19          MR. ELSENHEIMER:  We are bringing in

20     Line 15, Page 15, Line 20 through Page 17, Line 2,

21     and then the rest of that page is already unrecated,

22     so that is fine with us.

23          THE COURT:  Ms. Wilson?

24          MS. WILSON:  Yes, that is fine.

25          THE COURT:  Okay, very good.  Thank you.

```
 1              (A recess was taken.)

 2              (Open court, outside the presence of the

 3  jury.)

 4              THE COURT:  We are back on the record in

 5  USA versus Smith.

 6              Are we ready for the jury?

 7              MR. NAYBACK:  We are.

 8              MR. ELSENHEIMER:  Yes, Your Honor.

 9              MS. LAVIN:  Yes, Your Honor.

10              (Whereupon the jury entered the

11  courtroom.)

12              THE COURT:  All right.  Please be seated.

13              Before we go on the record, let me just

14  state that I understand somebody has a birthday

15  today.  And so I want to wish you a happy birthday

16  and I want to tell you that I am very impressed that

17  you are here serving on this jury on your birthday.

18  A lot of people would probably find a way to not do

19  that.  I hope you have a happy birthday and I wish

20  we could do more to celebrate.

21              Now we will go on the record and we are

22  ready, at this time to begin opening statements.  So

23  we will begin with the Government.

24              Mr. Nayback.

25              MR. NAYBACK:  Thank you, Your Honor.
```

**OPENING STATEMENT ON BEHALF OF THE GOVERNMENT**

1

2          MR. NAYBACK:  May it please the Court,

3   Mr. Elsenheimer, Ms. Lavin.

4          THE COURT:  Make sure you speak into the

5   microphone.  With your back to me, it is going to be

6   a little more challenging.

7          MR. NAYBACK:  If you were to travel in

8   your vehicles from the courthouse here and go north,

9   you would travel through a number of our 22 Native

10  American Reservations here in the District of

11  New Mexico.  The District of New Mexico is the same

12  as State of New Mexico.  It's the Federal district.

13         The crimes that happen on those

14  Reservations are Federal crimes, that is why the FBI

15  and the U.S. Attorney's Office is involved.  You

16  would travel past us, you would go right through

17  Sandia Pueblo, Santa Ana, San Felipe, Kewa and then

18  you would head in towards Santa Fe.

19         If you haven't been that way, you can take

20  the Relief Route 599 or you can go up to St. Francis

21  Drive and cut across to 285.

22         And then you will go through Tesuque

23  Pueblo, Pojoaque and then travel on and you come

24  into the City of Espanola.

25         But the City of Espanola is neighbors with

1    both the Santa Clara Pueblo Indian Reservation and

2    it borders the Ohkay Owingeh Reservation.  They have

3    all lived together as neighbors up there for

4    decades, hundreds of years.

5           Many of you have probably been there.  If

6    you go through Riverside Drive, it is the heart of

7    the business district.  The Santa Claran Hotel and

8    Casino is right there.  They have a bowling alley,

9    and you continue on past hardware stores, Walmart,

10   Home Depot and then you come to 826 Riverside Drive.

11          If you are heading north it is on the

12   left-hand side of the street or the west side of the

13   street and there is the Western Winds Motel.  It is

14   a large property and the owner and manager of it is

15   sitting behind me, is the defendant, Doug Smith.

16          The area has a KFC across the street, a

17   Pizza 9 pizzeria, on the other side of the street,

18   on the east side of the street.  Has a lot of

19   vehicle traffic and a lot of foot traffic in and

20   around the hotel grounds.

21          On May 5th of 2018 between midnight and

22   1:00 a.m. it is dark outside.  Mr. Smith, who also

23   lives on the motel property, hears his motion

24   sensors go off in the backyard.  His backyard is

25   fenced in and you will see photographs of that.

1    There is no doubt about it.

2              He has a travel trailer that he hasn't

3    been into in a long time outside his fenced area.

4    And when he goes outside, he has got a gun in his

5    hand.  He later told police he was scared.  And he

6    looks on the other side of his fence, this is

7    outside of his backyard, and he sees what he

8    describes as a shadow.  He doesn't know if it is a

9    man or a woman.  He doesn't know if it is a

10   juvenile, and he says nothing.  He doesn't say, "Can

11   I help you?  Can I help you find something?"

12             He doesn't say, "Hey, I have got a gun,

13   get out of here," none of that was said.  Silently

14   he takes the gun up from his side, fire ready,

15   points and shoots four times.  Boom, boom, boom,

16   boom.  Silence.

17             Maria Gallegos lost her life.  He put a

18   bullet in her temple and she fell on her face

19   lifeless in the parking lot of the Western Winds

20   Motel, the defendant's property.

21             The evidence will show there were zero no

22   trespassing signs.

23             Maria Gallegos was not trying to get into

24   his home.  She was not an intruder.  She was

25   36 years old, proud member of the Santa Clara

1   Pueblo, 5'3", done.

2          So my colleague Novalene Wilson and I,

3   Assistant United States Attorneys, my colleague

4   Travis Taylor from the FBI, have the responsibility

5   of showing you the evidence.  You heard that in voir

6   dire, and we are going to do that, and we are going

7   to do it efficiently.

8          You might imagine that at a homicide scene

9   in Espanola there is a lot of police that show up,

10  EMS might show up, fire and rescue, OMI field

11  investigators.  But we don't call everyone in a

12  trial nor do we have to.  We are going to call the

13  two detectives that talked to the defendant.  We are

14  going to call the field investigator who had to bag

15  the body.  And there are some things in this case

16  that are not really in dispute at all, I believe,

17  speaking on behalf of the United States.

18         There is no question that this happened on

19  the Santa Clara Pueblo Indian Reservation.  We call

20  it Indian Country.  That is a Federal term.  I hope

21  no one is offended by it.  That is the term that

22  Congress gives our Reservations here in New Mexico

23  and all over the country, for that matter.

24         There is no dispute that Maria Gallegos is

25  a tribal member.  There is no dispute that Doug

1    Smith is a non-Indian.  And Special Agent Taylor

2    will explain to you that is kind of the combination

3    we need for a Federal case.

4          There is no dispute that a bullet from his

5    gun entered her temple and killed her.  So it is

6    going to be important to listen because we are going

7    to play a recording of the defendant talking to the

8    Espanola Police Detective, and I am going to ask

9    Special Agent Taylor some questions about his

10   interview.  They were basically consistent, but it

11   is important to listen to what he said he did, what

12   he did do and what he didn't do and what he didn't

13   say.

14         He said, "I thought she left the area,"

15   and the evidence will show that after that first

16   shot she started running for her life, and she only

17   made it about ten strides.  You will see

18   photographs, you will be able to tell many of you

19   can estimate measurements.  I mean, from the travel

20   trailer to the parking lot of the motel it was about

21   10 to 15 feet.

22         He told law enforcement he has never shot

23   that fast before.  And it is also important to

24   acknowledge that he didn't give her time to clear

25   the area.  He told law enforcement, "I thought she

1    was gone." She is dead right there and you said you
2    were shooting as fast as you could. He also told
3    law enforcement, "She was trying to break into my
4    travel trailer."
5          But at the same time he said he couldn't
6    tell if it was a man or a woman. He couldn't tell,
7    he said he saw no weapon. She didn't advance on
8    him. She didn't jump over the fence, and he shot at
9    her four times, killing her.
10          So those elements of the offense that some
11    of you heard in voir dire are: It happened on the
12    Reservation. She is a tribal member. He is
13    non-Indian. He killed her. And at the end of the
14    evidence the United States submits that the evidence
15    will show he acted recklessly. He shot in her
16    direction in the dark. You will see the photographs
17    through the brush and then he says he didn't intend
18    to hit her. He is not charged with intending to hit
19    her. He acted recklessly and he killed her, and
20    that is second-degree murder. And we are going to
21    ask you to find him guilty at the conclusion of the
22    trial.
23          Thank you, Your Honor.
24          THE COURT: And now we will here from
25    Ms. Lavin.

**OPENING STATEMENT ON BEHALF OF THE DEFENDANT**

1

2          MS. LAVIN:  Good afternoon ladies and

3   gentlemen of the jury.  Thank you for being here.

4          Douglas Smith, our client, did not go

5   looking for trouble in the early hours of May 5th,

6   2018.  He was at home, he was in bed.  It was around

7   1:00 in the morning.  The motion sensors that he had

8   installed due to multiple break-ins on his property

9   had gone off for the third time that evening.  He

10   had already heard them go off twice at that time.

11   He knew there was something or someone out there.

12          Now, 826 North Riverside Drive where

13   Mr. Smith lives, Mr. Nayback is right, it is in the

14   heart of a business district.  But this is a

15   residential home.  It is a home located behind what

16   used to be the Western Winds Motel.  Yes, there is

17   still a sign there.  It is an old motel, but it

18   hasn't been operating since at least 2014.  This is

19   not a place that was open for business.

20          Mr. Smith's home is one of the only

21   residential homes in this area.  It is surrounded by

22   fast food restaurants, liquor stores, automotive

23   supply stores.  So after dark, after business hours

24   he is the only one around.  It is him and his home.

25   This is his home, it is not a business, it is not an

1   operating motel.  So we are going to hear lots of

2   references to the Western Winds Motel.  It is

3   important to understand that this was an empty old

4   nonoperating motel.

5              Espanola is a community in Northern

6   New Mexico that sadly has a lot of issues in the

7   last couple of decades.  As Mr. Smith will tell you,

8   it has been his home since he was a child.  There

9   have been a lot of increases in drug use, in crime,

10  in violence.  And his property was essentially under

11  siege.  He is going to tell you about the break-ins

12  that have been happening during the months leading

13  up to this incident.

14             He had had several thefts from his

15  property, people were breaking in.  Sure he didn't

16  have no trespassing, but this is a heavily

17  trafficked area in an area where there is quite a

18  lot of crime out there.

19             His fear was escalating, the incidents of

20  crime on his property were escalating.  And this

21  property, it is important to understand, you're

22  going to see photos of it.  It is a pretty large

23  property.  Yes, it is in the heart of this busy

24  heavily trafficked business area but it is a vast

25  property.  It is bordered behind it by the river,

1    and on either side are businesses which are empty at

2    night.

3            There are several structures on his

4    property, several vehicles and an old empty hotel.

5    It is an attractive place for a lot of people for a

6    lot of purposes who shouldn't be there.  You are

7    going to hear Mr. Smith talk about how a couple of

8    these incidents where people had committed crimes on

9    his property, the police had gotten involved and

10   there wasn't really anything they could do.  The

11   person had left, they didn't know who it was, they

12   couldn't recover the stolen property.  And so the

13   police getting involved in these incidents that were

14   happening on this property, it wasn't making any

15   sort of difference.  People were continuing to come

16   on his property and continuing to commit crimes on

17   his property.

18           The things that were happening on his

19   property, the trespassing, the break-ins, et cetera,

20   were escalating to the point where Mr. Smith, who is

21   a 71-year-old man, at the time he was 68.  He

22   actually ended up into a physical altercation with

23   someone who had broken into a bus on his property.

24   He didn't know what to do.  He was trying to protect

25   himself, and so he installed motion sensors.  And he

1    was going out at least two times a night every night

2    during the weeks leading up to this incident in May

3    of 2018 because those motion sensors were going off

4    over and over and over again and his fear was

5    escalating.

6            He started carrying a .22 pistol with him

7    when he would go out at night.  And the reason that

8    he has a .22 pistol isn't because he wants to kill

9    someone with it, and it isn't because he wants to

10   hurt someone with it.  This is a gun that he owns

11   that he can make noise to scare people away.

12           So on May 5th of 2018 in the early hours

13   of that morning after he had been woken up or been

14   alerted three times by the motion sensors, he goes

15   out on to his back porch with his pistol in his

16   hand.  You are also going to hear that his pistol

17   that he keeps, he doesn't keep it with the a bullet

18   in the chamber.  He is not, you know, jumping to use

19   this pistol in every opportunity.  It is a last

20   resort and he is using it to scare people, not to

21   hurt people.

22           He goes out onto his back porch.  Now, his

23   back porch is dark.  This is a huge property that

24   faces -- there is nothing lit behind him.  There is

25   a few dark structures and then there is a river.

1    And there is a camper trailer parked about 20 feet

2    from his back porch.  It is very close.  When he

3    goes out onto his porch that morning in the middle

4    of the night, in the pitch black, he sees a figure

5    trying to force their way in to this camper trailer.

6    They are trying to jiggle the handle, trying to

7    force their way into a locked camper trailer, and he

8    is scared out of his mind.  This is the middle of

9    the night, it's dark.  He doesn't know who or what

10   that is.  He doesn't know what is happening, so he

11   shoots his .22 pistol well to the left of that

12   figure.  He is shooting to miss them and he is

13   shooting to scare them away.

14            When he hears them and sees them leave, he

15   is certain they are gone, he then he shoots a few

16   more warning shoots into a woodpile.  This is a

17   woodpile of wood that he has stacked himself.  It is

18   several yards beyond where his porch is.  It is in

19   an area that he thought with the amount of time had

20   gone by and what he had seen and heard, that this

21   figure had already cleared.  He thought that the

22   person that he saw was gone.  He wasn't tracking

23   them, he wasn't aiming for them, he couldn't even

24   see anything.  But he has lived on this property

25   since he was 15 years old.  He knows this property

1    better than anyone.  This is a woodpile he stacked

2    himself.  You are going to hear it is several layers

3    deep, it is huge.  He knew that was a safe place to

4    aim his gun because he didn't want the bullets to

5    just go flying in every which way.  He didn't want

6    to shoot them up in the air so they would come down

7    and hurt someone or break something.

8            Under the circumstances he was scared out

9    of his mind, it was pitch dark.  He doesn't know who

10   is trying to break in the structure of his property.

11   He is being as careful as he can and he is trying to

12   protect himself.  He is trying to scare this person

13   away.  He thinks they are gone.

14           Now tragically someone was killed that

15   night.  And so he fires these shots.  He is not sure

16   what else is going on and so he thinks that the

17   person that he saw has left.  And I am saying person

18   because he doesn't know who he saw.  When he saw

19   that person trying to open and force their way into

20   the trailer, he didn't know if it was a man or a

21   woman.  He doesn't know, he doesn't know who is

22   there.  He only saw one person that night but we

23   don't know how many people were on his property that

24   night.

25           And so when he goes out to see what else

```
 1    could be going on, on his property after he has
 2    fired those shots to his horror he discovered a
 3    woman's body.  He sees that he has killed someone
 4    and he feels terrible.  This is not what he wanted
 5    to have happen.  This is shocking and traumatic and
 6    it was not his intent to hurt anyone or kill anyone
 7    that night.
 8            Now, when he realizes what he has done,
 9    what has happened, he calls 911.  From Day One he
10    has told the police exactly what happened.  He has
11    been an open book.  He has never tried to hide from
12    the police.  He has never tried to hide what he did
13    because he didn't do anything wrong.  He has been
14    consistent in his story from Day One.
15            This is a tragic accident.  Mr. Smith is
16    going to have to live with the fact that he
17    accidentally took a woman's life for the rest of his
18    life.  There is no undoing that.
19            Now, the Government has charged him with
20    murder, as you know.  But Mr. Smith didn't commit a
21    crime.  He is an innocent man.  However, it is not
22    his job to prove to you-all he is innocent, it is
23    their job to prove to you that he committed murder.
24            Mr. Smith is a 71-year-old man who likes
25    to stay home, he likes to keep to himself.  He
```

1    doesn't like to fight with people.  He doesn't like

2    to get in trouble.  He likes art, he makes

3    sculptures.  He likes nature, he likes to watch

4    animals, he likes to hike.  He wasn't looking for

5    trouble this night.  This is not who he is.  This is

6    a tragic accident that nobody feels good about.

7    Maria Gallegos should not have died, but he didn't

8    know she was there and when he shot those warning

9    shots he didn't think anyone was going to be hit by

10   them.

11           And so when you hear and listen to all the

12   evidence and you listen and see all the evidence

13   that is going to be presented in this case and when

14   you are thinking about what the Government has

15   presented, just keep in mind, not only what you are

16   getting to see and hear but what is missing.  What

17   are you not getting to see and hear?  It is their

18   job to prove this case beyond a reasonable doubt.

19           We think you are just going to hear pieces

20   of the story, so that is why we feel at the end of

21   this case, at the end of this trial, we feel

22   confident that you are going to find Mr. Smith not

23   guilty of murder.

24           Thank you.

25           THE COURT:  Thank you.  At this time the

1    Government may call its first witness.

2                MS. WILSON:  Thank you, Your Honor.  The

3    United States calls Matthew Cain.

4                THE COURT:  My clerk will administer the

5    oath before you take your seat.

6                (Whereupon, the witness was sworn.)

7                THE COURT:  Before we begin, let me ask

8    you to give us your full name for the record and

9    spell your first and last names, please.

10                THE WITNESS:  It is Matthew Darrell Cain,

11    M-A-T-T-H-E-W.  My last name is Cain, C-A-I-N.

12                THE COURT:  Thank you.  Counsel, you may

13    proceed.

14                MS. WILSON:  Thank you, Your Honor.

15                    MATTHEW CAIN, MD,

16    **after having been first duly sworn under oath,**

17       **was questioned and testified as follows:**

18                     **DIRECT EXAMINATION**

19    BY MS. WILSON:

20    Q.    Sir, how are you employed?

21    A.    I am currently employed part time with the

22    New Mexico Office of the Medical Investigator and I

23    am also contracted as a forensic pathologist in

24    Marion County, Indianapolis, Indiana.

25    Q.    And what is the New Mexico Office of the

1    Medical Examiner?

2        A.    So the Office of the Medical Investigator,

3    which I will refer to as the OMI going forward, is

4    basically the centralized office that serves the

5    State of New Mexico and investigates on an

6    unexpected or sudden violent deaths in the State of

7    New Mexico to establish a cause and manner of death.

8        Q.    And what are your responsibilities?

9        A.    When I worked there full time, I performed

10   autopsies, trained Fellows and Residents and

11   essentially did autopsies to establish a cause and

12   manner of death.

13       Q.    Sir, could you explain to the jury what is

14   your educational background?

15       A.    So starting with undergrad, I have a

16   degree in chemical and biomolecular engineering from

17   Georgia Tech.

18           After that I went to the Medical College

19   of Georgia, for four years of medical school.

20           And then after that had additional

21   training in Birmingham, Alabama.  So I did

22   four years of what is called anatomic and clinical

23   pathology training and also while I was in Alabama,

24   I did one additional year in forensic pathology

25   training.

1    Q.    And, Doctor, how many autopsies have you

2    conducted?

3    A.    At this point, roughly 1200 autopsy or

4    autopsy equivalents.

5    Q.    How many times have you testified as an

6    expert?

7    A.    Roughly 12 times.

8    Q.    And what types of courts are those?

9    A.    So that would be both State and Federal

10   court.

11        MS. WILSON:  Your Honor, the United States

12   would proffer Dr. Cain as an expert witness in the

13   field of forensic pathology with the ability to

14   testify about Maria Gallegos' cause and manner of

15   death.

16        MR. ELSENHEIMER:  No objection.

17        THE COURT:  All right.  The witness will

18   be recognized as an expert in the area of forensic

19   pathology, and you may proceed.

20        MS. WILSON:  Thank you, Your Honor.

21   Q.    (By Ms. Wilson) Dr. Cain, how did you

22   become involved in this case?

23   A.    So at the time I was working full time for

24   the OMI and I think probably the easiest thing would

25   be if I provide some background to the work flow for

1   OMI if that is all right.

2       Q.    Yes.

3       A.    So the OMI, as I said, investigates deaths

4   in the State of New Mexico and so they were notified

5   of the death of Ms. Gallegos and an investigator

6   went to that scene.  And it was determined that she

7   needed to be sent to the OMI for an autopsy.

8           And so the way that it works is the body

9   is transported to the centralized office and each

10  morning there is a morning report that involves a

11  Central Office investigator and other pathologists.

12  And during that time they go through the cases for

13  the day, an investigator will talk about the

14  circumstances of death, any available scene photos

15  or if there is any kind of imaging, they will review

16  that.

17          And in this case it was determined that

18  Ms. Gallegos needed a full autopsy with a homicide

19  workup, and I was assigned that case.

20      Q.    What were you asked to do?

21      A.    So based on the circumstances of the

22  death, and also we do imaging, specifically computer

23  tomography, so it is kind of like an x-ray with a

24  number of images there of the whole body.  And it

25  was apparent that there was a retained bullet, so I

1    did a full autopsy.

2          The decedent was transferred to the

3    autopsy suite, and so we did photographs of the

4    body.  I did an external examination, we did

5    homicide workup, and then I did an internal

6    examination and recovered a bullet.

7          After that, I produced an autopsy report.

8    Q.    And what was the condition of

9    Ms. Gallegos' body when it arrived?

10   A.    So initially the body as received was an

11   adult female.  She was clad in a pink hoody, shirt,

12   pants, shoes.  It appeared that she had an injury to

13   her head as well.

14         MS. WILSON:  May I approach, Your Honor.

15         THE COURT:  You may.

16   Q    (By Ms. Wilson) I am handing you what has

17   been marked for identification purposes as

18   Government's Exhibits 1 through 4.

19         Do you recognize those, Dr. Cain?

20   A.    I do.

21   Q.    How so?

22   A.    So these were photographs that were taken

23   during the course of the autopsy.

24   Q.    Are they very accurate depictions?

25   A.    They are.

1          MS. WILSON:  May I approach, Your Honor?

2          THE COURT:  Yes.

3          MS. WILSON:  And at this time, Your Honor,

4    the United States would move for admission of

5    Government's Exhibits 1 through 4.

6          THE COURT:  Is there objection to

7    Exhibits 1 through 4?

8          MR. ELSENHEIMER:  No.

9          THE COURT:  1 through 4 will be admitted.

10         (Exhibits admitted, Government's 1 through

11   4.)

12         THE COURT:  You may proceed, Ms. Wilson.

13    Q.   (By Ms. Wilson) What is Government's

14   Exhibit 1?

15    A.    This is a photo of Ms. Gallegos, her face

16   and her upper torso.

17    Q.    And what can you tell the jury about the

18   injuries on her face?

19    A.    So starting from the top, we can see right

20   above the eyes sort of on the forehead, this injury

21   that looks like a defect.  I am going define a

22   couple of terms.  That is a laceration.  That is

23   basically a skin tear.  These typically occur from a

24   blunt force.  And so in this case if you have got

25   the skin and soft tissue, you have got over -- that

1    is overlying the bone, if you have a force applied,

2    that tissue can tear.

3              So centrally there is a laceration and

4    then surrounding that is, the medical term we use is

5    abrasion, but it is basically a scrape.

6              If we move further down between the

7    eyes --

8        Q.    Dr. Cain, I think you can interlineate if

9    you touch the screen there.

10       A.    Okay.  So that is the injury that I just

11   described.  If we move further down to this area

12   right here (indicating), we see that there is a

13   laceration centrally located.

14             I know this because it has the classic

15   features.  You can kind of see what is called tissue

16   bridging.  There is a small piece of tissue that is

17   basically going between the skin tear there.

18   Surrounding that is more abrasion or scrape.  We see

19   similar scrapes on the nose and just on the -- just

20   beneath the nose on the left side.

21             If we look on the left side of

22   Ms. Gallegos' face, I am going to circle that

23   region.  So this would be her left.  We see an

24   additional scrape that is sort of on the cheek

25   there, and then additional scrapes around the mouth.

1    So in this region (indicating).

2         Q.    And in your opinion what are these

3    injuries indicative of?

4         A.    So this would be blunt trauma.

5         Q.    And I am not sure if you are able to see

6    it on this photograph, but were you able to

7    determine where the bullet entered?

8         A.    So not on this photo.  We should have

9    another photo that shows the gunshot wound.

10         Q.    Let me show you Government's Exhibit 3.

11    Can you describe that for the jury?

12         A.    I can.  So it is helpful to -- for some

13    orientation here.  We are looking at the -- so the

14    decedent is laying on a table and we are looking at

15    the left side of her head.  Sort of at the lower

16    aspect of this photograph would be her ear.

17              Centrally located, though, is a defect

18    right here (indicating).  We have basically shaved

19    an area so that it is free of hair so that you can

20    see the gunshot wound.  But there is a central

21    defect and then around that is an area of abrasion

22    and this is what we would expect to see in an

23    entrance gunshot wound.

24         Q.    And showing you what has been admitted as

25    Government's Exhibit 2, can you please tell the jury

1   what this is?

2       A.    So as I have mentioned, it appeared that

3   there was a retained bullet, and so we recovered

4   bullet fragments.  This is one of those, as

5   indicated on the envelope, we indicate that missile

6   fragments were recovered from the right side of the

7   brain.

8       Q.    And did you recover more than one

9   fragment?

10      A.    I did.  So this represents one.  Actually

11  I recovered two fragments.

12      Q.    I am showing you Government's Exhibit

13  Number 4.  What is that?

14      A.    So this is the other fragment.  As you can

15  see, a bit smaller than the other one but this was

16  also recovered within the head.

17      Q.    How is it recovered specifically?

18      A.    So during the autopsy we do an internal

19  exam, and so after reflecting the scalp and removing

20  a portion of the skull, we examine the brain.  And

21  in this case I recovered bullet fragments during

22  that time.

23      Q.    And, Dr. Cain, ultimately what were your

24  opinions?

25      A.    So based on my findings at autopsy and the

```
 1   circumstances of the death, I concluded that the
 2   cause of death was a gunshot wound to the head.  I
 3   indicated a manner of death as homicide.
 4            MS. WILSON:  I pass the witness,
 5   Your Honor.
 6            THE COURT:  Mr. Elsenheimer, you may
 7   cross-examine the witness.
 8            MR. ELSENHEIMER:  Thank you, Your Honor.
 9                    CROSS-EXAMINATION
10   BY MR. ELSENHEIMER:
11   Q.    Good afternoon, Dr. Cain.
12   A.    Good afternoon.
13   Q.    So are you still working for OMI?
14   A.    I am.  I work part time remotely.
15   Q.    You are also working in Indiana; is that
16   right?
17   A.    That is correct.
18   Q.    So you are visiting New Mexico now?
19   A.    That is correct.
20   Q.    Welcome back to New Mexico.
21   A.    Thank you.
22   Q.    I want to ask you a couple of questions.
23   I want to ask you a couple of questions in reference
24   to the exhibits that we just looked at, so I am
25   going to go back to this table.
```

1          I want to ask you about the injuries that
2   you described in this exhibit.  This is Government's
3   Exhibit 1.
4          You prepared a report in this case; is
5   that right?
6      A.    That is correct.
7      Q.    Have you reviewed the report recently?
8      A.    I have.
9      Q.    Okay.  If you need to review it again, let
10  me know and I will bring you a copy.
11     A.    That actually would be helpful, please.
12         MR. ELSENHEIMER:  May I approach the
13  witness, Your Honor?
14         THE COURT:  You may.
15     Q    (By Mr. Elsenheimer) When you have a
16  chance, Dr. Cain, can you refer to the summary and
17  opinion page of your report?
18     A.    I have it.
19     Q.    Okay.  I want to ask you about the
20  lacerations and the lacerations and abrasions to
21  Ms. Gallegos' face.  Those, just to be clear, none
22  of those are the result of a gunshot wound, correct?
23     A.    Correct.
24     Q.    And based on your discussions and
25  investigation in this case, your discussions with

1    the OMI investigator, those lacerations and

2    abrasions can be explained by Ms. Gallegos running

3    and falling on pavement, correct?

4        A.    That is one possible scenario but, yes,

5    they could be explained by that.

6        Q.    And blunt trauma on a stoney surface can

7    result in skin tearing and the pavement would cause

8    scrapes and abrasions to the skin, correct?

9        A.    That's correct.  That is basically stated

10    similarly in my report.

11        Q.    And that was your conclusion in the report

12    in your summary and opinion, correct?

13        A.    Correct.  I indicated that this is one

14    possibility for that.

15        Q.    And so the only, just to be clear, the

16    only gunshot wound that you found was on the left

17    side of Ms. Gallegos' head; is that correct?

18        A.    That is correct.

19        Q.    Can you tell me again how you describe

20    this?  This is Government's Exhibit 4.

21        A.    I indicated that this was a missile

22    fragment.

23        Q.    It is a fragment and you found two

24    fragments, correct?

25        A.    That is correct.

1    Q.    And those are fragments from one missile

2    or one bullet, correct?

3    A.    That is correct.

4    Q.    I want to ask you, Ms. Gallegos was

5    wearing clothing, correct?

6    A.    Correct.

7    Q.    And in particular she was wearing a hooded

8    sweatshirt?

9    A.    That is correct.

10    Q.    You found a hole on the left side of that

11    hooded sweatshirt, the left side of the hood,

12    correct?

13    A.    That is correct.

14    Q.    And that corresponded with the entrance

15    wound that we looked at in Government's Exhibit 3,

16    correct?

17    A.    Correct.

18    Q.    And your conclusion from that or your

19    inference from that is that Ms. Gallegos was wearing

20    a hood, correct?

21    A.    Most likely.  The defect on the left side

22    of the hood did line up with the defect on the side

23    of the head.

24         MR. ELSENHEIMER:  May I have a moment,

25    Your Honor?

```
 1              THE COURT:  You may.
 2              MR. ELSENHEIMER:  Nothing further,
 3  Your Honor.
 4              THE COURT:  Any redirect.
 5              MS. WILSON:  No, Your Honor.  Thank you.
 6              THE COURT:  May this witness be
 7  permanently excused?
 8              MS. WILSON:  Yes, Your Honor.
 9              THE COURT:  All right.  Thank you for your
10  testimony today.
11              (Whereupon the witness was excused from
12  the courtroom.)
13              THE COURT:  You may call your next
14  witness.
15              MR. NAYBACK:  Thank you, Your Honor.  The
16  United States calls Daniel Smith.
17              THE COURT:  Before you sit down, I will
18  have you take the oath.  My clerk will administer
19  the oath.
20              (Whereupon, the witness was sworn.)
21              THE COURT:  For the record, I will ask you
22  to give us your full name and please spell your
23  first and last names for the record.
24              THE WITNESS:  Okay.  Daniel Smith,
25  D-A-N-I-E-L, S-M-I-T-H.
```

```
 1              THE COURT:  Thank you.  You may proceed.
 2              MR. NAYBACK:  Thank you, Your Honor.
 3                       DANIEL SMITH,
 4    after having been first duly sworn under oath,
 5         was questioned and testified as follows:
 6                    DIRECT EXAMINATION
 7    BY MR. NAYBACK:
 8    Q.    Mr. Smith, where do you live?
 9    A.    In Espanola.
10    Q.    How long have you lived in Espanola?
11    A.    Pretty much all my life.
12    Q.    Okay.  Do you have any siblings?
13    A.    No, I don't.
14    Q.    Do you have any brothers?
15    A.    Yes, I do.
16    Q.    And what are their names?
17    A.    Doug Smith and Derrick De La Cruz.
18    Q.    Okay.  Do all three of you have the same
19    biological mother and father?
20    A.    Yes, we do.
21    Q.    Is Douglas Smith in the courtroom today?
22    A.    Yes, he is.
23    Q.    Would you please point to him and describe
24    the clothing he is wearing?
25    A.    He has the gray suit on there.
```

```
 1              MR. NAYBACK:  Your Honor, would the Court
 2    record reflect proper identification of the
 3    defendant or do you need more detail?
 4              THE COURT:  I see what looks like maybe
 5    two gray suits.  I can't really tell, but --
 6              MR. NAYBACK:  I can clear that up.
 7         Q.   (By Mr. Nayback) Can you describe the color
 8    of your brother, Douglas Smith's, hair?
 9         A.   It is gray.
10              MR. NAYBACK:  Would the court record
11    reflect proper identification now, Your Honor?
12              THE COURT:  Yes.  The record will so
13    reflect.
14         Q.   (By Mr. Nayback) Sir, how old are you?
15         A.   I am 65.
16         Q.   You were saying earlier that you grew up
17    in the Espanola area; is that right?
18         A.   Yes.
19         Q.   Can you describe where you went to
20    elementary school, middle school and high school?
21         A.   There in Espanola, Espanola Elementary and
22    then I went to Fairview Elementary and then Espanola
23    Junior High and Espanola High School.
24         Q.   Thank you.
25              And if you recall when you got ill as a
```

```
1   child, you or your brothers, do you recall where you
2   would get medical care?
3       A.     Yeah, we had a local doctor.
4       Q.     Okay.  Are you or your brother, Douglas
5   Smith, enrolled in any Indian tribe?
6       A.     No, we are not.
7              MR. NAYBACK:  I pass the witness,
8   Your Honor.
9              THE COURT:  You may cross-examine the
10  witness.
11             MR. ELSENHEIMER:  We have no
12  cross-examination.
13             THE COURT:  All right.  May this witness
14  be permanently excused?
15             MR. NAYBACK:  He may, Your Honor.  Thank
16  you.
17             THE COURT:  Thank you for your testimony
18  here today, Mr. Smith.
19             THE WITNESS:  You're welcome.
20             (Whereupon the witness was excused from
21  the courtroom.)
22             THE COURT:  The Government may call its
23  next witness.
24             MS. WILSON:  Thank you, Your Honor.  The
25  United States calls Geraldine Gutierrez.
```

1          THE COURT:  Ms. Gutierrez, before you take

2   your seat I will have my law clerk administer the

3   oath.

4          (Whereupon, the witness was sworn.)

5          THE COURT:  Ms. Gutierrez, I will ask that

6   you give us your full name and spell your first and

7   last names for the record, please.

8          Make sure you speak into the microphone.

9          THE WITNESS:  Okay.  My name is Geraldine

10  Isabel Gutierrez.  G-E-R-A-L-D-I-N-E; Isabel,

11  I-S-A-B-E-L; Gutierrez, G-U-T-I-E-R-R-E-Z.

12          THE COURT:  Thank you.

13              GERALDINE GUTIERREZ,

14  **after having been first duly sworn under oath,**

15     **was questioned and testified as follows:**

16                 **DIRECT EXAMINATION**

17   BY MS. WILSON:

18   Q.    Ms. Gutierrez, where do you work?

19   A.    I work with the Santa Clara Pueblo Office

20  of Vital Statistics/Enrollment.

21   Q.    And what is your job position called?

22   A.    My job position with Santa Clara, I am the

23  enrollment clerk.

24   Q.    And is the Santa Clara Pueblo a federally

25  recognized Indian tribe?

1      A.    Yes, it is.

2            MS. WILSON:  Your Honor, we would ask the

3      Court to take judicial notice that the Santa Clara

4      Pueblo is a Federally recognized Indian tribe.

5            THE COURT:  Objection?

6            MS. LAVIN:  No objection.

7            THE COURT:  The Court will take judicial

8      notice.

9      Q.    (By Ms. Wilson) How long have you been

10     employed as an enrollment clerk?

11     A.    I have been employed with Santa Clara as

12     an enrollment clerk for 11 years.

13     Q.    And could you can explain to the jury how

14     are members of the Santa Clara Pueblo identified?

15     A.    Santa Clara Pueblo tribal enrolled

16     individuals are identified by either a parent being

17     a tribal member of Santa Clara, so either a mother

18     or a father, if they are enrolled, will

19     automatically have the child at birth be an enrolled

20     member.

21     Q.    And typically they have enrollment

22     numbers?

23     A.    Yes.  Yes, we do.

24     Q.    And also certificates of enrollment?

25     A.    Yes, ma'am.

1      Q.    And do you recall processing a certificate

2  of enrollment for Maria Gallegos?

3      A.    Yes, I do.

4            MS. WILSON:  May I approach, Your Honor?

5            THE COURT:  You may.

6      Q    (By Ms. Wilson) I am handing you what has

7  been marked for identification only as Government's

8  Exhibit 65.  If you could please take a look at it

9  and let me know when you are done.

10      A.    Okay.  Yes, this is the tribal,

11  certificate of tribal enrollment for Maria Elena

12  Gallegos.

13      Q.    And do you recognize it?

14      A.    Yes, I do.

15      Q.    Is it a fair and accurate depiction?

16      A.    Yes, it is.

17            MS. WILSON:  Your Honor, at this time I

18  would move for admission of Government's Exhibit 64.

19            THE COURT:  Is there objection?

20            MS. LAVIN:  No objection.

21            THE COURT:  64 is admitted.

22            MS. WILSON:  Permission to publish.

23            THE COURT:  You may.

24            (Exhibit admitted, Government's 64 and

25  published to the jury.)

1    Q    (By Ms. Wilson) All right.  Ms. Gutierrez,

2    just for folks who are not familiar with this, can

3    you explain to the jury what information is on here

4    and what this is exactly?

5    A.    Yes.  This is a certificate of tribal

6    enrollment.  This certificate here states the name

7    Maria Elena Gallegos as being a tribal member,

8    tribal enrolled member of Santa Clara Pueblo.

9    On the left-hand side it states the date

10    of birth, which is 11-3-1981, and date of death

11    being 5-5-2018 when she passed away.

12    Enrollment status being enrolled and

13    deceased and enrollment number SCP, which is

14    Santa Clara Pueblo/10-16 being her full enrollment

15    number.

16    Mother is a tribal member Denise Naval.

17    Her maiden name was Cisneros Gallegos.  Father,

18    joseph Robert Gallegos, was a nonnative.  And

19    mailing address being PO Box 207, Espanola, New

20    Mexico, 87532.  Physical address being 1307 Alfred

21    Lane 21, Espanola, New Mexico, 87532, and the county

22    being Rio Arriba County.

23    And Jay Michael Chavira, his signature is

24    on there as being the Governor of Santa Clara

25    Pueblo.

         1              John Sheehy is the director of the Office
         2    of Vital Statistics/Enrollment.
         3         Q.    Thank you very much, Ms. Gutierrez.
         4              Is it your opinion that Maria Gallegos was
         5    an enrolled member of the Pueblo of Santa Clara?
         6         A.    Yes, ma'am.
         7              MS. WILSON:  I pass the witness,
         8    Your Honor.
         9              THE COURT:  You may cross-examine the
        10    witness, Ms. Lavin.
        11              MS. LAVIN:  We don't have any
        12    cross-examination.  Thank you.
        13              THE COURT:  All right.  May this witness
        14    be permanently excused?
        15              MS. WILSON:  Yes, Your Honor.
        16              THE COURT:  Thank you for your testimony
        17    today, Ms. Gutierrez.
        18              (Whereupon the witness was excused from
        19    the courtroom.)
        20              THE COURT:  The Government may call its
        21    next witness.
        22              MR. NAYBACK:  Thank you, Your Honor.
        23              The United States calls OMI Deputy Field
        24    Investigator Lynne Gudes.  She should be coming in
        25    just a minute.

```
 1              THE COURT:  Before you take your seat, I
 2  will have my clerk administer the oath.
 3              (Whereupon, the witness was sworn.)
 4              THE COURT:  Ms.  Gudes, I will ask that
 5  you give us your full name and spell your first and
 6  last names for the record, please.
 7              THE WITNESS:  My name is Lynne Gudes,
 8  L-Y-N-N-E, G-U-D-E-S.
 9              THE COURT:  Thank you.
10              You may proceed.
11              MR. NAYBACK:  Thank you, Your Honor.
12                      LYNNE GUDES,
13  after having been first duly sworn under oath,
14      was questioned and testified as follows:
15                  DIRECT EXAMINATION
16  BY MR. NAYBACK:
17      Q.   Ms. Gudes, how are you employed?
18      A.   I am a deputy field investigator for the
19  Office of the Medical Investigator.
20      Q.   Is that here in New Mexico?
21      A.   Yes, that is for the State of New Mexico.
22      Q.   And can you describe the training, let me
23  first ask you this:  How long have you been an
24  investigator generally?
25      A.   I have been an investigator since the
```

1    early '70s.

2        Q.    Okay.  And what type of training do you go

3    through to be a Deputy Field Investigator for OMI?

4        A.    OMI first looks at your previous

5    experience.  And after you qualify there is a three-

6    or four-day training at OMI and then we do a weekly

7    continuing education.

8        Q.    Okay.  How often are you on-call and what

9    does it mean to be on-call?

10       A.    Your on-call basis is determined by your

11   own district, we make an agreement.  In general,

12   when I am working and I am off right now because of

13   a surgery, but when I am working, I usually work

14   three 24-our, three 24-hour duty rosters a week.

15             So during that time I am just on-call, I

16   have to be available if I get a call from dispatch.

17       Q.    And can you describe for the jury what a

18   field investigator for OMI does?

19       A.    Basically I work with the police but not

20   for the police.  I am called out on any unexpected

21   death, be it a murder, a suicide or Aunt Sally was

22   fine last night and this morning she is dead.  We

23   don't know what happened.

24             The general way of explaining it, the

25   scene, the police are in charge of the scene and I

1    am in charge of the body.

2         Q.    And were you called out on May 5th of 2018

3    in the middle of night?

4         A.    Yes, I was.

5         Q.    When you get the call who is it usually

6    from?

7         A.    I would get the call, that particular

8    call, because of its location, would have come from

9    Espanola Central dispatch.

10        Q.    Where do you live?

11        A.    I live in Vallecitos, which is roughly 45

12   minutes north of Espanola.

13        Q.    Can you give me a landmark for Vallecitos?

14        A.    Ojo Caliente.  If you have heard of it I

15   am 15 miles north of Ojo Caliente.

16        Q.    So did it take you awhile to respond to

17   the scene?

18        A.    Yes, it does.

19        Q.    If you recall, about what time did you

20   show up?

21        A.    I think it was sometime a little after

22   3:00 in the morning.

23        Q.    This is at 826 Riverside Drive in

24   Espanola?

25        A.    Yes, it was.

1    Q.    What was the name of the motel that was
2    there, if you recall?
3    A.    It was something like West Winds.
4    Q.    Okay.  And what is the first thing you do
5    when you arrive?
6    A.    Well, the first thing I would do is make
7    contact with police or whoever is handling the
8    scene, be it FBI or whoever, you know, and ask what
9    happened, what do they have.
10    Q.    Okay.  And when you say what did they
11    have, when you are talking to a law enforcement
12    officer, it seems kind of a lingo.  What are you
13    asking them?
14    A.    I am asking them what happened, why they
15    were, why they were called out and why we are here.
16    Q.    Ultimately were you taken to the location
17    of a decedent?
18    A.    Actually because of the lighting, I could
19    see that as I arrived.
20    Q.    Okay.  And are there steps that you take?
21    When you find a decedent, it seems like that is your
22    primary responsibility; is that right?
23    A.    Yes.
24    Q.    Are there steps that you take to make
25    sure, do you do things in a certain order, do you

1    check out the scene, look around, what are you doing

2    at that point?

3        A.    I am trying to understand how and why,

4    whatever happened, happened.  So I would pause and

5    look around the scene, speak to law enforcement

6    about, you know, what they know of what happened and

7    kind of put that together in my head.

8            At the same time, I am keeping an eye on

9    the decedent because the minute I get there they are

10   my responsibility.  So I need to make sure that no

11   one approaches them, no one takes anything, touches

12   anything, moves anything.

13       Q.    What about before you get there, do you

14   ask law enforcement, has anyone touched the body,

15   has the decedent, did they receive some kind of

16   medical care, that type of thing?

17       A.    Yes.  I would normally ask if EMS has been

18   there and if the person has been moved, if anything

19   has been changed.

20       Q.    Did you learn whether Ms. Gallegos was

21   moved prior to your arrival?

22       A.    My understanding is that EMS had changed

23   her position to look for signs of life.

24       Q.    And do you have any sense that they, so if

25   I understand you correctly, did they turn her from

1    prone position, face down, to face up?

2        A.    Yes, they turned her over.

3        Q.    And not -- to your understanding, not

4    moved her length-wise in any direction, correct?

5        A.    No.

6        Q.    That would be improper for EMS to do that,

7    there would be no reason?

8        A.    There would be no reason for it.  I mean,

9    you look at each individual scene.  There was

10   nothing to move her away from.  Sometimes there

11   might be, but in this case there was no reason to do

12   anything but move her to a -- to a place where they

13   could see her face.

14       Q.    And did you take photographs while you

15   were there?

16       A.    Yes, I did.

17            MR. NAYBACK:  May I approach the witness,

18   Your Honor?

19            THE COURT:  You may.

20            MR. NAYBACK:  Thanks.

21            May I approach the witness?

22            THE COURT:  Yes, you may.

23            MR. NAYBACK:  Thank you.

24       Q    (By Mr. Nayback) Ms. Gudes, I am showing

25   you what has been marked for identification as

1   Government's 58, 59, 60, and 61.  If you would just

2   take a minute, take your time and look at each of

3   those photographs and simply tell me when you are

4   done.

5       A.    (Witness complies.)  Okay.

6       Q.    Do you recognize those photos?

7       A.    Yes, I do.

8       Q.    Did you take them?

9       A.    Yes.

10      Q.    Are they a fair and accurate depiction of

11  the scene and Maria Gallegos' body when you arrived?

12      A.    Yes, they are.

13            MR. NAYBACK:  Your Honor, I move

14  Government's 58, 59, 60, and 61.

15            THE COURT:  Is there objection?

16            MS. LAVIN:  No objection.

17            THE COURT:  58, 59, 60, and 61 are

18  admitted.

19            MR. NAYBACK:  Permission to publish.

20            THE COURT:  You may.

21            MR. NAYBACK:  Thank you.

22            (Exhibits admitted, Government's 58

23  through 61 and published to the jury.)

24      Q    (By Mr. Nayback) Ms. Gudes, I am showing

25  you Government's Exhibit 58.  Can you tell me what

1   you are seeing in this photo?

2       A.    This is Ms. Gallegos as I first approached

3   her in the positions that she was when I found her.

4       Q.    Can you describe her clothing?

5       A.    She is wearing, I believe, a hoody with

6   jeans, sneakers, a shirt.  She is not carrying

7   anything.

8       Q.    Is part of your job to also, when you

9   encounter a decedent, do you check in and around

10  their person or their body for weapons or burglary

11  tools?

12          MS. LAVIN:  Objection, leading.

13      A.    Yes, I do.  I go through the --

14          THE COURT:  Hold on just one second.

15  There was an objection.  If you could rephrase,

16  please.

17          MR. NAYBACK:  I will be happy to.

18          THE COURT:  Yes, thank you.

19      Q    (By Mr. Nayback) When you arrive on scene

20  what do you check on the decedent's person?

21      A.    I look through their pockets, if they are

22  carrying a purse or anything, I look for what they

23  have on them and around them.

24      Q.    I am going to ask you some specific

25  questions.  Were you, did you locate any weapons?

1          A.    No, I did not.

2          Q.    Did you locate any burglary tools?

3          A.    No, I did not.

4          Q.    Investigator Gudes, I am showing you

5    Government's Exhibit 59 that has been admitted into

6    evidence.  The lighting is poor.

7              Can you describe for the jury why you took

8    this photograph from a different angle than you did

9    Government's 58?

10         A.    I was trying to show the pathologists, the

11   surrounding area and the visual problems involved.

12         Q.    And can you describe for the jury what you

13   noticed about Ms. Gallegos' face?

14         A.    I'm sorry?

15         Q.    That is all right.  Thanks for -- again,

16   showing you Government's Exhibit 58, how many -- let

17   me ask you this first.

18              Investigator Gudes, how many death

19   investigations do you think you have been involved

20   with?

21         A.    Hundreds.

22         Q.    Did you observe Ms. Gallegos' face?

23         A.    Yes, I did.

24         Q.    And what did you notice about it?

25         A.    Her face was quite bloody.  There were

```
 1    several defects on her face.  Part of it, I am
 2    trying to think how to describe this.  We don't
 3    define, on the scene we don't define what is a
 4    bullet hole and what is a stab wound and what is a
 5    something from hitting the pavement.  All of those
 6    things are defects.  She had several defects on her
 7    face.  It appeared that she had hit the ground
 8    fairly hard.
 9         Q.    That is what I was going to clarify.  Was
10    it your understanding -- well, let me ask you this:
11    In your opinion were the lacerations to her face
12    consistent with hitting the pavement face down?
13         A.    Some of the lacerations on her face were
14    consistent with that.
15         Q.    Now, do you take the time at 3:00 in the
16    morning when you are at the scene, do you take time
17    to put on gloves and exam Ms. Gallegos closer?
18         A.    Absolutely.
19         Q.    How do you go about doing that?
20         A.    We put on gloves, we feel around the areas
21    that we think are problem areas.  Ms. Gallegos had
22    very, very thick hair and it was, there was a great
23    deal a blood around her head.  It was hard to feel
24    at that time exactly where everything was, but it
25    was absolutely certain there were other defects I
```

1    couldn't visualize because of her hair.

2        Q.    Thank you.

3            Can you describe for the jury in

4    Government's Exhibit 60 what work have you done that

5    is reflected in this photograph?

6        A.    I had bagged Ms. Gallegos' hands because

7    that is a standard thing to do.  Anytime that there

8    is any gunshot involved or any other reason to think

9    that there is a reason to protect their hands, we

10   put paper bags on the hands to protect evidence so

11   that the doctors at OMI will be able to find them.

12           I placed her on top of the body bag so

13   that I can also photograph the blood that was on the

14   ground around her.

15       Q.    What types of evidence might be under

16   those brown paper bags taped around her wrists?

17       A.    For example, if she had had a weapon and

18   fired it there might be gunshot residue on her

19   hands.  There could, you know, there could be

20   anything on her hands.  I am just protecting it so

21   that when the doctors at OMI examine her they can

22   find what is there and it doesn't rub off inside the

23   bag.

24       Q.    And, Investigator Gudes, what are the next

25   steps after you are at this point with Ms. Gallegos'

1  body?

2       A.      Well, after I have checked her pockets, I

3  have looked for whatever it is she might have on

4  her, I am also looking for identification.  Then I

5  will seal the white bag and then we have a seal with

6  a number on it that is very secure.

7            I have sealed that, I photograph that

8  number and that number is sent to OMI so that when

9  she arrives that seal has to be in tact with the

10 same number on it.

11      Q.      And, Investigator Gudes, do you transport

12 Ms. Gallegos or does someone else?

13      A.      No, we have a rotation for each County and

14 I call, if family is there they get to choose.  If

15 there is no family there, I call whatever funeral

16 home is on rotation.

17      Q.      Finally I am publishing and showing you,

18 Ms. Gudes, Government's 61.  Did you take this

19 photograph?

20      A.      Yes, I did.

21      Q.      And first what direction is the jury

22 looking at?

23      A.      You are looking roughly towards the west.

24 I am standing near the edge of Riverside drive in

25 Espanola.

1      Q.    And, Investigator Gudes, you can actually
2   touch your screen to make a little dot or make a
3   little circle.  If you see it in that photograph,
4   can you give the approximate location of
5   Ms. Gallegos' body?
6      A.    It would have been somewhere in here
7   (indicating).
8      Q.    So the motel parking lot; is that correct?
9      A.    Yes, or the driveway that goes through
10  there.
11     Q.    There is a red car in the left of that
12  photograph.  Do you know whether that belonged to a
13  tenant at the hotel or a law enforcement agency, do
14  you have any idea?
15     A.    I don't have any idea.  I don't believe it
16  was law enforcement.
17     Q.    Okay.  And when you were present at the
18  motel that morning did you notice tenants in and
19  around that area?
20     A.    When I, no.  When I first arrived there, I
21  didn't see anyone else except law enforcement.
22     Q.    And in the direction that you were
23  describing west, there is a telephone pole there.
24  Did you happen to notice what is further west?  If
25  you were to go further west what would the jury see

1    or hit?

2        A.    There is kind of an open area behind the

3    motel and further out there are buildings and houses

4    and, you know, I don't know exactly what they were,

5    but there is obviously things back there.

6        Q.    And is it a part of your job, do you

7    attempt to figure out -- well, let me ask you this:

8    Is it a part of your job to try to figure out where

9    decedents might have been coming from or going to?

10       A.    That actually is more law enforcement's

11   job but because I have been an investigator for

12   getting close to 50 years now, when I do a scene I

13   try to understand what happened.  And in this case,

14   I wondered where she came from.

15       Q.    And was it clear to you or no?

16       A.    It was not clear.  The law enforcement

17   officer and I tried to look for footprints but the

18   ground was not good at making it easy to read

19   footprints.  But it appeared that she probably came

20   from somewhere back there.

21       Q.    Investigator Gudes, finally, did you

22   notice any private property or no trespassing signs

23   when you were on site at the Western Winds Motel?

24       A.    No, there were no no trespassing signs.

25   It appeared to be a motel and it is not a usual

1  place to have no trespassing signs.

2          MR. NAYBACK:  Your Honor, I will pass the

3  witness.

4          THE COURT:  All right.  Ms. Lavin, you may

5  cross-examine the witness.

6                    **CROSS-EXAMINATION**

7    BY MS. LAVIN:

8    Q.    Good morning, Ms. Gudes.  My name is

9  Amanda Lavin, I represent Mr. Smith, the defendant.

10         So, Ms. Gudes, you responded to the scene

11  the night that this happened and then the following

12  day; is that correct?

13   A.    It was actually all the same day, it was

14  still the 5th.

15   Q.    The following morning, I should say.

16   A.    Yes.  Or actually afternoon.

17   Q.    Thank you.  I am going to show you what

18  had previously been marked Defendant's Exhibit B18

19  through 20.

20         MS. LAVIN:  Permission to approach the

21  witness, Your Honor?

22         THE COURT:  You may.  B18 through 20, you

23  said?

24         MS. LAVIN:  Yes.

25   Q   (By Ms. Lavin) Ms. Gudes, if you could

1   please review those photos that I just handed you

2   and tell me if you recognize them?

3        A.    Yes.

4        Q.    What are those photos?

5        A.    These are photographs of the scene when I

6   first arrived at 3-something in the morning.

7        Q.    Did you take those photos?

8        A.    I believe, I did.

9             MS. LAVIN:  Your Honor, I would move at

10  this time for the admission of Defendant's

11  Exhibits B18 through 20.

12            THE COURT:  Is there objection?

13            MR. NAYBACK:  No objection, Your Honor.

14            THE COURT:  B18, B19 and B20 are admitted.

15            (Exhibits admitted, Defendant's B18

16  through B20.)

17            MS. LAVIN:  Thank you.  I am going to

18  approach the witness again to take those back.

19            Your Honor, permission to publish B18 to

20  the jury.

21            THE COURT:  You may.

22            (Whereupon Defendant's Exhibit B18

23  published to the jury.)

24        Q    (By Ms. Lavin) Ms. Gudes, can you see

25  Exhibit B18 on your screen there?

1       A.    Yes, I can.

2       Q.    Can you please tell the jury what this

3  picture that you took, what it depicts?

4       A.    This would have been what I saw when I

5  first pulled up.

6       Q.    And those vehicles that we see in the

7  image, those are patrol vehicles from the town of

8  Espanola Police Department; is that right?

9       A.    Yes, they are.

10       Q.    And the scene where you responded, the

11  Western Winds Motel, that was in the town of

12  Espanola?

13       A.    Yes, ma'am.

14       Q.    And Espanola Police Department was the

15  only law enforcement agency that you interacted with

16  that night; is that right?

17       A.    Yes, they were.

18       Q.    Now, Ms. Gudes, I am going to ask you to

19  look at Defendant's Exhibit B19.

20       A.    Okay.

21       Q.    Can you please tell the jury what this

22  image depicts?

23       A.    This is a shed that is between where

24  the -- where law enforcement tells me that Mr. Smith

25  was standing and where the decedent's body is.

```
 1          Q.     Thank you.

 2                 And your information about what happened

 3    that night all came from law enforcement; is that

 4    right?

 5          A.     Yes, it did.

 6          Q.     Thank you.

 7                 And now I would like to show you

 8    Defendant's Exhibit B20.

 9                 Can you please tell the jury what this is

10    a picture of?

11          A.     That is just the sign of the motel.

12          Q.     And this picture was taken at the time

13    that you responded; is that right?

14          A.     Yes, it was.

15          Q.     As was the prior image that we just saw?

16          A.     Yes, ma'am.

17          Q.     And this image that we are looking at

18    right now, that light that is shining above the

19    Western Winds Motel sign, that is a streetlight; is

20    that right?

21          A.     Yes, I believe, it is.

22          Q.     And that Western Winds Motel sign, it

23    wasn't light up that night, was it?

24          A.     No, it wasn't but I am not sure -- it was

25    a sign that was visible from the lights around it.
```

1    Q.    Okay.  And when you went back the next

2    day, now I would like to show you what has been

3    previously admitted as Government's Exhibit 61.

4          This is another photo that you took,

5    right?

6    A.    Yes, ma'am.

7    Q.    And that car that is parked in front of

8    the motel, is that your car, the dark gray one?

9    A.    It looks like it.  I honestly am not sure

10   where I parked that day, but that looks like my car.

11   Q.    Okay.  It looks like the Western Winds

12   sign, the sign for the Western Winds Motel is not

13   lit up in this photo, would you agree?

14   A.    I am not sure it is the kind of sign that

15   does light up.

16   Q.    And was there anyone, was there like a

17   reception office that you went and visited?  Was

18   there any activity in the front of the building

19   looking like they were checking guests in or

20   anything like that?

21   A.    Not that I noted.

22   Q.    Did you see any of those rooms being

23   occupied?

24   A.    I didn't look to see if any rooms were

25   occupied.

1    Q.    No one coming and going from the rooms?

2    A.    No.

3    Q.    So when you arrived it was early in the

4    morning on the night of May 5th, the morning of

5    May 5th, I should say.  You noted in your report it

6    was really too dark to continue your investigation;

7    is that right?

8    A.    I wanted to come back in daylight to see

9    better what the surroundings were.

10    Q.    Okay.  And those photos that you took that

11    we just looked at, B18 through B20, those show that

12    it is pretty dark.

13          Would you agree?

14    A.    The other ones, yes, it was pretty dark.

15    Q.    Okay.  And at the time that you responded,

16    the Espanola Police Department in terms of light

17    that they had provided, they had a small generator

18    with the floodlight and they had their headlights

19    shining; is that right?

20    A.    Yes.

21    Q.    That was the extent of the lights that

22    were available?

23    A.    Yes.

24    Q.    And would you agree that without any of

25    those lights that the police had brought, you

1  wouldn't have been able to see anything, you

2  wouldn't have been able to see the body?

3      A.    I would have used a larger flashlight.

4      Q.    Okay.  In fact, in your report you noted

5  that visibility into and out of the backyard is

6  limited?

7      A.    Yes, it was dimly lighted.

8      Q.    Okay.  So you observed, I think, what you

9  called earlier defects on the forehead of Maria

10 Gallegos; is that right?

11     A.    Yes, I did.

12     Q.    Okay.  And your information at the time

13 that you observed those injuries was that someone

14 had shot her; is that right?

15     A.    Yes.

16     Q.    Okay.  And you assumed that those injuries

17 that you saw on her forehead were gunshot wounds; is

18 that right?

19     A.    I don't assume anything on a defect, that

20 is for the pathologists to determine.

21     Q.    So in your report you noted that the

22 shooter's story seems unlikely based on the defects

23 on her forehead.

24          Do you remember putting that in your

25 report?

```
1        A.    I would like to see that report, if I may.
2        Q.    Would it refresh your recollection if I
3   showed you your report as to what you wrote?
4        A.    Please.
5              MS. LAVIN:  May I approach the witness?
6              THE COURT:  Yes, you may.
7              MS. LAVIN:  This is Bates 2456.
8        Q    (By Ms. Lavin) So, Ms. Gudes, after you
9   have reviewed your report let me know and then we
10  can respond to the question.
11       A.    I'm sorry to look confused, but I need to
12  let you know that the report that I write and what
13  OMI ends up producing are not exactly the same all
14  the time.
15       Q.    Okay.  No problem.
16       A.    I am not certain if this is mine or the
17  pathologist's, so or even a note from the Central
18  Office.  So, yeah, this first part here that you
19  gave me honestly does not look familiar to me.  The
20  latter part does and I am wondering if the -- oh,
21  these are log comments.  What that means is that the
22  investigator at the Central Office that I spoke to,
23  I have a rather casual conversation with an
24  investigator at the Central Office to give them some
25  initial information and they ask me questions, what
```

```
 1    I think and I tell them, you know, what is going on.
 2              The fact that this says log comment, this
 3    is something that the Central Office investigator
 4    wrote, not me.
 5         Q.    Okay.  Thank you.
 6              MS. LAVIN:  I will approach now.
 7         Q.    (By Ms. Lavin) So these field investigator
 8    notes that have your name on them, some of them are
 9    your statements, some of them come from the OMI
10    office.
11              Is that fair to say?
12         A.    I think log comment is what specifies that
13    the Central Office investigator wrote that.
14         Q.    All right.  Well --
15         A.    I noticed that she also says law
16    enforcement will attend the autopsy.
17              THE COURT:  The court reporter couldn't
18    hear you.  Could you repeat the last part.
19              THE WITNESS:  That she also noted that law
20    enforcement would attend the autopsy.  I'm sorry, I
21    have a little bit of laryngitis thanks to my
22    grandkids.
23         Q     (By Ms. Lavin) Ms. Gudes, the night that
24    you took photos of Maria Gallegos, you didn't see
25    the bullet hole that actually caused her death; is
```

1    that right?

2         A.    She had very thick hair and I could feel a

3    lot of blood and things under her hair but I could

4    not see it without shaving her head.

5         Q.    The field investigation notes that I am

6    looking at don't indicate that her hair caused any

7    visibility problems.  Would that surprise you to

8    know that that is not in your report?

9         A.    Actually I think my report does say that

10   she had very thick hair which was tied back.

11        Q.    Now Mr. Nayback asked you some questions

12   about whether or not, what her belongings were that

13   she had on her.

14              Did Ms. Gallegos have a backpack?

15        A.    No, she did not.

16        Q.    Did she have a blanket?

17        A.    No.

18        Q.    Did she have any luggage?

19        A.    No.

20        Q.    Did she have an ID?

21        A.    No, she didn't.

22        Q.    Did she have any credit cards?

23        A.    No.

24        Q.    She had a flashlight, didn't she?

25        A.    It was a small glow flashlight.

1      Q.    And the only money she had on her was a

2  dollar and some change; is that right?

3      A.    I remember the pennies, I don't remember

4  the dollar.

5      Q.    You took photos of the belongings that she

6  had in her pockets that night; is that right?

7      A.    Yes, I did.

8      Q.    If you saw a photo that you took or a

9  couple of photos, would that refresh your

10 recollection as to what she had on her?

11     A.    Yes, it would.

12           MS. LAVIN:  Permission to approach?

13           THE COURT:  You may.

14           MS. LAVIN:  Now --

15           MR. NAYBACK:  We are going to object to

16 the photos.

17           (Whereupon a Bench discussion was held

18 outside the hearing of the jury.)

19           THE COURT:  What are the photos, the

20 contents of the pockets?

21           MR. NAYBACK:  There is an orange drug cap

22 that the Court has excluded from evidence,

23 potentially holding drugs, potentially holding

24 drugs.  That is calling into question that the Court

25 has expressly kept out of evidence.

1          MS. LAVIN:  Your Honor, she opened the
2    door.  They asked if she had questions.
3          MR. NAYBACK:  I didn't reopen the door.
4    All we asked about, you remember you sustained a
5    leading question.  I was trying to get just to
6    weapons and --
7          THE COURT:  So I sustained a leading
8    question, so you are not supposed to lead.
9          MR. NAYBACK:  I don't think I opened the
10   door by asking of burglary tools to showing
11   paraphernalia that the Court specifically kept out.
12         THE COURT:  The Court makes evidentiary
13   rulings, but if somebody opens the door, then the
14   evidentiary rulings kind of fall by the wayside.  I
15   don't know what is in somebody's pocket, so if you
16   ask what was on her, I am not really sure you asked
17   about what she had in her possession.  You asked
18   about things that were in her possession.
19         MR. NAYBACK:  They are suggesting that she
20   was a danger and breaking into a trailer, so I think
21   it is relevant that we ask about weapons.
22          THE COURT:  Of course, yes.
23         MR. NAYBACK:  I don't think it opens the
24   door to drug paraphernalia, something that the Court
25   said was improper character evidence.

1          THE COURT:  I think if she had drug
2   paraphernalia on her person and so you're right, the
3   Court ruled before that her drug history would not
4   come in.  I don't think it is relevant, but when it
5   is in a way misleading the jury now they don't get
6   to see what all was on her person, I don't have
7   any -- I don't have the knowledge of all the
8   evidence that you-all have, and so if this was
9   something that was going to be an issue it would
10  have been better between -- it would have been
11  brought to the Court's attention specifically before
12  this.
13          You know, if somebody had told me, if
14  these pictures would contain photos of drug
15  paraphernalia we could have talked about it.  But
16  now I am concerned that with the information that
17  was elicited about what was in her possession, now
18  the defendant should be then given the opportunity
19  to fully answer the question.
20          It is time for us to take a break.  Let me
21  just, let's take an afternoon recess and let me just
22  think about it for a minute because I do feel that
23  the door was opened but I am going to think about it
24  a little bit and see.  Was there something else?
25          MS. WILSON:  I don't think those were on

the Defendant's Exhibit list at all.

        MS. LAVIN:  We are not trying to get these in as exhibits, Your Honor.  I think another issue, the prosecution is trying to suggest that she was there for some sort of legal purpose and regardless, if the door was open --

        THE COURT:  Let's just back up a second. You were at the point where you wanted to show the photos to the witness.  You were not at the point where you were offering them into evidence.

        MS. LAVIN:  Exactly.

        THE COURT:  And the objection was you didn't want the witness to identify the photo and talk about the contents.

        MR. NAYBACK:  That is right.

        THE COURT:  Okay.  Thank you.

        (Whereupon the following proceedings were held in Open Court.)

        THE COURT:  I normally take an afternoon recess at 3:10, take about a 15-minute break, so by the time we concluded this sidebar it is time for our break.

        So Yvonne will give you instructions and let you know where you can go, if you need to.  Is it downstairs, so second floor, but we will be back

1   in the courtroom in about 15 minutes, all right.

2             (Whereupon the jury exited the courtroom.)

3             (A recess was taken.)

4             (Open court, outside the presence of the

5   jury.)

6             THE COURT:  Before we bring the jury in,

7   let me just say that I did say that I believe the

8   Government opened the door on that particular issue.

9             And I did review the question on the

10  realtime and I am satisfied that the door was

11  opened.  The question was asked, "When you arrive at

12  a scene what do you check on the decedent's person?"

13            The answer was, "I check pockets and if

14  carrying a purse, check that."

15            So I will allow the question about the

16  photograph that has not been offered into evidence,

17  that the defense does not intend to offer into

18  evidence.

19            So I am not saying that the door has been

20  opened on all matters involving her drug history, I

21  am simply saying that this particular question

22  opened the door, the question about what do you

23  check on the decedent's person and the answer, "I

24  check pockets," allows the question about what was

25  in her pockets.

1                    Are we ready for the jury?

2                    MR. NAYBACK:  Real quick, Your Honor.

3                    Judge, I just want to raise one issue.

4    You had us changing our exhibit and indicating we

5    could probably get it done overnight.  The witness

6    we are calling, we have two photographer -- you see

7    we are moving along fairly quickly.  We have two

8    photographers and then Byron Abeyta is the logical

9    order and has been our order for a while.

10                   We don't have the recording yet.  I was

11   wondering if the Court would entertain breaking

12   after two photographers, it might be 4:30, it might

13   be 4:45, 4:15, or do you require us to grab a

14   witness out of order?

15                   THE COURT:  We will see what time it is.

16   If it is 4:15 I would like to get a little bit more

17   done.  If it is 4:30, 4:45, then we can break for

18   the day.

19                   MR. NAYBACK:  Thank you.

20                   THE COURT:  Just a reminder, this is being

21   streamed and so your conversations are being picked

22   up by the microphone.

23                   (Whereupon the jury entered the

24   courtroom.)

25                   (Whereupon the following proceedings were

1    held in Open Court.)

2             THE COURT:  Please be seated.

3             When we broke, Ms. Lavin was

4    cross-examining the witness, and so you may continue

5    your cross-examination.

6             MS. LAVIN:  Thank you, Your Honor.

7        Q.   (By Ms. Lavin) Ms. Gudes, I had asked you

8    if reviewing a couple of photos that you took of the

9    contents of Maria Gallegos' pockets would refresh

10   your recollection, and you indicated that they

11   would.

12       A.   Yes.

13            MS. LAVIN:  Permission to approach the

14   witness, Your Honor?

15            THE COURT:  Yes, you may.

16       Q.   (By Ms. Lavin) Ms. Gudes, once you have had

17   the opportunity to look at those photos, let me

18   know.

19       A.   Yes, ma'am.

20       Q.   So after looking at those photos do you

21   now recall what the contents of Ms. Gallegos, or

22   what those things were in the photos that you

23   photographed that you found on her person?

24       A.   Yes, but I didn't take this photo.  This

25   photo was taken by OMI when they do the autopsy.

```
 1    They probably found a few extra things in her
 2    pockets.  Many times when I am looking at the scene
 3    I may not get every single pocket and that is why I
 4    didn't recall the dollar bill.  Here is a dollar
 5    bill, no dollar bill there (indicating).
 6         Q.    Okay.  So you took one of those photos,
 7    right?
 8         A.    Yes, ma'am.
 9         Q.    Okay.  So what did you find?
10         A.    I found three pennies.
11               MR. NAYBACK:  Objection, Your Honor.  Can
12    I object and ask for clarification as to which photo
13    the witness took and I would also object to her
14    commenting on a photo that she didn't take.
15               MS. LAVIN:  I can collect the photo that
16    she didn't take.
17               THE COURT:  All right.  That is fair
18    enough.  So --
19         Q.    (By Ms. Lavin) So based on your review of
20    the photo that you took, Ms. Gudes, what do you
21    remember finding on Ms. Gallegos?
22         A.    I remember the three pennies.  I didn't
23    find the dollar bill.  Looking at this thing, there
24    also a ChapStick.  It looks like a cap from a small
25    syringe, and I am truly not sure what that item on
```

1    the left is.

2        Q.    (By Ms. Lavin) Okay.  And in your report

3    you indicated that there were two caps from a small

4    syringe; is that right?

5        A.    Yes.

6        Q.    Okay.  Thank you.

7              MS. LAVIN:  I will come and grab that

8    photo.

9        Q.    (By Ms. Lavin) So I want to go back when

10   you first arrived on the scene, Ms. Gudes.  You said

11   it took about 40 minutes to arrive or so since you

12   live some distance from Espanola?

13       A.    It would have been more than 40 minutes.

14       Q.    More than 40 minutes.  Okay.  So when you

15   arrived there were already a lot of law enforcement

16   officers on the scene; is that right?

17       A.    There was at least two law enforcement

18   officers on the scene, I wouldn't say a lot.

19       Q.    Okay.  They had been walking around the

20   property?

21       A.    Yes.

22       Q.    And you mentioned earlier that you weren't

23   able to find any footprints?

24       A.    Not, not footprints.  One of the law

25   enforcement officers and I looked, and I think they

1    actually think it was later that afternoon when I

2    came back in daylight that I believe it was

3    Officer Cody Martinez and I tried to figure out

4    where she came from.  Neither one of us are good

5    trackers.

6        Q.    So it was too dark when you arrived on

7    scene to look for footprints; is that right?

8        A.    Yes, that night it was.

9        Q.    Okay.  And so the reason you came back

10   later that afternoon was because it was really too

11   dark to do any investigation on the property?

12       A.    Not that it was too dark to have an

13   investigation, but I was bothered by the fact that I

14   couldn't figure out what had happened.

15       Q.    What do you mean by that?

16       A.    There were a lot of -- there was that

17   shed, there were plants growing on the fence, there

18   wasn't a good line of sight from where law

19   enforcement told me Mr. Smith had been standing.

20   But law enforcement had already moved the shells and

21   so I only had a vague idea of where things had been

22   and I was trying to understand in my mind just what

23   had gone on.

24       Q.    I understand.

25            MS. LAVIN:  If I could just have a moment,

1    Your Honor?

2             THE COURT:  You may.

3             MS. LAVIN:  Those are all the questions I

4    have for Ms. Gudes.  Thank you.

5             THE COURT:  Redirect, Mr. Nayback?

6             MR. NAYBACK:  Briefly, Your Honor.

7                   **REDIRECT EXAMINATION**

8        BY MR. NAYBACK:

9        Q.    Investigator Gudes, you were shown some

10   photographs by defense counsel of, it looks like a

11   shed on the hotel property, motel property.

12             Defendant's Exhibit B19, I believe, was

13   admitted.  I just want to publish it.

14             You were testifying earlier that it was

15   very dark?

16       A.    Yes, sir.

17       Q.    How did you go about obtaining this

18   well-lit photograph of a shed on the motel property?

19       A.    Flash of my camera.

20       Q.    Did you notice whether from were any patio

21   lights or any other lighting from the perspective

22   where you were standing in this photo?

23       A.    I don't recall.  I have a vague idea, the

24   officers may have helped with their flashlights, but

25   I am not certain.

1    Q.    Thank you.  But you are suggesting, in

2    this photo anyway, you used a flashbulb to increase

3    the lighting, correct?

4    A.    Yes, sir.

5    Q.    Then I want to point out a couple of other

6    things in Defendant's Exhibit B19.

7          Do you see those lights there?

8    A.    Yes, sir.

9    Q.    Are those from the other side, if you

10    know, are those from the other side of the driveway

11    where that red car was pictured?

12    A.    I don't, I am not certain but I believe

13    they are.

14    Q.    Did you open the door to the motel shed or

15    was it already opened when you photographed it?

16    A.    It was already opened.

17    Q.    Was there a -- can you describe how this

18    shed, how it was in the area such as a backyard, how

19    is it demarcated?  Were there any structures that

20    created a backyard of sorts to your recollection?

21    A.    Yes.  There is a kind of a metal fence

22    around the yard of the house.  And that fence is,

23    that shed is the yard side of the fence but there is

24    definitely a kind of like a garden fence, maybe

25    4 feet high or so and wire.

1      Q.    And, Investigator, on this photograph can

2   you demarcate on your screen where you would

3   estimate Ms. Gallegos' body to be?

4           MS. LAVIN:  Objection, speculation.

5           THE COURT:  If you know, you can answer.

6      A.    I am a little vague on it, but I think it

7   is somewhere -- well, of course it would be ground

8   level, but it is back behind the shed and the other

9   side of the fence that has a lot of plants growing

10  on it.

11     Q    (By Mr. Nayback) You were asked some

12  questions by me and by the defense counsel about

13  what you found on Ms. Gallegos.

14     A.    Yes, sir.

15     Q.    And you indicated you had taken one of the

16  photos but OMI must have taken the other one,

17  correct?

18     A.    Yes, sir.

19     Q.    You mentioned a syringe cap; is that

20  right?

21     A.    Yes, just a cap.  And by the way, if I may

22  add, the reason I am certain OMI took the other one

23  is because they used a scale and I see the scale in

24  their photo.  I did not have a scale at the scene.

25     Q.    Did you find a syringe?

```
1        A.    No, I did not.

2        Q.    Do you know whether Ms. Gallegos was

3   diabetic?

4        A.    No idea.

5             MS. LAVIN:  Objection, speculation.

6             THE COURT:  She already answered the

7   question, but I was going to allow the question, if

8   she knew the answer, so thank you.

9             MR. NAYBACK:  Pass the witness,

10  Your Honor.

11            THE COURT:  May this witness be

12  permanently excused?

13            MR. NAYBACK:  She may.

14            THE COURT:  Thank you for your testimony.

15            (Whereupon the witness was excused from

16  the courtroom.)

17            MR. ELSENHEIMER:  Your Honor, may we

18  approach.

19            THE COURT:  Yes.

20            (Whereupon a Bench discussion was held

21  outside the hearing of the jury.)

22            MR. ELSENHEIMER:  At least my review of

23  the medical records does not indicate anything that

24  suggests that Ms. Gallegos had diabetes at all, and

25  I think the Government has now introduced a
```

1   suggestion that she used the syringe for diabetes.

2   I think that opens the door to her history to the

3   fact that she had morphine in her system, at the

4   very least morphine in her system.  There is also

5   alcohol in her system and I don't think that is

6   within the scope of what they have opened the door

7   of, but by suggesting that the syringes could be

8   from diabetes, when I don't think there is any

9   records that she has diabetes, at least that I can

10  see there is no testimony from Dr. Cain, that opens

11  the door to the morphine in her system.

12          THE COURT:  So who is your next witness?

13          MR. NAYBACK:  We are going to call Tammy

14  Peter.  She is a FBI photographer.

15          THE COURT:  Is this going to come up with

16  the next witness, the diabetes?

17          MR. NAYBACK:  No.

18          THE COURT:  I would rather get to the

19  testimony.  You have alerted us to that, but I don't

20  want to keep the jury waiting.  So what I would like

21  to do is get through testimony.  If we get to the

22  end of the day for, whatever, 4:30, whatever time,

23  we can take this issue up.

24          MR. ELSENHEIMER:  Could we ask that

25  Dr. Cain be kept here so that he can be recalled to

1  address that?

2          THE COURT:  He is the first witness that

3  we heard from.  Well, if it is not too late we can

4  try to do that.

5          MS. WILSON:  He actually has to testify in

6  Oklahoma in another murder trial, that is why we

7  called him first so he can catch the plane.  He is

8  likely at the airport now.

9          MR. NAYBACK:  I think we alerted the

10  defense counsel with that issue.

11          MS. LAVIN:  That is before they opened the

12  door.

13          THE COURT:  We haven't even decided that

14  they opened the door, but it sure sounds like you

15  did.

16          MR. NAYBACK:  I didn't get a chance to

17  respond.

18          THE COURT:  I said we are going to take

19  this up later.  I am giving you a hint of what I am

20  thinking, so be prepared.

21          (Whereupon the following proceedings were

22  held in Open Court.)

23          THE COURT:  The Government may call its

24  next witness.

25          MR. NAYBACK:  Thank you, Your Honor.  The

1    United States calls Tammy Peter to the witness

2    stand.

3              (Whereupon, the witness was sworn.)

4              THE COURT:  Before you begin, let me ask

5    you to give us your full name.  Spell your first and

6    last names for the record, please.

7              THE WITNESS:  Tammy Peter, T-A-M-M-Y,

8    P-E-T-E-R.

9              THE COURT:  Thank you.  You may proceed,

10   Mr. Nayback.

11                     TAMMY PETER,

12   **after having been first duly sworn under oath,**

13       **was questioned and testified as follows:**

14                  **DIRECT EXAMINATION**

15     BY MR. NAYBACK:

16       Q.    Ms. Peter, where do you work?

17       A.    I work for the Albuquerque division of the

18   FBI.

19       Q.    How long have you been with the FBI?

20       A.    Just shy of 25 years.

21       Q.    And what do you do for them?

22       A.    I am the photographer for the division.

23       Q.    And throughout your 25 years, have you

24   always served in that capacity or have you served in

25   other capacities?

1      A.     I have served in other capacities, and I

2    am also a member of the evidence response team.

3      Q.     Okay.  How large is the evidence response

4    team?

5      A.     We have 24 members throughout the State.

6      Q.     Are you familiar with an investigation

7    involving United States versus Douglas Smith?

8      A.     Yes.

9      Q.     And how did you get involved in that

10   investigation, if you recall?

11     A.     Initially a request came from the case

12   agent, Travis Taylor.

13     Q.     This was sometime after May 5th of 2018,

14   correct?

15     A.     Correct.

16     Q.     Okay.  Do you remember going -- do you

17   remember where you responded at Special

18   Agent Taylor's request?

19     A.     825 North Riverside, which is the Western

20   Winds Motel.

21     Q.     Okay.  Was it just you, Ms. Peter, or were

22   there other members of the team that were

23   participating that day?

24     A.     Other members as well.

25     Q.     Okay.  And what was your role?

```
1        A.    Photographer.
2        Q.    Okay.  What kind of camera do you use?  I
3   assume it is fairly high tech, but can you describe
4   to the jury the type of camera you use and the type
5   of photos you took at this location?
6        A.    We use Nikon DSLR cameras, which are
7   cameras that have interchangeable lenses.  On that
8   day I used what is called a fisheye lens as well as
9   a normal zoom.
10       Q.    Okay.  And how did you go about -- did
11  you -- how would you describe the property at the
12  Western Winds Motel?
13       A.    Well, it obviously had rooms, because it
14  is a hotel, but there was also a residence on the
15  back as well as some outer, outbuildings.
16       Q.    And how did you know where to, what agents
17  wanted photographed, I guess is what I am getting
18  after?
19       A.    Basically there was discussions through
20  the case agent as well as my other counterparts that
21  were there.
22            MR. NAYBACK:  May I approach the witness?
23            THE COURT:  You may.
24       Q    (By Mr. Nayback) Ms. Peter, I am showing
25  what you has been marked for identification as
```

1    Government's Exhibits 5, 6, 7, 8, 9, 10, 11, 12, 13,

2    14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26,

3    27, 28, 29, 30, 31, and 32.  Would you take your

4    time and look at these and let me know when you are

5    finished reviewing each photograph.

6        A.    (Witness complies.)

7        Q.    What are those photographs?

8        A.    Those are photographs that I took at the

9    scene.

10       Q.    Are they fair and accurate depictions of

11   the scene when you responded?

12       A.    Yes.

13       Q.    Do you recall which date you were there?

14       A.    I remember it was August of 2019.

15             MR. NAYBACK:  I move Government's

16   Exhibit 5 through 32, Your Honor.

17             MS. LAVIN:  No objection.

18             THE COURT:  No objection, 5 through 32 are

19   admitted.

20             (Exhibits admitted, Government's 5 through

21   32.)

22             MR. NAYBACK:  Permission to publish?

23             THE COURT:  You may.

24             (Whereupon Government's Exhibits 5 through

25   32 published to the jury.)

1    Q    (By Mr. Nayback) Ms. Peter, in Government's

2    Exhibit 5 can you describe for the jury what

3    direction you are looking in and maybe where your

4    tripod was located on the motel property?

5    A.    So the tripod would be just outside of

6    where the front door would be, and this view is to

7    the southwest for the most part.

8    Q.    And just for clarification, you said front

9    door, front door of which building?

10   A.    So what would be considered the residence

11   to the west of the motel or on the west side of the

12   motel.

13   Q.    In Government's Exhibit 6 is your tripod

14   in the same location or in a slightly different

15   position?

16   A.    A slightly different position.  It is now

17   more to the south from the original position.

18   Q.    And looking straight out from the photo,

19   what do you see -- first of all, can you describe,

20   is there a fence in that photo?

21   A.    Yes.

22   Q.    And you can make demarcations on the

23   screen in front of you.  Can you point that out for

24   me, please?

25   A.    This is what I would consider the fence

1    (indicating).

2        Q.    And then beyond the fence what do you see

3    in that photograph?

4        A.    A trailer.

5        Q.    Is the trailer affixed or mobile, if you

6    know?

7        A.    I believe it can be moved, yes.

8        Q.    And in Government's Exhibit 7, which

9    direction is the jury looking here?

10       A.    Now they are looking to the north.

11       Q.    Okay.  And you described where your tripod

12   was earlier in those earlier photographs.  If you

13   recall, can you show the jury where your tripod was,

14   at that point?

15       A.    So right in this area (indicating), but

16   obviously a little bit further back.

17       Q.    Okay.  And then earlier you were talking

18   about a front door.  Can you point out which door

19   you were referring to?

20       A.    (Indicating.)

21       Q.    And how did you describe that door, if you

22   know?

23       A.    I referred to it as the front door, yeah.

24       Q.    To the hotel?

25       A.    To the residence.

```
 1        Q.    In Government's Exhibit 8 earlier I was

 2   asking you if there was a fence and in this, can you

 3   describe for the jury the absence of the fence and

 4   what is in that location, if you recall, or can you

 5   describe where the fence line is and when it stops?

 6        A.    Like right in this area (indicating).

 7        Q.    And then where you don't see the fence,

 8   what is there?

 9        A.    So initially you obviously walk out, but

10   then further is like a carport.

11        Q.    Thank you.

12              Ms. Peter, looking out the gate there, and

13   you're referencing a carport.  Was it clear to you

14   where the motel property stopped and started?

15        A.    No.

16        Q.    Is this a different vantage point from

17   essentially the same view?

18        A.    Yes.

19        Q.    What is the jury seeing in Government's

20   Exhibit 11?

21        A.    Again, this would be what I referred to as

22   the front door of the residence.

23        Q.    In this photo what is the jury seeing?

24        A.    This is the steps coming out from that

25   door on to like the patio area.
```

1    Q.    Did you have any knowledge about, for

2  example, where shell casings were located?

3    A.    No.

4    Q.    Were you asked to photograph the door and

5  the porch specifically?

6    A.    No.

7    Q.    Now what vantage is the jury looking

8  toward in Government's Exhibit 13?

9    A.    This is more to the south.

10    Q.    And in 14 it is not clear to me what angle

11  you are looking at.  Can you describe what the jury

12  is seeing in this photograph?

13    A.    So this is actually from the trailer and

14  this is pointing to the residence, so now you would

15  be going to the northeast.

16    Q.    And is the trailer in Government's

17  Exhibit 14 the same trailer you were pointing out in

18  earlier photos?

19    A.    Yes.

20    Q.    Are there any other travel trailers around

21  there, to your knowledge?

22    A.    No.

23    Q.    In Government's Exhibit 15 if you can see

24  it, can you circle where the door to the residence

25  is.

1        A.      (Witness complies.)

2        Q.      And, if you know, where is the motel

3   parking lot or driveway?

4        A.      (Indicating.)  You can actually drive in

5   here, too, but initially there is an area to park

6   beyond that.

7        Q.      Okay.  And in Government's 15 there is a

8   red vehicle parked outside one of the rooms.  While

9   you were on location did you happen to see whether

10  there were any tenants at the motel?

11       A.      There was one person, yes.

12       Q.      Can you describe, if you recall, where is

13  your tripod in this photo and what direction is the

14  jury looking?

15       A.      So, again, I am just a little back from

16  that mark.  You are now pointing to the south.

17       Q.      And off, I am just going to make a mark

18  here.  And this area right here (indicating), is

19  this also part of the motel, if you know?

20       A.      Yes.

21       Q.      In Government's Exhibit 17 this seems to

22  be a different vantage point.  Can you describe

23  maybe, if you know, where your tripod is at and the

24  direction the jury is looking?

25       A.      So now the direction that you are looking

1    is to the west and again tripod will be in this area

2    (indicating).

3        Q.    And is this the carport you were referring

4    to?

5        A.    Yes.

6        Q.    Do you know whether that belonged to the

7    defendant, Mr. Smith, or who that belonged to?

8        A.    No.

9        Q.    And, again, could you tell while you were

10   out by this travel trailer and this carport where

11   the motel property started and stopped?

12       A.    No.

13       Q.    What about these, it looks like some homes

14   down in this area (indicating).  Were you intending

15   to capture those in your photo?

16       A.    No.  I mean you are going to, but that is

17   not my intention, no.

18       Q.    And is that trailer that the jury can see,

19   is that to the southwest of the motel?

20            Does that sound right to you or is that

21   correct?

22       A.    So you are talking about this trailer

23   (indicating)?

24       Q.    I'm sorry, no.  I'm sorry, Ms. Peter, that

25   is my mistake.

```
 1              This trailer down that I demarcated in
 2   blue, is that south, southwest of the travel trailer
 3   in the motel property?
 4        A.    I would say it is more west.
 5        Q.    Very well.
 6              In Government's 18 can you describe what
 7   the jury is looking at here?
 8        A.    So now are you actually looking back to
 9   the direction of the residence from outside of the
10   fence line.
11        Q.    In Government's 19 from left to right can
12   you describe what the jury is seeing, from the left
13   of the photo that you are looking at on the screen?
14        A.    So, again, you are seeing part of the
15   residence and then the fenced area and then the void
16   or the area between the trailer and the fence.
17        Q.    And this (indicating), is part of the
18   motel here, correct?
19        A.    Correct.
20        Q.    Is that part of the motel, is that where
21   you saw the tenant?
22        A.    Yes.
23        Q.    Government's Exhibit 20, what were you
24   photographing here?
25        A.    So this is the opposite side of that
```

1    motel, so this would be to the east.  This is more

2    in, like, the parking area and then, you know,

3    entering in.

4         Q.    Okay.  And what does that orange sign read

5    that you are taking a picture of right there?

6         A.    "Private property."

7         Q.    And do you know if that sign was there on

8    May 5th of 2018?

9         A.    I do not.

10         Q.    Government's 21, can you point out in that

11    red car, if you know, while you were present,

12    Ms. Peter, and something that you saw with your own

13    eyes where was the resident living, if you know?

14         A.    Basically perpendicular to that car.  It

15    would be more in this area (indicating).

16         Q.    Very well.  And this gate, do you know if

17    that was present on May 5th of 2018?

18         A.    No.

19         Q.    You didn't respond to the scene on May 5th

20    of 2018, correct?

21         A.    I did not.

22         Q.    What is the jury seeing here in

23    Government's 22?

24         A.    So you are seeing another part of the

25    hotel.  This is the part that actually faces the

1    street.

2        Q.    Is that 826 Riverside Drive?

3        A.    Yes.

4        Q.    And just pointing out in Government's 22,

5    this gate over here (indicating), do you know

6    whether that was present on May 5th of 2018?

7        A.    No.

8        Q.    And is this further, from Government's 22

9    is this just simply a vantage point further right in

10    Government's 23?

11        A.    Correct.

12        Q.    What can you see here in this photograph,

13    Ms. Peter?

14        A.    So another entry point into the motel.

15    The address is obviously different.  It is now 826,

16    and a closed sign and again another possible private

17    property sign off to the right.

18        Q.    I take it your answer is the same, you

19    don't know whether those signs were there on May 5th

20    of 2018?

21        A.    I don't.

22        Q.    Thank you.

23              I know you were working with some, you

24    mentioned earlier in your testimony that you were

25    working with some colleagues.  What were you

1    attempting to take a photograph in Government's 25?

2        A.    So this would be a view of an impact.

3        Q.    And, if you know, can you make a little

4    dot or circle the impact point with your finger on

5    the screen.

6        A.    (Witness complies.)

7        Q.    Is this a close-up?  Do I have it facing,

8    is it upside down or right side up, can you tell me.

9    Sideways?

10       A.    I can't for sure.  More than likely it is

11   probably the other way.  That way you can actually

12   read the label.

13       Q.    Is this a close-up of the impact point

14   that you were describing in Government's 25?

15       A.    Yes.

16       Q.    And Government's 27, what is the jury

17   looking at here?

18       A.    So another impact point but in a different

19   location.

20       Q.    Can you describe the location in relation

21   to like the travel trailer?

22       A.    So there was more than one shed, so this

23   would be the shed that would be the farthest to the

24   Southwest.

25       Q.    Okay.  And if you were standing in the

1    backyard where your tripod was, Ms. Peter, and you

2    just pointed out the impact point in

3    Government's 26, pointed that out to the jury, is

4    this impact point to the left or to the right of the

5    travel trailer?

6        A.    So if you are at the trailer it would be

7    to your left.

8        Q.    And is Government's Exhibit 28 a close-up

9    of that same impact point?

10       A.    Yes.

11       Q.    Government's 29, where was your tripod?

12       A.    So in this photograph it was actually me,

13   there is no tripod.  But I would be standing,

14   obviously, again in this area (indicating), just a

15   little further back.

16       Q.    What is the jury seeing, what are you

17   attempting to take a photograph of?

18       A.    So this will be what we consider a median

19   view of this area and then the things that are

20   around it.

21       Q.    And, Ms. Peter, did you discover these on

22   your own or did agents, did you have agents

23   assisting on the evidence response team that pointed

24   these impact points out for you?

25       A.    Yes.

1      Q.     And do you know, do you have a colleague
2   Theodore Chavez?
3      A.     Yes.
4      Q.     And what does he do?
5      A.     So he works with the firearms and
6   toolmarks unit at the FBI laboratory.
7      Q.     And you were working in coordination with
8   him, somewhat, to gather these photographs so he
9   could do his work; is that right?
10      A.     Yes.
11      Q.     And Government's Exhibit 30, is this
12   simply a close-up of Government's 29?
13      A.     Yes.
14      Q.     And it looks like the fenced-in area of
15   the motel or the residence, is this simply a
16   different vantage point?
17      A.     Yes.
18      Q.     Finally, Government's 32.  Can you point
19   out, or let me ask it this way:  If you know, do you
20   know where your tripod is at if you were using a
21   tripod?
22      A.     It is always just a little further back.
23      Q.     Okay.  And can you circle the impact point
24   on the travel trailer, if you see it in the
25   photograph?

1      A.    I can't see it in the photograph, although
2   I know it was in the general area of the end of the
3   trailer from here.

4      Q.    And if it is in the photograph, Ms. Peter,
5   what about that second impact point?  Can you see
6   the shed that you were describing?

7      A.    Yes.

8      Q.    Can you circle it?

9      A.    (Witness complies.)

10     Q.    Is that the shed that had the second
11  impact point?

12     A.    Yes.

13          MR. NAYBACK:  The Court's indulgence.

14          I pass the witness, Your Honor.  Thank you
15  for your indulgence.

16          THE COURT:  Cross-examination, Ms. Lavin?

17                    **CROSS-EXAMINATION**

18  BY MS. LAVIN:

19     Q.    Good afternoon, Ms. Peter.  My name is
20  Amanda Lavin, I represent the defendant, Douglas
21  Smith.

22          The photos that we just talked about that
23  you took, those were taken in August of 2019,
24  correct?

25     A.    Yes.

1        Q.    You were investigating an incident that

2    took place at 826 Riverside on May 5th, 2018?

3        A.    I don't know the exact date, but I know it

4    was May of 2018.

5        Q.    So by the time you went out to the scene

6    to take all of these photographs it was about

7    15 months after the fact; is that right?

8        A.    Yes.

9        Q.    Okay.  So you have no idea what the

10   property looked like in May of 2018?

11       A.    I don't.

12       Q.    So there is no way to know if the photos

13   you took in August of 2019 are an accurate

14   representation of what the property looked like back

15   in May of 2018; is that right?

16       A.    Not on my end.

17       Q.    Okay.  Thank you.

18             And these impact points that we talked

19   about, you have no idea when those impact points

20   were made; is that right?

21       A.    Not me, no.

22       Q.    Okay.  They could have been made before

23   May 5th, 2018; is that right?

24       A.    Sure, yes.

25       Q.    Or after?

1        A.    Well, yes.

2        Q.    Okay.  No idea when those were made.  And

3    we talked about the trailer camper where you

4    identified an impact point.  You said that that was

5    a trailer that could be moved around?

6        A.    Yes.

7        Q.    Okay.  So you don't know if it was in that

8    position that you photographed it in back in May of

9    2018?

10       A.    I don't.

11       Q.    Okay.

12             MS. LAVIN:  These are all the questions I

13   have.  Thank you.

14             THE COURT:  Do you have any redirect?

15             MR. NAYBACK:  I do not, Your Honor.  Thank

16   you.

17             THE COURT:  May this witness be

18   permanently excused?

19             MR. NAYBACK:  Permanently excused.

20             MS. LAVIN:  Your Honor, we would ask to

21   reserve all of the Government's witnesses.

22             THE COURT:  You are subject to re-call, so

23   thank you for your testimony this afternoon.

24             (Whereupon the witness was excused from

25   the courtroom, subject to re-call.)

1           THE COURT:  The Government may call its
2    next witness.
3           MR. NAYBACK:  The United States calls
4    Nathan Schwabedissen from the FBI.
5           THE COURT:  I'm sorry, we will have you
6    sworn in.  Could you stand, please.
7           (Whereupon, the witness was sworn.)
8           THE COURT:  And before we begin with your
9    testimony, I will ask you to give us your full name
10   and please spell your first and last names for the
11   record.
12          THE WITNESS:  Nathan Douglas
13   Schwabedissen, N-A-T-H-A-N,
14   S-C-H-W-A-B-E-D-I-S-S-E-N.
15          THE COURT:  And tell me one more time, how
16   do you pronounce your last name.
17          THE WITNESS:  Schwabedissen.
18          THE COURT:  Thank you.
19          You may proceed, Mr. Nayback.
20          MR. NAYBACK:  Thank you, Your Honor.
21
22
23
24
25

1                    NATHAN SCHWABEDISSEN,

2      **after having been first duly sworn under oath,**

3          **was questioned and testified as follows:**

4                      **DIRECT EXAMINATION**

5      BY MR. NAYBACK:

6      Q.    Mr. Schwabedissen, where do you work?

7      A.    Federal Bureau of Investigation.

8      Q.    How long have you been with the FBI?

9      A.    14 years.

10     Q.    What do you currently do for the FBI?

11     A.    I am an investigative specialist.

12     Q.    What does an investigative specialist do?

13     A.    I collect information for the agents on

14     their investigations, I type up reports on those,

15     and I also assist by taking photos.

16     Q.    Are you familiar with an investigation

17     involving Douglas Smith?

18     A.    Yes.

19     Q.    If you recall, how were you asked to be

20     involved in that case?

21     A.    A request was put in by the investigative

22     agent to our aviation coordinator to get some aerial

23     photos of a location, and the coordinator got me as

24     the photographer and took me up in the airplane to

25     take some photos.

1    Q.    Okay.  What location did you report to, if

2  you recall?

3    A.    We reported to the Western Winds Motel in

4  Espanola.

5    Q.    Okay.  Is that on 826 Riverside Drive?

6    A.    Yes.

7    Q.    Now, I assume that you're not both flying

8  the plane and taking photographs.

9          Do I have that right?

10    A.    That is absolutely correct.

11    Q.    How many other people in the plane with

12  you?

13    A.    Just the pilot.

14    Q.    Okay.  That is an FBI pilot?

15    A.    Correct.

16          MR. NAYBACK:  Can I approach the witness,

17  Your Honor?

18          THE COURT:  Yes, you may.

19          MR. NAYBACK:  Thank you.

20    Q.    (By Mr. Nayback) Mr. Schwabedissen, I am

21  showing you what has been marked for identification

22  as Government's 66 through 74, consecutively.

23          Will you take a minute to look at each of

24  those photos take your time and just tell me when

25  you are done?

1      A.    Okay.  (Witness complies.)  Okay.

2      Q.    Do you recognize those photos?

3      A.    I do.

4      Q.    What are they?

5      A.    They are stills taken from the video of

6  our aerial photography.

7      Q.    Are they fair and accurate depictions of

8  the location that you saw with your own eyes?

9      A.    Yes.

10     Q.    At 826 Riverside Drive?

11     A.    Yes, they are.

12           MR. NAYBACK:  Your Honor, I would move at

13  this time Government's 66 through 74 inclusive and

14  consecutive.

15           THE COURT:  Is there objection?

16           MS. LAVIN:  No objection.

17           THE COURT:  All right.  66 through 74 are

18  admitted.

19           (Exhibits admitted, Government's 66

20  through 74.)

21           MR. NAYBACK:  Thank you.

22           Permission to publish?

23           THE COURT:  You may.

24           (Whereupon Government's Exhibits 66

25  through 74 were published to the jury.

1       Q     (By Mr. Nayback) Mr. Schwabedissen, when

2    you were flying over Riverside Drive in Espanola,

3    did you notice anything about the traffic going

4    through the area?

5       A.    Yes.  Riverside Drive is one of the main

6    throughfares through Espanola and there is a lot of

7    traffic right there in the vicinity.

8       Q.    If you know the boundaries of the Western

9    Winds Motel, you can actually demarcate with your

10   finger on the screen in front of you.  Can you at

11   least show the front side at this point, the front

12   side of the property on the left-hand side of

13   Riverside Drive as you go north?  Can you make a

14   line there?

15      A.    Yes, right there (indicating).

16      Q.    Okay.  What is to the east of your line,

17   if you know, that building across the street from

18   the Western Winds Motel, do you know what that

19   establishment is?

20      A.    Yes, that is a Pizza 9, I believe.  It is

21   a restaurant.

22      Q.    Okay.  And then only if you know where the

23   property stops and starts, can you make a line

24   heading west that demarcates the Western Winds

25   Motel?

1    A.    I don't know exactly where the property

2    stops on the west.

3    Q.    Okay.  If you know, can you start the line

4    as to where the property line is?

5    A.    My understanding, is that just to the west

6    side?

7    Q.    Yes, please, heading west.

8    A.    Heading west would be around here

9    (indicating).

10    Q.    Okay.  I think you were just letting me

11    know that you don't really know where the property

12    stops and starts; is that right?

13    A.    Right.  To the west side I am not sure

14    where the line is there.

15    Q.    On the north side could you tell where the

16    property of the Western Winds Motel starts and

17    stops?

18    A.    I know there is a gate to the north.  I am

19    not sure if that gate is part of the Western Winds

20    property or it is not.

21    Q.    Okay.  Can you circle the gate that you

22    saw.

23    A.    Yeah, the gate is right here (indicating.)

24    Q.    Do you know if that gate was there on

25    May 5th of 2018?

1        A.    I do not know.

2        Q.    I am showing you Government's 67.  What

3    vantage point is the jury looking at here?  In other

4    words, what direction are they looking if they went

5    straight forward to the top of the photograph?

6        A.    They would be looking west.  We are on the

7    east side of the property.

8        Q.    Again, the red and white building, do you

9    know what that is?

10       A.    That is a KFC.

11       Q.    As you were flying over Riverside Drive,

12   did you notice other restaurants in and around that

13   area?

14       A.    Yes, there are a couple more restaurants

15   to the left of the KFC, to the south.  There is also

16   some on the opposite side of the street on the east

17   side of Riverside.

18       Q.    Thank you.

19             Mr. Schwabedissen, I am showing you

20   Government's 68.  Can you explain to the jury what

21   they are seeing in this photo and which way they may

22   be looking?

23       A.    So we are towards the north end of the

24   property looking south.  The top of the photo where

25   the car is, the parking lot, that is the KFC.

1           On the left side you have the Western

2    Winds Motel sign along Riverside Drive, and to the

3    right is the western edge of the motel.

4        Q.    And Government's 69, this looks like a

5    completely different vantage point.

6           Can you tell me about where the plane is

7    at and what we are looking at in this photograph?

8        A.    We are to the northwest of the property.

9    So, again, the top right corner is the KFC parking

10   lot.

11          The street in the top left, that is

12   Riverside to the east of the motel.

13          And the arrows are pointing to, the center

14   arrow is pointing towards the back of that

15   north/south running building of the motel.

16       Q.    I don't know if you were given any detail.

17   If you weren't, don't answer my question.  Did you

18   happen or were you trying to get a shot of either a

19   motel or a residence or did you know the difference?

20       A.    When I was given the mission it was the

21   Western Winds Motel.  I knew it was a motel, but I

22   did not know the exact purpose of the mission.  I

23   didn't know what photos I was looking for exactly.

24       Q.    Very well, thanks for being candid.

25          In Government's Exhibit 70 can you

1    describe what the jury is seeing and maybe relating

2    it to other photographs they have already seen?

3        A.     So here we are on the south end of the

4    motel.  So top right is the lot on the Riverside

5    Drive, area of the motel.

6              To the left we have the vehicles that were

7    parked in the back.

8              And there at the bottom is the KFC parking

9    lot once again.

10       Q.     Thank you.

11             And in Government's 71, Mr. Schwabedissen,

12   this looks like a slightly, maybe a higher or the

13   lens is kind of pulled back a little bit.  Can you

14   describe the direction and the items that you saw,

15   that you see in this photo?

16       A.     Yeah, it is zoomed out from the other

17   photos, to get a little more area.  So on the right

18   side of the photo you have Riverside Drive running

19   north/south.  We are on the south side of the motel

20   once again.

21             And got the KFC at the bottom and then you

22   have at least one, it looks like two residences on

23   the western side, at least two buildings on the

24   western end.

25       Q.     Can you circle those, Mr. Schwabedissen,

1    so the jury knows exactly what you are referencing?

2        A.    (Witness complies.)

3        Q.    Those look like private residences to you?

4        A.    Yeah, they look like houses to me, yeah.

5        Q.    Okay.  So again could you tell from the

6    airplane from your own eyes where the motel

7    property, where it stopped and started, as it

8    relates to these private homes behind there?

9        A.    My guess would be somewhere in this area,

10   (indicating).

11       Q.    You don't know whether the road was a

12   demarcation of the motel lot or not?

13       A.    I do not know.

14       Q.    Okay.  Can I ask you about while you were

15   up in the air was there any foot traffic in and

16   around that area that you happened to notice?

17       A.    Towards the end of our video time there

18   was someone that was walking east through the motel

19   towards Riverside.

20       Q.    In Government's 72 do you see that person,

21   if it is in the photograph, do you see the person

22   that you are referencing?

23       A.    Yes, I do.

24       Q.    Can you circle it on the screen?

25       A.    (Indicating.)

1      Q.    I assume, Mr. Schwabedissen, you don't

2   know who that person was?

3      A.    I do not.

4      Q.    Do you know if that person was confronted

5   by any of the motel employees for being on the

6   property?

7      A.    I don't know.

8      Q.    Other than this individual did you observe

9   foot traffic on Riverside Drive that day?

10     A.    As I recall, yes.

11     Q.    And in 73, it is not the clearest photo,

12  but can you describe what the jury is looking at in

13  this photo?

14     A.    So we are on the south end of the motel.

15  The building on the right side of the photo is the

16  north/south building of the motel.

17          The building on the bottom of the photo is

18  the one that runs east/west.

19          And then this is the tree that is directly

20  behind the north/south building and the vehicle, so

21  to the west of it.

22     Q.    Finally Government's 74,

23  Mr. Schwabedissen, can you describe for the jury the

24  vantage point that you are taking a photograph here?

25  Is this northwest?

1       A.    Yeah, we are to the southeast of the
2  property.
3       Q.    Okay.
4       A.    This photo of Riverside Drive.  There in
5  the bottom right corner the north/south building
6  running up to the north corner, to the upper right
7  corner of the photo and the KFC lot in the bottom
8  left.
9       Q.    If you know, Mr. Schwabedissen, is this
10  parking lot, is that motel parking lot or do you
11  know whose parking lot that belongs to?  Do you know
12  whether it is KFC or the motel parking lot?
13       A.    I don't know for sure but it appeared to
14  be part of the KFC.
15            MR. NAYBACK:  I will pass the witness,
16  Your Honor.
17            THE COURT:  Cross-examination, Ms. Lavin?
18                 **CROSS-EXAMINATION**
19       BY MS. LAVIN:
20       Q.    Good afternoon, Mr. Schwabedissen.  When
21  were you assigned to this case?
22       A.    I do not know the exact day.  The agent
23  contacted the aviation coordinator and when weather
24  permitted we flew, which was out towards the end of
25  August.

1      Q.    So the agent contacted the aviation
2  coordinator at the end of August of 2019?
3      A.    I don't know exactly which day, but, yes.
4      Q.    Okay.  So it wasn't until August of 2019
5  that you were asked to do anything in this case?
6      A.    To my knowledge, correct.
7      Q.    Okay.  So you were flying around in a
8  plane for about ten minutes in this area; is that
9  right?
10      A.    The recording was on for about ten
11  minutes.  We were overhead for a few minutes prior
12  to that making sure we were on the right property
13  before we started the video.
14      Q.    Okay.  And so you were just surveying
15  826 Riverside Drive, correct?
16      A.    Correct.
17      Q.    And the photo that we just saw showed that
18  that motel as having a totally empty parking lot.
19          Would you agree?
20      A.    I would say there was the one car but --
21      Q.    The one red car?
22      A.    Right.
23      Q.    During the time that you surveilled the
24  area did you see any cars coming and going?
25      A.    No.

1      Q.    Any activity at the front of the motel?

2      A.    No.

3      Q.    So the motel looked closed to you?

4      A.    It did.

5      Q.    Okay.  There is a wall between the KFC and

6   the Western Winds Motel.

7            Could you see that from the plane?

8      A.    Not that I recall, no.

9      Q.    Okay.  Had you ever visited 826 Riverside

10  Drive in Espanola prior to August 30th, 2019?

11     A.    No, I had not.

12           MS. LAVIN:  No other questions, thank you.

13           THE COURT:  Any you have any redirect?

14           MR. NAYBACK:  I don't, Your Honor.  Thank

15  you.

16           THE COURT:  May this witness be excused?

17           MR. NAYBACK:  On behalf of the

18  United States, yes.

19           MS. LAVIN:  That is fine, Your Honor, he

20  may be excused.  Thank you.

21           THE COURT:  All right.  So thank you for

22  your testimony and you are excused.

23           (Whereupon the witness was excused from

24  the courtroom.)

25           THE COURT:  So it is about 4:36.  Who is

1    your next witness?

2            MR. NAYBACK:  Byron Abeyta.  We discussed

3    earlier an exhibit that we were going to use with

4    him.

5            THE COURT:  You are not going to finish

6    his testimony by 5:00, correct?

7            MR. NAYBACK:  That's correct, Your Honor.

8            THE COURT:  All right.  So we will break

9    at this time for the day.  But before I let the jury

10   go, let me -- I am not trying to pin you down, but

11   are we on schedule would you say?

12           MR. NAYBACK:  I think we are ahead of

13   schedule.  I am happy to provide more detail but

14   maybe, you know, a couple of witnesses that are

15   longer, maybe five more witnesses, four more

16   witnesses.

17           THE COURT:  All right.  So ladies and

18   gentlemen of the jury, we are going to break for the

19   day.  And I am going to give you some instructions

20   every time we break, so you are going to probably

21   memorize these and get tired of hearing them before

22   too long.

23           But it is important that I remind you that

24   you should not discuss this case with anyone, not

25   with family members.  You are certainly free to let

1    people know, your family know that you are on jury

2    duty, but if they ask you any questions about the

3    details of the case or what the case is about you

4    should not discuss anything with anyone.

5            You should not, should there be any media

6    reports about this case, you should ignore them.

7    You should not pay attention to anything you might

8    hear, see, read in the media about this case.  You

9    should not do any independent research.  If you are

10   curious at all about the location where this event

11   happened, your curiosity must be satisfied by what

12   you see in this courtroom and not any independent

13   research.

14           Every now and then there may be people who

15   might be curious about a term, a word, a term that

16   was used.  Don't look it up in the dictionary.  I am

17   trying hard to cover anything that might be out

18   there that you might want to consult in order to

19   learn more about the case.

20           You should not report on social media

21   anything about this case.  And other than that, I

22   hope you are able to have a nice restful evening,

23   enjoy your evening.

24           My plan is to begin again tomorrow morning

25   at 9:00.  So Yvonne, as usual, will let you know

1    what time you should report.  And because this case

2    is moving pretty quickly, there are times that I

3    need to meet with the attorneys to talk about some

4    of the legal issues, jury instructions, for example.

5          So my hope is we are able to have these

6    discussions during our breaks or the lunch break or

7    at the end of the day.  But we may be getting,

8    because it is moving so quickly, I am going to ask

9    in advance for your patience.  I try not to keep the

10   jury waiting, but sometimes in trials it is just

11   part of the typical court day.  So bear with us.

12   Have a restful evening.  We will see you tomorrow

13   morning.

14          Please rise while our jury leaves the

15   courtroom.

16          (Whereupon the jury exited the courtroom.)

17          (Open court, outside the presence of the

18   jury.)

19          THE COURT:  Let me ask you-all to be

20   seated for a moment.  I want to revisit our sidebar

21   here, the reference to the syringe cap and then the

22   question about the syringe and then the question

23   about whether or not the decedent had diabetes, I

24   believe it was.

25          The defense has argued that the door has

1    been opened to elicit testimony about whether or not

2    the defendant, excuse me, the decedent was suffering

3    from diabetes.  I don't know where you-all plan to

4    go, but I did want to take it up before I get

5    Mr. Nayback's response.

6              I don't know what you have in mind.  The

7    medical examiner that we heard testimony from

8    earlier today is probably gone.  He had been

9    discharged and he had other obligations, so what are

10   you thinking?

11             MS. LAVIN:  Thank you, Your Honor.

12             I guess just as a practical matter we have

13   been in touch with Dr. Cain.  He is going to be on

14   his way back to Colorado, could come back tomorrow

15   morning.  He is available if the Court would allow

16   us to call him.

17             THE COURT:  He is available when?

18             MS. LAVIN:  Thursday.

19             THE COURT:  I don't know whether or not we

20   will be hearing from him, but all right.  And what

21   do you expect to go with his testimony?

22             MS. LAVIN:  Well, I mean, I think we, we

23   hadn't intended to elicit testimony about the drugs

24   that were in Ms. Gallegos' system, but now the

25   Government has put the idea out there that maybe

1    these syringe caps were for a needle that was to

2    inject, by saying, you know, do you know if she had

3    diabetes, the question is out there.

4         There is absolutely nothing in the

5    discovery that we have been provided that she was

6    diabetic.  That is just evidence that is not true.

7    So now I think it is highly prejudicial for that to

8    be in the jury's mind because it is an incorrect

9    assessment of the facts of the case.

10         In addition, I think as far as the

11   relevance as far as where we are going to go, at

12   this point it is mostly critical just to clarify

13   that, you know, she had syringes because she was an

14   IV drug user and the Government in the various

15   pleadings in the case indicates she was there for

16   some sort of innocuous purpose.  She was looking for

17   a room, what have you.

18         So I think that rebuts that evidence.  She

19   was under the influence of morphine, and so there

20   was morphine in her system.  And, you know, we are

21   not -- it is rebuttal evidence to the fact that they

22   put out there that she is a diabetic and that is

23   what the syringes are for.

24         THE COURT:  When I asked where you were

25   going, I meant what was the evidence that you were

1    looking for.  I guess it is what you just discussed,

2    the OMI, The toxicology report that discussed

3    morphine.

4                MS. LAVIN:  Discussed there was morphine,

5    codeine, hydrocodone, various substances that -- no,

6    excuse me, just morphine, I apologize and alcohol,

7    but I think Mr. Elsenheimer earlier stated that

8    morphine is really the only relevant substance.

9                THE COURT:  All right.

10               MS. LAVIN:  That is what they opened the

11   door to.

12               THE COURT:  All right.  Your response,

13   Mr. Nayback?

14               MR. NAYBACK:  I asked a question about

15   what they found on her person.  The Court ruled that

16   it opened the door to the needle caps.  And what I

17   was intending to elicit from Investigator Gudes was

18   that she didn't know what the needle caps were for.

19               I asked her if she knew she was diabetic

20   simply as an example.  And I think this is simply an

21   attempt by the defense to dirty up our victim as a

22   homeless IV drug user.

23               I thought when the Court was going to ask

24   them where they were going with it, like what is the

25   relevance.  I mean, she was standing outside of the

1    property and I don't know what codeine in her system

2    has to do with it.  I don't know how they are going

3    to argue that is what I am suggesting.

4            So I mean if the Court allows it in, we

5    will deal with it.  I know the victim's family was

6    very concerned about her getting dirtied up like

7    this.  It is kind of a classic defense tactic and we

8    know how to argue it.  I am not pushing back so

9    hard, but I don't think that the defense should be

10   allowed to get into her having morphine in her

11   system.  They haven't tied that orange cap to the

12   morphine in her system.  I was simply suggesting to

13   the investigator, do you know what this cap is for,

14   and she didn't.

15           THE COURT:  And that would have been fine

16   if you had stopped there, but then suggesting

17   something I do think opened the door for the defense

18   to rebut the suggestion that it was possibly to

19   treat her diabetes.

20           So I am not saying that that means that

21   the defense gets to go into the specifics of her

22   history, but I do think that it would be fair to the

23   defense to be able to rebut that point.

24           So I am not, I am not sure, I don't want

25   to, I don't want this to turn into something bigger

1    than it is.  I mean, I know that the relevance, if

2    these questions hadn't been asked we wouldn't be

3    talking about this in front of a jury.

4            So it is not, my ruling is not to be taken

5    as an invitation to completely canvass her history

6    and her use of drugs, it is simply because these

7    specific questions were asked and these specific

8    answers were given, and that is really all I want

9    you-all to focus on.

10           MR. NAYBACK:  The only thing I might add,

11   Your Honor, is it might lengthen the trial.  It

12   wouldn't be by long.  We have got some family

13   members that could talk about, who have been

14   interviewed and have talked about the victim's very

15   hard life as being homeless and we would be calling

16   them.  So it may lengthen the trial.  I know that

17   doesn't concern the Court, but I think that their

18   going into the morphine use allows us in our

19   rebuttal to have family talk about the victim's hard

20   life.

21           THE COURT:  We will see where it goes.  I

22   certainly didn't expect that we were going to be

23   having any of these conversations and so we will

24   just see where it goes.

25           MR. NAYBACK:  Okay.  Thanks.

```
 1              THE COURT:  Anything else before we break

 2   for the evening?

 3              MS. LAVIN:  No, Your Honor.  Thank you.

 4              MR. ELSENHEIMER:  No, Your Honor.  Thank

 5   you.

 6              MS. WILSON:  No, Your Honor.

 7              THE COURT:  9:00 tomorrow morning.  We'll

 8   be in recess.

 9              (Proceedings concluded at 4:48 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    REPORTER'S CERTIFICATE

2         I certify that the foregoing is a correct

3    transcript from the record of proceedings in the

4    above-entitled matter.  I further certify that the

5    transcript fees and format comply with those

6    prescribed by the Court and the Judicial Conference

7    of the United States.

8    Date:  June 15, 2021

9

10

11         _____

12                   PAUL BACA, RPR, CCR
                     Certified Court Reporter #112
13                   License Expires:  12-31-2023

14

15

16

17

18

19

20

21

22

23

24

25